**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>**SPIRIT AVIATION HOLDINGS, INC., *et al.*,**<br><br>Debtors. | Chapter 11<br><br>Case No. 25-11897 (SHL)<br>(Jointly Administered) |
| **SPIRIT AIRLINES, LLC,**<br><br>Plaintiff,<br><br>v.<br><br>**CSDS ASSET MANAGEMENT LLC, ZED AEROCAPITAL LLC, WIKERT INVESTMENTS COMPANY LLC, SRIYANTHA BENEDICT SIRIMANNE, CHRISTOPHER KELLER, GERALD GLASS, JIM IACONO, ZANDER FUTERNICK, and GARY LESNIK,**<br><br>Defendants. | Adversary Proceeding<br>No. 26-01102 (SHL) |

**EMERGENCY MOTION OF ZED AEROCAPITAL LLC, ZANDER FUTERNICK, JIM IACONO, AND GARY LESNIK TO DISSOLVE THE AMENDED TEMPORARY RESTRAINING ORDER [ADV. ECF NO. 15] AS TO THE ZED PARTIES**

ZED AeroCapital LLC ("**ZED**"), Zander Futernick, Jim Iacono, and Gary Lesnik (collectively, the "**ZED Parties**"), specially appearing and reserving all rights and defenses, move on an emergency basis under Fed. R. Civ. P. 65(b)(4), made applicable by Fed. R. Bankr. P. 7065, and paragraph 8 of the *Amended TRO*, for an order dissolving the *Amended TRO* in its entirety as to the ZED Parties. Per Local Bankr. R. 9013-1(a), no separate memorandum of law is submitted because the supporting authorities are set forth herein. In support, the ZED Parties state:

## PRELIMINARY STATEMENT

1. On October 21, 2026, Spirit Airlines, LLC ("**Spirit**") obtained an *ex parte* order freezing every dollar the ZED Parties own — without a word of notice to them or to their counsel,

whose identity Spirit had known since the day before and whose client Spirit had subpoenaed five days earlier.[1] The freeze is not limited to funds traceable to Spirit or to any sum certain. It reaches everything: ZED's operating accounts at Seacoast National Bank and JPMorgan Chase Bank, and all "assets, property, or funds within [the] ownership, possession, custody, or control" of an operating aviation finance company and three individuals. The TRO is so grossly overbroad that it even binds the ZED Parties' "attorneys" — undersigned counsel. And it does so retroactively, deeming the ZED Parties bound "since entry of the TRO" on October 14, 2026, when they were not defendants, had not been served, and had not been named in any pleading.

2. Procedurally, Spirit exploited the *ex parte* nature of its filings to violate all the fundamental, indispensable protections of Rule 65 – procuring the Amended TRO without a relevant affidavit or verified complaint, without the required attorney certification, without any finding of irreparable injury specific to the ZED Parties, and without explaining why notice to known, reachable counsel was excused. Its findings are boilerplate, carried over verbatim from an order directed at CSDS Asset Management LLC ("**CSDS**"). And the Court entered it before the Amended Complaint naming the ZED Parties was even on the docket.[2]

3. But what is on the docket — Spirit's own sealed documents — refutes Spirit on the merits. Spirit asks the Court to find that a bridge lender became a conspirator by doing the most ordinary thing a lender does: getting its own money back, under its own contract, after its borrower defaulted. ZED lent CSDS $46,350,000 under a February 16, 2026 Loan Agreement providing that the loan proceeds "shall at all times remain the sole and unencumbered property of the Lender and not subject to any claims by Borrower, *Spirit Airlines, Inc.* or any other person," and that

---

[1] Futernick Decl. ¶¶ 55-56 & Ex. G; Ex. 19.

[2] Compare Adv. ECF No. 15 (Am. TRO), with Adv. ECF No. 17 (Am. Compl.).

"neither this Agreement nor any other Loan Document is for the benefit of Spirit Airlines, Inc."[3] The February 13, 2026 Escrow Terms — signed by McAfee & Taft, the same escrow agent Spirit used — required that the funds be held "*solely to the order of the Lender*" and distributed "only... in accordance with the Lender's written instructions." [4] The money was ZED's from the day it was deposited to the day it came back.

4. It came back because CSDS defaulted. On March 30, 2026, CSDS signed a Forbearance Agreement "acknowledg[ing] and agree[ing] that the Loan Amount is due and payable to Lender . . . and that Borrower has failed to make repayment."[5] ZED forbore until 3:00 p.m. on April 17, 2026, leaving its funds in place pending the replacement financing CSDS said was coming.[6] When CSDS reported that $8,000,000 of that financing had arrived, ZED instructed the return of that amount, which the escrow agent wired on April 7; when the forbearance expired, ZED instructed the return of the $38,350,000 balance, wired April 17 — each time by Fedwire, to the Seacoast account ZED had disclosed at the outset.[7] ZED recovered not one dollar more than it deposited, and, apart from a single $1,000,000 payment, CSDS never paid ZED the fees it owed.[8]

5. Every one of those events occurred between February and April 2026 — openly, by traceable wire, under written contracts to which Spirit was not a party and which expressly disclaimed any benefit to Spirit. All of it preceded Mr. Sirimanne's April 20 declaration that Spirit says deceived it, the April 24 HFS Sale Order, any alleged Buyer default (July through October) — a breach Spirit has yet to establish — and, by six months, the October 14 TRO.[9] On Spirit's

[3] Loan Agreement § I.3 (Futernick Decl. Ex. B); Futernick Decl. ¶ 18.
[4] Escrow Terms §§ 2, 4 (Futernick Decl. Ex. C); Futernick Decl. ¶¶ 24-25.
[5] Futernick Decl. Ex. D.
[6] Futernick Decl. ¶ 38.
[7] *Id.* ¶¶ 26, 40-47.
[8] *Id.* ¶¶ 50, 52.
[9] Futernick Decl. ¶¶ 50, 53-54.

own authorities, conduct that predates an injunction cannot be "active concert or participation" in violating it.

6. Nor can Spirit claim it was kept in the dark about ZED. On February 14, 2026, CSDS's then-counsel emailed Spirit's financial advisor (FTI Consulting), Spirit's Associate General Counsel, and Spirit's bankruptcy counsel (Debevoise) a file titled "*ZED Wire 2.14.26 Activity Center Seacoast National Bank.pdf*" as "evidence of a wire . . . initiated this morning for $7.900,000."[10] FTI had already warned that the deposit structure "is not what was discussed." *Id.* Spirit accepted the late deposit anyway, asked no questions, designated CSDS the successful bidder on April 2, and obtained the Sale Order on April 24 in reliance on CSDS's sworn representations — representations ZED never made, never saw, and knew nothing about.[11]

7. Spirit's grievance, if it has one, lies with those who did. It lies with CSDS, which defaulted. It lies with Mr. Sirimanne, CSDS's guarantor and declarant. It lies with the escrow agent, which confirmed the "full balance" to Spirit while holding the same money "solely to the order of" ZED. And it lies with Spirit's own professionals, who learned in February that the deposit came from a ZED account and let the sale proceed anyway. It does not lie with a lender that held no equity in CSDS, negotiated neither the APA nor Spirit's escrow agreement, made no representation to anyone, and stood to earn a $200,000-per-aircraft success fee only if the deal closed.[12]

8. Even if Spirit could state a claim against ZED, the remedy it obtained is unavailable as a matter of law. Spirit seeks money damages from non-debtors and asserts no lien or equitable interest in any specific asset of the ZED Parties. The Supreme Court in *Grupo Mexicano* made

[10] Tobak Decl. Ex. E, Adv. ECF No. 18, at 13–15 (Ex. 10).
[11] Futernick Decl. ¶¶ 20, 36, 53.
[12] Futernick Decl. ¶¶ 31-36, 39.

clear that a federal court has no equitable power to freeze a defendant's assets pending adjudication of such a claim.[13] Relabeling a damages claim as "unjust enrichment" or an "accounting" does not change that result, and section 105(a) cannot supply power that Article III and the Civil Rules withhold.

9. Because that power is withheld, the Amended TRO should be dissolved in its entirety as to the ZED Parties. The ZED Parties expressly reserve all claims for wrongful restraint, damages, fees, costs, and sanctions arising from Spirit's misuse of the *ex parte* process.[14]

## JURISDICTION, VENUE, AND RESERVATION OF RIGHTS

10. The ZED Parties appear specially and solely to seek relief from the Amended TRO, and they dispute this Court's personal and subject matter jurisdiction over Spirit's claims against them. Nothing herein, or in their participation at any hearing, constitutes a general appearance, consent to jurisdiction or entry of final orders, or a waiver of any right, claim, objection, or defense, all of which are expressly reserved.

## BACKGROUND

### A. ZED Is a Bridge Lender and Lent CSDS $46,350,000 on Documented, Arm's-Length Terms.

11. ZED is an aviation finance company in the business of providing short-term, asset-backed financing.[15] ZED is not an equity holder, member, manager, partner, joint venturer, or affiliate of CSDS.[16] It shares no offices, employees, officers, bank accounts, or common control with CSDS.[17] ZED's relationship with CSDS was an arm's-length lender-borrower relationship,

---

[13] *Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 333 (1999).
[14] See Reservation of Claims, infra.
[15] Futernick Decl. ¶¶ 2-3, 30.
[16] *I*d. ¶ 31.
[17] *I*d. ¶¶ 31-32.

documented in writing, with a personal guaranty from CSDS's principal and an indemnity in ZED's favor.[18]

12. On February 13, 2026, ZED (as Lender), CSDS (as Borrower), and McAfee & Taft (as Escrow Agent) executed Escrow Terms and Conditions (the "**ZED Escrow Terms**") for "a short-term loan to be made by Lender to Borrower in connection with the Borrower's purchase of twenty (20) aircraft from Spirit Airlines."[19] ZED would deposit up to US$46,350,000 under the reference "*ZED AeroCapital* - *CSDS Asset Management* - *Spirit Aircraft Bridge Loan*," to be held "*solely to the order of the Lender*" and returned within three business days of ZED's written instruction.[20]

13. The Escrow Agent could distribute the funds "only . . . in accordance with the Lender's written instructions," "solely in accordance with the Lender's *unilateral* written instructions," and "to the same account from which it was received."[21] That account — ZED's account at Seacoast Bank, Stuart, Florida — was disclosed in writing, at the outset, to the same escrow agent Spirit used.[22] Mr. Iacono signed for ZED, Mr. Sirimanne for CSDS, and Maria Gonzalez for McAfee & Taft.[23]

14. Three days later, on February 16, 2026, ZED and CSDS papered the loan itself in a Delaware-law Loan Agreement and Promissory Note (the "**Loan Agreement**").[24] The Loan Amount of US$46,350,000, carrying a Loan Fee of US$4,635,000, "shall, at all times, be held in

---

[18] *Id.* ¶ 33.
[19] Futernick Decl. Ex. C § 1; Futernick Decl. ¶¶ 23-24.
[20] Futernick Decl. Ex. C § 2.
[21] *Id.* §§ 2, 4.
[22] Futernick Decl. ¶ 26.
[23] *Id.* ¶ 23.
[24] Futernick Decl. ¶ 15 & Ex. B.

escrow by the Escrow Agent *solely at Lender's order* until refunded by the Escrow Agent to Lender on the Payment Date."[25]

15. Refund was *automatic* on the earliest of "(a) March 30, 2026, (b) ***the date on which the Escrow Agent has received funds from a third-party lender in the Escrow Agent's account for the benefit of Borrower in an amount equal to or greater than the Loan Amount plus the Loan Fee***, and (c) within 3 Business Days of Lender's written demand."[26] The Loan Amount would "solely be used to evidence proof of funds" for CSDS's purchase of 20 Airbus aircraft from Spirit, and Section I.3 provides:

> Borrower hereby acknowledges and agrees that Borrower shall have no rights, title or interest in the Loan Amount and that the Loan Amount shall at all times remain the sole and unencumbered property of the Lender and not subject to any claims by Borrower, Spirit Airlines, Inc. or any other person. Borrower expressly warrants and represents that it has not and will not pledge or grant any security interest in the Loan Amount to Spirit Airlines or any other party and that Borrower has not and will not enter into any agreement purporting to convey or pledge the Loan Amount to Spirit Airlines, Inc. or any other person as security or partial payment of amounts owed in connection with the Aircraft Transaction . . . neither this Agreement nor any other Loan Document is for the benefit of Spirit Airlines, Inc. and shall not for any reason be deemed to be part of Spirit Airline's estate . . . nor subject to the Spirit bankruptcy proceeding . . . no consent or authorization from Borrower or any third-party (including, but not limited to Spirit Airlines, Inc.) will be required in order for the Escrow Agent to refund the Loan Amount . . . In no event will Lender have any obligation or liability in respect of the Aircraft Transaction and Borrower will indemnify and hold harmless Lender.

16. That language reflects the premise of the loan: CSDS represented to ZED that a more substantial lender would replace ZED's short-term funds, and no one — not CSDS, the Escrow Agent, or Spirit — told ZED that its loan was being used as Spirit's deposit or "full balance."[27] ZED is not a party to the APA or to Spirit's February 9, 2026 escrow agreement,

---

[25] Futernick Decl. Ex. B § I.1; Futernick Decl. ¶ 16.
[26] Futernick Decl. Ex. B § I.1.3.1; Futernick Decl. ¶¶ 17, 20 (emphasis added).
[27] Futernick Decl. ¶¶ 7-10, 20-21 & Ex. A.

negotiated neither, and never communicated with or made any representation to Spirit, its professionals, or this Court.[28]

**B. After CSDS's Default, the Escrow Agent Released ZED's Funds to ZED.**

17. CSDS did not repay the loan when due. In the March 30, 2026 Forbearance and Reservation of Rights Agreement (the "**Forbearance Agreement**"), CSDS "acknowledge[d] and agree[d] that the Loan Amount is due and payable to Lender as of the date hereof and that Borrower has failed to make repayment."[29] Though entitled to immediate repayment, ZED left its funds in escrow pending CSDS's replacement financing and forbore until 3:00 p.m. (New York time) on April 17, 2026, with Extension Fees of US$20,000 per day and late interest of 0.1% per day accruing.[30] ZED also bargained for a US$200,000 Aircraft Success Fee per Spirit aircraft CSDS acquired — a direct financial stake in CSDS closing, ***not*** in its collapse.[31]

18. Part of that replacement financing then appeared to arrive. On April 6, 2026, Mr. Iacono wrote to the Escrow Agent, copying Mr. Sirimanne, Mr. Lesnik, and Mr. Futernick: "Per Bens incoming wire and instructions, please wire $8m to our Seacoast Bank Account."[32] Mr. Sirimanne had represented that $8,000,000 had arrived from CSDS's new lender, so ZED requested only that amount and left the balance in escrow.[33] The wire went out April 7 (FEDR:20260407B6B7HU2R014507).[34] That day, at Mr. Lesnik's instruction, the Escrow Agent noted in its file that it was "NOT authorized to release funds from escrow unless we receive your

[28] *Id.* ¶¶ 34-36.
[29] Futernick Decl. ¶¶ 37-38 & Ex. D.
[30] Futernick Decl. ¶ 38 & Ex. D; Loan Agreement §§ I.1.3.4–1.3.5 (Futernick Decl. Ex. B).
[31] *Id.* ¶ 39.
[32] Futernick Decl. ¶ 40 & Ex. E.
[33] Futernick Decl. ¶ 43.
[34] *Id.* ¶ 42.

approval, along with the approval from either Jim or Zander" — ZED's internal control over its own funds.[35]

19. The balance followed when the forbearance expired. On April 17, 2026, Mr. Futernick requested the "return of all remaining funds from ZED Aerocapital's escrow today," noting that "Ben of CSDS is CC'd here for visibility and fully supports the plan for full capital return today."[36] Mr. Lesnik approved at 10:51 a.m., and Mr. Iacono authorized release at 12:13 p.m.[37] At 12:28 p.m., the Escrow Agent confirmed: "the starting balance was $46,350,000 USD. We sent $8,000,000 back to ZED on April 7 . . . The current balance in the escrow is $38,350,000." The wire went out that day (FEDR:20260417B6B7HU1R013607).[38]

20. The Escrow Agent's own figures confirm two points. First, it tracked a discrete "Zed AeroCapital escrow account" with a starting balance of exactly $46,350,000 — what ZED put in and what ZED took out.[39] Second, CSDS told ZED that its new lender was providing replacement funds, consistent with the take-out mechanism in Loan Agreement § I.1.3.1(b).[40]

21. ZED never requested, received, or directed any payment from Spirit's escrow; it received only its own $46,350,000 from its own escrow.[41] Other than a single $1,000,000 payment, CSDS never paid ZED the interest and fees it owed, and ZED is itself initiating legal action against CSDS for its default.[42]

22. Nor did ZED or its principals know of Mr. Sirimanne's April 20, 2026 declaration [Main Case ECF No. 966] or the April 24 HFS Sale Order until after this litigation began; they did

---

[35] Futernick Decl. Ex. E; *see also id.* ¶ 46.
[36] Futernick Decl. ¶ 45 & Ex. F.
[37] Futernick Decl. ¶ 46.
[38] Futernick Decl. ¶ 47.
[39] Futernick Decl. ¶¶ 47, 50.
[40] *Id.* ¶ 43.
[41] Futernick Decl. ¶ 51.
[42] *I*d. ¶ 52.

not review, were not consulted on, and provided no information for either.[43] By then, ZED's funds had been back for three days.[44]

### C. Spirit is Aware of Zed's Involvement by February 2026.

23. On February 13, 2026, FTI's Marc Bilbao wrote to CSDS's side that "this is not what was discussed even a few hours ago. There was to be a $20MM deposit today in addition to the $7MM in the account."[45] CSDS missed Spirit's February 12 deposit deadline. Spirit accepted a late deposit completed February 18.[46]

24. On February 14, 2026, at 15:23, CSDS's then-counsel transmitted to FTI, to Spirit's Associate General Counsel, and to Spirit's bankruptcy counsel a file named "ZED Wire 2.14.26 Activity Center Seacoast National Bank.pdf," described as "evidence of a wire that Jerry Glass caused to be initiated this morning for $7.900,000," to hit the Escrow Agent's account.[47] Thus, in February 2026, Spirit knew funds were arriving from a ZED account at Seacoast National Bank. Spirit did not inquire further.

25. Spirit designated CSDS the successful bidder on April 2, 2026, and obtained the HFS Sale Order on April 24, 2026.

### D. The TRO and Amended TRO.

26. On October 13, 2026, the Escrow Agent told Spirit's counsel that it was not holding any escrow funds, that "certain investors of CSDS had withdrawn the Escrow Funds," and that it believed "there were two additional escrow agreements executed with CSDS investors that they

---

[43] Futernick Decl. ¶ 53.
[44] *Id.* ¶ 54.
[45] Ex. 10.
[46] Ball Decl. ¶ 6 [Adv. ECF No. 4] (Ex. 11).
[47] Ex. 10.

suspected Spirit was unaware of, under which Spirit's Escrow Funds were likely released."[48] The Escrow Agent — not ZED — held both arrangements and confirmed the deposit to Spirit.

27. On October 14, 2026, Spirit filed an adversary complaint naming only CSDS [Adv. ECF No. 1] seeking $48,015,000 in Escrow Funds and alleging that funds were removed by "CSDS, or parties acting at its behest or under its control, or in combination with CSDS."[49] Spirit's TRO motion stated that the escrow funds "originated from entities that are investors in CSDS."[50] That characterization is wrong: ZED is a lender, not an investor. The Court entered the original *ex parte* TRO against CSDS the same day [Adv. ECF No. 2] (Ex. 14) (the "**TRO**").

28. On October 16, 2026, Spirit's counsel served a Rule 30(b)(6) deposition subpoena and document requests on ZED AeroCapital LLC at 500 S. Dupont Hwy, Dover, Delaware 19901, noticing a deposition for October 21, 2026 at 9:30 a.m. in Wilmington, Delaware. Ex. 19. Spirit plainly knew how to reach ZED.

29. On October 19, 2026, undersigned counsel advised Spirit's counsel, Davis Polk & Wardwell LLP, in writing that Cole Schotz P.C. represents ZED, and counsel met with Spirit's counsel by video conference on October 20, 2026.[51]

30. Nonetheless, Spirit filed a *Motion for an Order Amending and Clarifying the TRO on Sources of Escrow Funds*[52] (the "**Motion to Amend**") (Ex. 15), dated October 19 and noticed for hearing October 20 at 4:00 p.m., made expressly "ex parte without notice to the Additional Parties."[53] The Motion to Amend candidly admits that the relevant facts "were not known to the

---

[48] Ball Decl. ¶ 15 (Ex. 11).
[49] Compl. ¶ 69.
[50] Adv. ECF No. 3 ¶ 29 (Ex. 12).
[51] Futernick Decl. ¶ 56 & Ex. G.
[52] [Adv. ECF No. 16]
[53] Mot. to Amend ¶ 41.

Debtors on October 14."[54] It rests on "information and belief."[55] It concedes that the individual principals "are natural persons who may be required to spend assets to pay for their or their dependents' daily needs," and that Spirit is "willing to narrow the relief sought" upon an accounting and security. Id. ¶ 39. Its evidentiary support consists of two attorney declarations authenticating documents the Escrow Agent produced and filed under seal. Adv. ECF Nos. 18, 19 (Ex. 16).

31. Neither contains the certification required by Civil Rule 65(b)(1)(B).

32. On October 21, 2026, the Court "so ordered" the Amended TRO on the record at 3:01 p.m.; it was entered on the docket at 17:41 [Adv. ECF No. 15] (Ex. 17). The Motion to Amend was docketed at 18:01, the Amended Complaint at 18:13 [Adv. ECF No. 17] (Ex. 18), and the Tobak declarations at 18:22 and 18:27. In other words, when the Amended TRO was entered, the ZED Parties were not yet defendants in any pleading on this Court's docket.

33. The Amended TRO provides, at ¶ 3, that CSDS and those in active concert with it who receive actual notice are restrained. Paragraph 4 declares that ZED, Wikert, Sirimanne, Glass, Keller, Iacono, Futernick, Lesnik, "and their respective officers, agents, servants, employees, *and attorneys*" are, "and *since entry of the TRO have been*," Restrained Parties bound "as persons in active concert or participation with CSDS," and extends the restraint to "any assets, property, or funds within their ownership, possession, custody, or control, including but not limited to Zed's bank accounts at Seacoast National Bank and JPMorgan Chase Bank."

34. The Amended TRO contains no finding specific to any ZED Party. Its findings are generic — that transfers "***may*** frustrate the Court's ability to enforce its prior orders." (emphasis added). It does not describe the injury to be suffered from any ZED Party, does not state why that

[54] Id. ¶ 29.
[55] Id. ¶¶ 3, 6, 34.

injury is irreparable, and does not state why the order was issued without notice to counsel whom Spirit had met the day before.

35. To date, the ZED Parties have not been served with a summons and the Amended Complaint under Bankruptcy Rule 7004.[56] ZED first learned of the Amended TRO when ZED's aviation counsel received a copy by email and forwarded it to ZED; no one at ZED received any notice from Spirit or its counsel before the Amended TRO was entered that Spirit would seek to restrain the ZED Parties' assets.[57]

36. The Amended Complaint asserts against the ZED Parties the Third Claim (conversion), Fourth Claim (unjust enrichment), Sixth Claim (accounting), Seventh Claim (tortious interference with contract), and Eighth Claim (aiding and abetting fraudulent misrepresentation). The fraud claim itself is pleaded ***only*** against CSDS, Mr. Sirimanne, and Mr. Keller. Spirit does not allege that any ZED Party made any representation to Spirit or to this Court.

**LEGAL STANDARD**

37. A temporary restraining order is not a provisional judgment. It is a stopgap. The Supreme Court has held that ex parte temporary restraining orders "should be restricted to serving their underlying purpose of preserving the status quo and preventing irreparable harm just so long as is necessary to hold a hearing, and no longer."[58] Injunctive relief is "an extraordinary remedy never awarded as of right," and the movant must demonstrate that irreparable harm is likely — not merely possible.[59] The movant must make a "clear showing" of entitlement.[60]

---

[56] Futernick Decl. ¶ 55.
[57] *Id*.
[58] *Granny Goose Foods, Inc. v. Brotherhood of Teamsters*, 415 U.S. 423, 439 (1974).
[59] *Winter v. NRDC*, 555 U.S. 7, 22, 24 (2008).
[60] *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997); see also *In re Sledziejowski*, 533 B.R. 408 (Bankr. S.D.N.Y. 2015).

38. The four-factor standard is settled in this District and was recently restated by this Court: the movant must show (i) a likelihood of success on the merits, (ii) that it is likely to suffer irreparable injury absent relief, (iii) that the balance of hardships tips in its favor, and (iv) that an injunction is in the public interest.[61] The same criteria govern temporary restraining orders and preliminary injunctions.[62]

39. Federal Rule of Bankruptcy Procedure 7065 makes Rule 65 applicable in adversary proceedings. Under Rule 65(b)(4), a party subject to a temporary restraining order issued without notice may move to dissolve or modify the order on two days' notice, or on shorter notice set by the court. The court must then "hear and decide the motion as promptly as justice requires." Fed. R. Civ. P. 65(b)(4).

40. Critically, on a motion to dissolve under Civil Rule 65(b)(4), the burden does not shift. "On a motion to dissolve a temporary restraining order, the party that obtained the order bears the burden of justifying continued injunctive relief."[63] Spirit has never carried that burden as to the ZED Parties because it has never faced an adversary. Facing one now, it cannot carry it.

---

[61] *In re Sears Holdings Corp.*, 659 B.R. 236, 248 (Bankr. S.D.N.Y. 2024) (Lane, J.); accord *In re Purdue Pharma L.P.*, 666 B.R. 461 (Bankr. S.D.N.Y. 2024).

[62] *In re Keene Corp.*, 168 B.R. 285 (Bankr. S.D.N.Y. 1994).

[63] *Lapa v. JP Morgan Chase Bank, N.A.*, No. 21-CV-04737 (NSR), 2022 WL 3290677, at *2 (S.D.N.Y. Aug. 11, 2022) (citing *Granny Goose Foods, Inc. v. Teamsters*, 415 U.S. 423, 443, 94 S.Ct. 1113, 39 L.Ed.2d 435 (1974)); *accord Gilead Scis., Inc. v. Safe Chain Sols., LLC*, 684 F. Supp. 3d 51, 63 (E.D.N.Y. 2023).

## ARGUMENT

### I. The Amended TRO Was Wrongfully Obtained and Should Be Dissolved as to the ZED Parties Immediately.

#### a. The Amended TRO is Procedurally Deficient.

##### *i. Spirit Did Not File a Rule 65(b)(1)(B) Certification as to the ZED Parties, a Fatal Defect.*

41. Civil Rule 65(b)(1) permits a court to issue a temporary restraining order without notice "only if" two conditions are satisfied: (A) "specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition"; and (B) "the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required." Both are mandatory, which Spirit acknowledges in its moving papers.[64] Neither was satisfied here as to the ZED Parties.

42. ***First***, the Amended Complaint is unverified and silent as to any "immediate and irreparable injury, loss, or damage" before the ZED Parties could be heard. Worse, Spirit told the Court that the ZED Parties were "already restrained by the TRO entered by this Court on October 14."[65] Spirit cannot claim both that the original TRO already restrained the ZED Parties and that, despite it, Spirit faced injury so imminent that the ZED Parties could not be heard. Those positions are mutually exclusive. Mutually exclusive positions cannot satisfy Rule 65(b)(1)(A).[66]

43. ***Second***, whatever Spirit claims, there is no Rule 65(b)(1)(B) certification. The Tobak Declarations[67] authenticate documents produced by the Escrow Agent. They ***do not certify***

[64] (ECF #16 at ¶41).
[65] Adv. ECF No. 16 ¶ 29.
[66] ***See*** *Rabbi Jacob Joseph Sch. v. Province of Mendoza*, 342 F. Supp. 2d 124, 127 (E.D.N.Y. 2004) (vacating order "issued without notice to the attorney for the Defendant whose identity was known, without declaring in an affidavit or verified complaint that immediate and irreparable harm would result before the adverse party or his attorney could be heard in opposition").
[67] Adv. ECF Nos. 18, 19.

any effort to notify the ZED Parties or Cole Schotz, and they do not explain why notice "should not be required." The Ball Declaration[68] addresses notice to CSDS, ***not*** the ZED Parties. That omission is not ministerial; it alone ***requires*** dissolution.[69]

44. Nor can Spirit excuse the omission. Its professed concern that notice "would simply provide perverse incentives to transfer additional assets out of the reach of the Court or to fraudulently transfer them to third parties"[70] cannot be squared with its own counsel's meeting with ZED's counsel on October 20, 2026 — the day ***before*** it sought the Amended TRO. A party that genuinely fears dissipation does not alert its target and then withhold notice of the motion.[71] The concern was manufactured.

45. And the conduct Spirit complains of occurred ***six months earlier***, in the open: Fedwire transfers, with Fed reference numbers, to a Seacoast account ZED disclosed in writing to Spirit's own escrow agent.[72] A party that takes its money by traceable wire to an account it disclosed in advance is not a party that secretes assets on receipt of notice.

#### *ii. The Amended TRO Contains No Findings Satisfying Civil Rule 65(b)(2) and Violates Civil Rule 65(d)(1).*

46. Civil Rule 65(b)(2) requires that an order issued without notice "describe the injury and state why it is irreparable" and "state why the order was issued without notice." The Amended TRO does neither as to the ZED Parties. Its boilerplate — that transfers "may frustrate the Court's ability to enforce its prior orders" — is carried over from the CSDS order. No finding indicates

---

[68] Adv. ECF No. 4.
[69] *See Park v. Parker*, No. 25-CV-00789 (MAB), 2025 WL 1002011, at *1 (S.D.N.Y. Apr. 3, 2025) ("Plaintiff did not file the Rule 65(b)(1)(B) certification required for *ex parte* relief. Noncompliance with Rule 65(b)(1)(B) is sufficient to deny the motion."); *see also Hope v. Warden York Cnty. Prison*, 972 F.3d 310, 320 (3d Cir. 2020) ("[A] TRO may be entered *ex parte*, but only if safeguards in Rule 65(b) are met.").
[70] Adv. ECF No. 16 ¶ 37
[71] Futernick Decl. ¶¶ 55-56 & Ex. G.
[72] Futernick Decl. ¶¶ 26, 42, 47 & Exs. C, E, F.

that any ZED Party is dissipating assets, is insolvent, or has done anything at all since October 14, 2026. And "may" describes a possibility of harm, not the ***likelihood*** the law requires.[73]

47. Civil Rule 65(d)(1) separately requires that every injunction "state its terms specifically" and "describe in reasonable detail — and not by referring to the complaint or other document — the act or acts restrained or required." Footnote 2 of the Amended TRO defines all capitalized terms by reference to the Motion to Amend. A restrained party reading the order cannot determine from its four corners what is restrained. That is the precise defect Rule 65(d)(1)(C) forbids.

### b. *Grupo Mexicano* Forecloses a Prejudgment Asset Freeze of the ZED Parties' Assets.

48. The Supreme Court has squarely held that a federal court has no equitable authority to issue a preliminary injunction preventing a defendant from transferring assets in which no lien or equitable interest is claimed, in an action for money damages.[74] That is exactly this case.

49. Spirit seeks $48,015,000 in damages from non-debtors. Spirit asserts no lien on, and no equitable interest in, any particular asset of the ZED Parties — and could not, since the Loan Agreement expressly provides that CSDS "has not and will not pledge or grant any security interest in the Loan Amount to Spirit Airlines or any other party."[75] Bankruptcy courts apply the same rule. [76]

50. Indeed, *Leadenhall Cap. Partners LLP v. Advantage Cap. Holdings LLC*[77] is directly on point here. In *Leadenhall*, the Second Circuit vacated a freeze of a non-pledging

---

[73] *See Winter*, 555 U.S. at 22 (rejecting "possibility" standard as "too lenient" and requiring a showing "that irreparable injury is *likely* in the absence of an injunction").
[74] *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 333 (1999).
[75] Futernick Decl. Ex. B § I.3.
[76] See *In re Nexgenesis Holdings Ltda*., 662 B.R. 406 (Bankr. S.D. Fla. 2024) (refusing prejudgment freeze of non-debtor assets on a damages claim).
[77] 171 F.4th 155, 164 (2d Cir. 2026).

guarantor's assets, holding that the district court abused its discretion because the plaintiff claimed neither a lien nor an equitable interest in those assets. The *Leadenhall c*ourt specified that while claims for money can implicate equitable interests, typically in the form of a constructive trust or equitable lien, such interests were distinguishable from "a general interest in receiving compensation."[78] That is all Spirit has here – a general interest in receiving compensation, not a specific, equitable interest via constructive trust, equitable lien, or other interest in particular property.

51. Furthermore, while "a preliminary injunction may restrain fungible assets like money without identifying particular property, … only 'where the plaintiff is pursuing a claim for final equitable relief, and the preliminary injunction is ancillary to the final relief.'"[79]

52. All of Spirit's claims against the ZED Parties sound in law. Labeling them an "accounting" or "unjust enrichment" does not convert a demand for a money judgment into a claim for equitable relief.[80] And, as shown below, those claims fail on the merits regardless.

53. Section 105(a) does not fill the gap. It authorizes orders "necessary or appropriate to carry out the provisions of this title"; it does not create substantive rights, expand the Civil Rules, or authorize what the Supreme Court has held equity cannot do.[81] It does not "authorize the bankruptcy courts to create substantive rights that are otherwise unavailable under applicable law, or constitute a roving commission to do equity."[82]

---

[78] *Id.*
[79] *Id.*, citing *Gucci America, Inc. v. Weixing Li*, 768 F.3d 122, 131 (2d Cir. 2014) (citation omitted); *see also Caplan v. Dollinger*, 803 F. Supp. 3d 219, 240 (S.D.N.Y. 2025) (holding that exception re: fungible assets does not apply where remaining claims "sound[] in law rather than equity").
[80] *See Leadenhall*, 171 F.4th at 164 ("The propriety of a preliminary injunction in relation to a court's equitable powers is determined by the nature of the *final* relief sought.").
[81] *See In re Dairy Mart Convenience Stores, Inc.*, 351 F.3d 86, 92 (2d Cir. 2003) ("This Court has long recognized that "Section 105(a) limits the bankruptcy court's equitable powers, which 'must and can only be exercised within the confines of the Bankruptcy Code.") (quoting *Norwest Bank Worthington v. Ahlers,* 485 U.S. 197, 206, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988)).
[82] United States v. Sutton, 786 F.2d 1305, 1308 (5th Cir.1986).")

54. Nor does the ZED Parties' status as non-debtors change the analysis in Spirit's favor: their assets are not property of the estate, see 28 U.S.C. § 1334(e), and a bankruptcy court does not acquire dominion over a non-debtor's assets merely because the non-debtor's funds once touched a transaction involving the debtor.[83]

55. Even assuming "related to" jurisdiction — which the ZED Parties dispute, *see supra* Jurisdiction, Venue, and Reservation of Rights — the Court's equitable power, however denominated, does not extend to freezing a non-debtor stranger's assets to secure a money judgment that does not yet exist.

**c. Spirit Cannot Show a Likelihood of Success on Any Claim Against the ZED Parties.**

56. Spirit devotes a single paragraph to its likelihood of success against the ZED Parties. Adv. ECF No. 16 ¶ 34. That paragraph offers conclusions, not elements or facts, and cannot carry Spirit's burden. Each claim fails, and that failure is an independent ground for dissolution.

***i. Aiding and Abetting Fraudulent Misrepresentation (Eighth Claim).***

57. Aiding and abetting fraud requires (i) an underlying fraud, (ii) the defendant's actual knowledge of it, and (iii) substantial assistance.[84] Constructive knowledge is insufficient; the plaintiff must plead actual knowledge, with particularity under Civil Rule 9(b), as applied by Bankruptcy Rule 7009.

58. As a threshold matter, Spirit's allegations fail Rule 9(b). Fraud allegations "cannot be based upon 'information and belief,'" except where the facts are peculiarly within the opposing party's knowledge, and even then "the complainant must set forth the facts upon which the belief

[83] See *In re Dreier LLP*, 429 B.R. 112 (Bankr. S.D.N.Y. 2010); *In re Desmond*, 316 B.R. 593 (Bankr. D.N.H. 2004) (dissolving TRO where the restrained collateral was not property of the estate).
[84] *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 292 (2d Cir. 2006).

is based."[85] Spirit pleads both the fraud and the ZED Parties' knowledge of it on "information and belief," with no stated basis.[86]

59. Nor does Spirit allege actual knowledge. The underlying fraud consists of misrepresentations by CSDS and Mr. Sirimanne.[87] Spirit alleges only that the ZED Parties knew CSDS was not the source of the escrowed funds.[88] — which is not the fraud — and that they "knew ***or had reason to know***" of the Sirimanne declaration.[89] "Reason to know" is constructive knowledge, which does not suffice. And the record forecloses actual knowledge: no one told ZED its loan was being used as Spirit's deposit, and ZED never saw the declaration.[90]

60. Nor is there substantial assistance. The misrepresentations Spirit identifies appear in Mr. Sirimanne's April 20, 2026 declaration[91] that the Buyer "timely deposited its Good Faith Deposit" and there were "no side agreements."[92] ZED's funds were out of escrow by April 17. One cannot substantially assist a statement made after one has exited the transaction, and which one never saw.[93] Lending, forbearance, and collection are routine commercial activities, not substantial assistance.

61. Tellingly, Spirit does not plead fraud itself against any ZED Party or allege that any ZED Party made any statement to Spirit, its professionals, or this Court. The alleged misrepresentations are CSDS's and Mr. Sirimanne's alone.

---

[85] *In re Old CarCo LLC*, 435 B.R. 169, 191 (Bankr. S.D.N.Y. 2010) (internal citations omitted).
[86] Am. Compl. ¶¶ 45, 80.
[87] Am. Compl. ¶ 116.
[88] *id.* ¶ 138.
[89] *id.* ¶ 139.
[90] Futernick Decl. ¶¶ 20, 53.
[91] [Main Case ECF No. 966]
[92] Am. Compl. ¶¶ 48–52.
[93] Futernick Decl. ¶¶ 50, 53-54.

#### *ii. Tortious Interference with Contract (Seventh Claim).*

62. Tortious interference requires a valid contract, the defendant's knowledge of it, intentional procurement of its breach without justification, actual breach, and damages.[94] Where the defendant acts to protect its own legal or financial interest, the economic-interest defense defeats the claim.[95]

63. ***First***, Spirit has not established the predicate breach. Actual breach is an element of the claim,[96] yet Spirit offers only the unverified allegation that CSDS failed to perform under the Asset Purchase Agreement. No court has adjudicated a breach, and Spirit's attorney declarations say nothing about the APA's payment terms, closing conditions, or notice and cure provisions.[97] Without a breach, there is nothing for the ZED Parties to have procured.

64. ***Second***, even assuming a breach, the timeline forecloses causation. The alleged breaches occurred from July through October 2026; an April 17 escrow return did not "procure" a breach months later in a transaction ZED had no power to perform or prevent. Spirit's theory that ZED "deprived CSDS of the means to close"[98] also founders on the contract: the Loan Amount would "solely be used to evidence proof of funds," would be automatically refunded, and CSDS "shall have no rights, title or interest in the Loan Amount."[99] Funds CSDS never had the right to spend were never its "means to close."

65. ***Third***, ZED had no motive to procure a breach. It stood to earn a US$200,000 Aircraft Success Fee per Spirit aircraft CSDS acquired, and, other than a single $1,000,000

---

[94] *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 424 (1996).
[95] *White Plains Coat & Apron Co. v. Cintas Corp.*, 8 N.Y.3d 422, 426 (2007); *Foster v. Churchill,* 87 N.Y.2d 744 (1996).
[96] *Lama Holding*, 88 N.Y.2d at 424.
[97] Adv. ECF Nos. 18, 19.
[98] (Am. Compl. ¶¶ 131–132)
[99] Futernick Decl. Ex. B § I.3.

payment, it has never been paid the fees CSDS owes.[100] A party whose upside depends on closing does not kill the deal.

66. ***Finally***, any procurement would have been justified. A lender collecting a matured loan its borrower admitted in writing was in default, under the express terms of its own contract, after granting forbearance, is the paradigm of justification. No economic interest is more legitimate than recovering one's own principal.

***iii. Conversion (Third Claim).***

67. Conversion requires that the plaintiff have ownership or a superior possessory right in a specific, identifiable thing, and that the defendant exercise unauthorized dominion over it.[101] Spirit never owned the $46,350,000. ZED deposited it. The ZED Escrow Terms provided that it was held "solely to the order of the Lender" and releasable only on ZED's "unilateral written instructions."[102] The Loan Agreement declared it ZED's "sole and unencumbered property."[103] The Escrow Agent tracked it in a separate "Zed AeroCapital escrow account" with a starting balance of exactly $46,350,000.[104] ZED exercised dominion over its own property — the antithesis of conversion.

***iv. Unjust Enrichment (Fourth Claim).***

68. Unjust enrichment requires that the defendant was enriched at the plaintiff's expense and that equity and good conscience require restitution, and the relationship between the parties cannot be "too attenuated."[105] It is "not a catchall cause of action to be used when others

---

[100] Futernick Decl. ¶¶ 39, 52.
[101] *Thyroff v. Nationwide Mut. Ins. Co.*, 8 N.Y.3d 283 (2007); *Colavito v. N.Y. Organ Donor Network, Inc.*, 8 N.Y.3d 43, 50 (2006).
[102] Futernick Decl. Ex. C §§ 2, 4; Futernick Decl. ¶ 24.
[103] Futernick Decl. Ex. B § I.3; Futernick Decl. ¶ 18.
[104] Futernick Decl. ¶¶ 47, 50 & Ex. F.
[105] *Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 182 (2011); *Georgia Malone & Co. v. Rieder*, 19 N.Y.3d 511, 516–17 (2012).

fail."[106] ZED was not enriched: it recovered its own principal and, apart from a single $1,000,000 payment from CSDS, never received its fees.[107] The relationship between Spirit and ZED—parties who never contracted, communicated, or dealt with one another—is the definition of attenuated.[108]

***v. Accounting (Sixth Claim).***

69. An equitable accounting requires a fiduciary or confidential relationship between the parties and a duty to account.[109] No such relationship exists between Spirit and any ZED Party. They are strangers to one another. Furthermore, there is no "absence of a legal remedy here" – Spirit is asking for money damages, a quintessential legal remedy. For these reasons alone, any accounting claim by Spirit against the ZED Parties fails.

**d. Spirit Cannot Show Irreparable Harm from the ZED Parties.**

70. Irreparable harm is "the single most important prerequisite for the issuance of a preliminary injunction," and must be "actual and imminent," not "remote or speculative."[110] Where money damages are adequate, there is no irreparable harm.[111]

71. Spirit's claims against the ZED Parties seek money: $48,015,000, plus damages, plus punitive damages. There is no unique chattel, trade secret,[112] or reputational interest — nothing money cannot remedy.

72. Nor is there evidence of dissipation. Spirit offers none — no evidence that ZED is insolvent, winding down, moving assets offshore, or transferring anything at all. The record shows the opposite: ZED received its funds six months ago through two Fedwire transfers into a Seacoast

---

[106] *Corsello v. Verizon N.Y., Inc.*, 18 N.Y.3d 777, 790 (2012).
[107] Futernick Decl. ¶¶ 50, 52.
[108] *Id*. ¶¶ 34-36.
[109] *See Metro. Bank & Tr. Co. v. Lopez*, 189 A.D.3d 443, 446 (1st Dep't 2020).
[110] See *Sears*, 659 B.R. at 248-49.
[111] *Brenntag Int'l Chems., Inc. v. Bank of India*, 175 F.3d 245, 249–50 (2d Cir. 1999) — an authority Spirit itself cites. (Mot., ¶ 30).
[112] Futernick Decl. ¶¶ 26, 42, 47 & Exs. C, E, F.

account it disclosed in writing to Spirit's own escrow agent. And since receiving notice of the Amended TRO, no ZED Party has moved any asset in contravention of it.[113]

73. What the record does show is delay: Spirit knew of ZED's involvement in February 2026 and said nothing for months. Delay of that magnitude is inconsistent with the emergency Spirit now asserts.

**e. The Balance of Hardships and the Public Interest Weigh Decisively Against the Restraint.**

74. The hardships fall entirely on the ZED Parties. The Amended TRO freezes every asset of an operating lender and three individuals, with no cap on the amount in dispute and no carve-out for operations, payroll, living expenses, or attorneys' fees. It names ZED's operating accounts and then sweeps in everything else. And it purports to restrain the ZED Parties' "attorneys," nominally enjoining undersigned counsel while it defends this very Motion.

75. Spirit itself recognized the overbreadth, conceding that the individuals "are natural persons who may be required to spend assets to pay for their or their dependents' daily needs" and that it was "willing to narrow the relief sought."[114] Spirit asked for relief it admitted was overbroad, obtained it without notice, and left the ZED Parties to bear the consequences.

76. Those consequences are severe. ZED is an operating business whose reputation rests on moving capital promptly; the Amended TRO has, in effect, shut it down. It cannot fund pending or new transactions, meet ordinary operating obligations or avoid ongoing harm to the relationships on which its business depends.[115] Messrs. Futernick, Iacono, and Lesnik received none of the funds personally, yet cannot pay ordinary bills or meet basic living expenses.[116] Spirit,

[113] Futernick Decl. ¶ 57.
[114] Mot. to Amend ¶ 39
[115] Futernick Decl. ¶ 58.
[116] *Id.* ¶ 59.

by contrast, loses nothing from dissolution: its claims, if any, remain available, and it has known the relevant facts since February 2026.

77. The public interest points the same way. Short-term, secured lending depends on the enforceability of written loan documents as written. If a lender can have its entire balance sheet frozen, without notice, because its borrower later deceived a third party, the cost of credit rises for every borrower. The public interest is served by predictable commercial lending and by holding parties to the contracts they signed — and it is not served by notice-less freezes imposed on unserved strangers to the litigation.

**f. If Any Restraint Continues, the Court Should Require Security Under Civil Rule 65(c)**.

78. Civil Rule 65(c) permits a restraining order to issue "only if the movant gives security." Although Bankruptcy Rule 7065 allows a court to excuse security for a debtor, trustee, or debtor in possession, Spirit offers no reason why that exemption should extend to an *ex parte* freeze of non-debtor strangers' assets.

79. Security matters because recovery for wrongful restraint is, as a practical matter, limited to the amount posted.[117] The requirement shifts the risk of an erroneous restraint onto the party that sought it.[118] *In re Lyondell Chemical Co.*,[119] on which Spirit relies, involved an injunction protecting a debtor's reorganization — not a total *ex parte* freeze of non-debtor strangers. Here, a debtor in active bankruptcy froze an operating business in its entirety, posted nothing, and left the ZED Parties with no assured recovery for wrongful restraint. That is one more reason the order cannot stand.

[117] *Blumenthal v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 910 F.2d 1049 (2d Cir. 1990).
[118] *Smart Study Co. v. Bichha123*, 505 F. Supp. 3d 322 (S.D.N.Y. 2020).
[119] 402 B.R. 571, 595 (Bankr. S.D.N.Y. 2009).

## II. The Court Should Hear This Motion On Two Days' Notice

80. Rule 65(b)(4) provides that, "[o]n 2 days' notice to the party who obtained the order without notice—or on shorter notice set by the court—the adverse party may appear and move to dissolve or modify the order," and that "[t]he court must then hear and decide the motion as promptly as justice requires." The ZED Parties are serving this Motion to Spirt on October 26, 2026. The ZED Parties thus respectfully request that this Court hear and decide this Motion on October 28, 2026, or at the Court's earliest availability, as promptly as justice requires. ZED submits a proposed Order to Show Cause contemporaneously herewith.

## RESERVATION OF CLAIMS

81. The ZED Parties expressly reserve, and do not waive, all rights, claims, and remedies against Spirit and against any person or entity that participated in seeking, procuring, or obtaining the TRO or the Amended TRO, including, without limitation, claims for wrongful injunction and wrongful restraint; recovery on any security posted or required to be posted under Civil Rule 65(c); actual, consequential, and punitive damages; attorneys' fees and costs; and sanctions under Bankruptcy Rule 9011, 28 U.S.C. § 1927, and the Court's inherent power — in each case arising from the improper procurement, issuance, maintenance, or enforcement of the TRO and the Amended TRO and any harm caused by them.

82. The ZED Parties further reserve the right to pursue such relief by separate motion, adversary proceeding, or action in this or any other court of competent jurisdiction. Nothing in this Motion, in any order entered on it, or in the ZED Parties' participation in any hearing shall be construed as an election of remedies, a waiver of any such claim, or a limitation on the amount or form of relief that may be sought.

## NO PRIOR REQUEST

83. No previous request for the relief sought herein has been made by the ZED Parties to this or any other court.

## CONCLUSION

84. The ZED Parties are a bridge lender and its principals. They made a loan, documented it, watched their borrower default, forbore, and then recovered the same $46,350,000 they had deposited — openly, by traceable wire, to a disclosed account, six months before Spirit filed anything. As a result, they have frozen every asset they own and enjoined their own lawyers, by an order obtained without notice, without the showing Rule 65 requires, and without any power equity confers. That order should be dissolved in its entirety.

WHEREFORE, the ZED Parties respectfully request that the Court enter an order, substantially in the form submitted herewith, (i) dissolving the Amended TRO [Adv. ECF No. 15] in its entirety as to ZED AeroCapital LLC, Zander Futernick, Jim Iacono, and Gary Lesnik, and (ii) granting such other and further relief as the Court deems just and proper.

[Remainder of Page Intentionally Left Blank]

Dated: October 26, 2026

Respectfully Submitted,

**COLE SCHOTZ P.C.**
Brickell City Tower
80 SW 8th Street, Suite 1900
Miami, Florida 33130
Telephone: (305) 374-4848
Email: LSalazar@coleschotz.com
Secondary: cs-eservice-Miami@coleschotz.com

By: /s/ Luis Salazar
Luis Salazar (admitted FL, NY, NJ)
New York Bar No. 2574762

-and –

1325 Avenue of the Americas, 19th Floor
New York, NY 10019
Telephone: (212) 752-8000
Jacob Frumkin, Esq.
New York Bar No. 4800215
Email: jfrumkin@coleschotz.com
Arielle H. Wasserman
New York Bar No. 5657119
Email: awasserman@coleschotz.com

*Counsel to ZED AeroCapital LLC, Zander Futernick, Jim Iacono, and Gary Lesnik*