**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br>**SPIRIT AVIATION HOLDINGS, INC., *et al.*,**<br>Debtors. | Chapter 11<br>Case No. 25-11897 (SHL)<br>(Jointly Administered) |
| **SPIRIT AIRLINES, LLC,**<br>Plaintiff,<br>v.<br>**CSDS ASSET MANAGEMENT LLC, ZED AEROCAPITAL LLC, WIKERT INVESTMENTS COMPANY LLC, SRIYANTHA BENEDICT SIRIMANNE, CHRISTOPHER KELLER, GERALD GLASS, JIM IACONO, ZANDER FUTERNICK, and GARY LESNIK,**<br>Defendants. | Adversary Proceeding<br>No. 26-01102 (SHL) |

# DECLARATION OF ALEXANDER FUTERNICK IN SUPPORT OF THE EMERGENCY MOTION OF THE ZED PARTIES TO DISSOLVE THE AMENDED TEMPORARY RESTRAINING ORDER [ADV. ECF NO. 15]

I, Alexander Futernick, declare as follows pursuant to 28 U.S.C. § 1746:

1. I am the Managing Partner of ZED AeroCapital LLC ("ZED"). I submit this declaration in support of *the Emergency Motion of the ZED Parties to Dissolve, or Alternatively Modify, the Amended Temporary Restraining Order* (the "**Motion**"). I submit it solely for that limited purpose and without waiving, and expressly reserving, all rights, claims, objections, and defenses, including all defenses of lack of personal jurisdiction, insufficient process, and insufficient service of process. Except where otherwise stated, the facts set forth below are based on my personal knowledge.

**ZED and Its Principals Have a Long-Standing Reputation for Integrity**

2. I begin with background on ZED and its principals because Spirit Airlines, LLC **("Spirit")** has used the *ex parte* application process to level baseless accusations against us**,** and I wish to correct the record. ZED is an aviation finance firm headquartered in West Palm Beach, Florida. ZED deploys private capital from domestic investors into short-term, asset-backed aviation transactions worldwide. Through its Tactical Opportunities business, ZED provides time-sensitive financing to airlines, lessors, maintenance providers, and aircraft brokers in transactions that sustain the operation of the global aircraft fleet. ZED operates across commercial and business aviation and maintains relationships with counterparties on every continent.

3. Although it makes loans of up to $50 million, ZED focuses on transactions below $20 million, a segment of the market that institutional investors generally do not pursue, and acts within that segment as a specialized lender against aviation assets. ZED evaluates opportunities within 48 hours and deploys between $1 million and $50 million per transaction, with a speed and structural flexibility that banks and institutional lenders are not typically positioned to offer. ZED's reputation in the market rests on that speed and on the reliability of its commitments.

4. ZED is led by three Managing Partners: Jim Iacono, Gary Lesnik, and me. Mr. Iacono is an aviation executive and entrepreneur with more than 30 years of experience across aircraft acquisitions and sales, aviation finance, leasing, aircraft management, technology development, and strategic investment. He co-founded AirLight Systems, an aviation technology company that developed and patented advanced aircraft exterior lighting systems, and over 13 years at MAC Air Group / Maine Aviation helped grow its Part 135 fleet from six to 28 aircraft. In 2019, he founded an independent aviation advisory and investment platform serving aircraft owners, operators, investors, and financial institutions worldwide. He holds a Bachelor of Science

in Management from the University of Massachusetts Dartmouth. Mr. Iacono has served on the Board of Directors of the Jason Program, which provides pediatric palliative care; co-chaired the Camp Sunshine Suitcase Event for eight years; volunteers with Operation Crosscheck, which serves military veterans; and serves on the Board of the Jim Iacono Memorial Scholarship Fund.

5. Mr. Lesnik has spent more than 35 years building and leading businesses across transportation, aviation, financial markets, and real estate. He graduated from the University of Florida in 1988 with a degree in Management. He began his career in his family's international shipping business, Econocaribe Consolidators, and from 1998 to 2010 ran Weston Trading Group, where he held a Series 7 license and trained more than 100 equity traders. At Avon Aviation he delivered multiple jets to Delta Private Jets and flyExclusive and oversaw a managed fleet of seven jets. He has also developed and managed more than 800,000 square feet of industrial warehouse space in Miami, Florida, with tenants including a Central Examination Station for U.S. Customs.

6. I have spent more than a decade at the intersection of aircraft, capital, and design across private and commercial aviation. In 2016 I founded AURA, a premium scheduled air service concept bridging commercial airline travel and private charter, and I have provided aircraft-acquisition and operational expertise to private-jet ventures across Africa, Europe, North America, and South America, and to regional aircraft operators in the United States. I work within the Federal Aviation Regulations governing Part 121 and Part 135 operations and Part 145 repair stations, and I am versed in aviation finance structures, including JOL and JOLCO structures, the Cape Town Convention, and EETCs. Since 2021 I have served as an associate aircraft appraiser at S3 Group, producing ASA-verified appraisals, a valuation discipline I bring directly to ZED's underwriting. I attended the NYU Stern School of Business. I sit on the YLD Board of the Greater Miami Jewish Federation and chair its Incubator Grants Committee.

**CSDS Approached ZED for a Short-Term Bridge Loan**

7. On Friday, February 13th, 2026, Sriyantha Benedict Sirimanne, the Managing Member and principal of CSDS, approached ZED and asked it to provide CSDS with a bridge loan in connection with CSDS's potential acquisition of Spirit Airlines aircraft. Mr. Sirimanne explained that CSDS urgently needed the bridge loan for what would likely be only three days, while he awaited final funding from a more substantial international partner.

8. Based on those discussions, ZED understood that CSDS sought the bridge loan to demonstrate its ability to raise the funds necessary for the transaction. At no time did CSDS or Mr. Sirimanne inform ZED that CSDS needed or intended to use ZED's funds as a deposit. Had ZED known, it would not have advanced its funds for that purpose.

9. That same day, CSDS gave ZED documentary support for its representation that replacement financing was coming. At 1:47 p.m. on February 13, 2026, Mr. Sirimanne emailed Mr. Iacono a copy of an "Investment and Profit Share Master Agreement," Agreement No. 001/SPA/BKI-CSDS/I/2026, dated January 26, 2026 (the "**Batavia Agreement**"), writing: "Please see attached the investment agreement signed between CSDS and Batavia in Indonesia, For your reference. This is where the $53.35 Million is coming from." Mr. Iacono forwarded that email and the Batavia Agreement to me. A true and correct copy of that email chain, including the Batavia Agreement, is attached hereto as **Exhibit A**.

**10.** The Batavia Agreement names the investor as PT. Batavia Kreatif Indonesia, a limited company with offices in Jakarta, Indonesia, represented by H.F. Sukiman Ardhaliwa, and identifies CSDS, represented by Mr. Sirimanne, as the beneficiary. It recites that the investor "intends to fund the purchase of Twenty (20) Airbus Spirit Airlines A320 - A 321 Fleet Aircraft," and that "the Investor agrees to fund the initial deposit of $53 Million to the escrow of McAfee &

Taft in Oklahoma City, OKlahoma [sic], USA, as a cash deposit." The Batavia Agreement thus confirmed what CSDS told ZED: any deposit for the Spirit aircraft was to be funded by CSDS's Indonesian investor, not by ZED's short-term bridge loan.

11. ZED's understanding was also informed by its prior dealings with CSDS. Before this transaction, ZED had completed four transactions with CSDS totaling approximately $50M of combined commercial value over the previous six months, and based on that positive recent experience combined with actual representations of CSDS's current urgent needs, ZED believed that CSDS could refinance and repay the bridge loan within the short time provided.

12. The Loan Agreement reflected that understanding. It provided that ZED's funds would be returned within that short timeframe or as soon as CSDS's replacement capital arrived.

13. Accordingly, at no time did ZED understand that CSDS would represent to anyone anything contrary to the terms of the Loan Agreement and the ZED Escrow Terms, including that ZED's funds were to be part of any payment to Spirit. Furthermore, ZED believed the confirming nature of McAfee & Taft ("M&T") as Escrow Agent, among the most prestigious agencies in the industry, would further assure of ZED's distance from Spirit and maintain proper representation as to the origin, presence, and nature of the funds deposited into ZED's own escrow account.

14. In fact, ZED also forwarded the Loan Agreement to Erin Van Laanen at M&T, so the terms of ZED's loan to CSDS were completely transparent.

**The February 16, 2026 Loan Agreement Made ZED a Lender, Not a Deal Participant**

15. On February 16, 2026, ZED and CSDS executed, via DocuSign, a Loan Agreement and accompanying Promissory Note (collectively, the "**Loan Agreement**"), which are governed by Delaware law. A true and correct copy is attached hereto as **Exhibit B**.

16. The Loan Agreement provided for a loan of US$46,350,000 (the "**Loan Amount**") and a Loan Fee of US$4,635,000. From the outset, it made clear that the Loan Amount would remain under ZED's control: Section I.1 provides that the Loan Amount "shall, at all times, be held in escrow by the Escrow Agent solely at Lender's order until refunded by the Escrow Agent to Lender on the Payment Date."

17. The Loan Agreement also required that the funds come back to ZED promptly. Section I.1.3.1 provides that the Loan Amount "shall automatically be refunded by the Escrow Agent to Lender's account . . . on the date that is the earlier of: (a) March 30, 2026, (b) *the date on which the Escrow Agent has received funds from a third-party lender in the Escrow Agent's account for the benefit of Borrower in an amount equal to or greater than the Loan Amount plus the Loan Fee***,** and (c) within 3 Business Days of Lender's written demand."

18. Section I.3 of the Loan Agreement further protected the Loan Amount from any claim by CSDS, Spirit, or anyone else. It provides, among other things:

> Borrower hereby acknowledges and agrees that Borrower shall have no rights, title or interest in the Loan Amount and that the Loan Amount shall at all times remain ***the sole and unencumbered property of the Lender and not subject to any claims by Borrower, Spirit Airlines, Inc. or any other person.*** Borrower expressly warrants and represents that it has not and will not pledge or grant any security interest in the Loan Amount to Spirit Airlines or any other party and that Borrower has not and will not enter into any agreement purporting to convey or pledge the Loan Amount to Spirit Airlines, Inc. or any other person as security or partial payment of amounts owed in connection with the Aircraft Transaction . . .
>
> neither this Agreement nor any other Loan Document is for the benefit of Spirit Airlines, Inc. and shall not for any reason be deemed to be part of Spirit Airline's estate . . . nor subject to the Spirit bankruptcy proceeding . . . no consent or authorization from Borrower or any third-party (including, but not limited to Spirit Airlines, Inc.) will be required in order for the Escrow Agent to refund the Loan Amount . . . In no event will Lender have any obligation or liability in respect of the Aircraft Transaction and Borrower will indemnify and hold harmless Lender.

(emphasis added).

19. ZED understood Section I.3 to mean precisely what it says: the funds were a loan to CSDS, and CSDS could not pledge them to Spirit Airlines, Inc. or anyone else. The Loan Agreement was not for the benefit of Spirit Airlines, Inc., and no consent from CSDS or any third party, including Spirit, was required for the Escrow Agent to refund the money to ZED.

20. Section I.3 also recites that the Loan Amount "shall solely be used to evidence proof of funds in connection with Borrower's purchase of 20 used Airbus A320-A321 aircraft from Spirit Airlines, Inc." That limited purpose was consistent with what CSDS told ZED: that CSDS had obtained more comprehensive financing from an Indonesian partner that would replace ZED's short-term loaned funds and be available to purchase the aircraft, $7M of which had been represented as already funded by this specific Indonesian partner. ZED never agreed to withhold, and never advised CSDS to withhold, disclosure that the funds were a loan. Nor did CSDS, McAfee & Taft as Escrow Agent, or Spirit ever advise ZED that its loaned funds were being used as a deposit or as the "full balance."

21. Taken together, these provisions reflect the entire commercial premise of ZED's participation: ZED loaned funds to CSDS, but those funds were never intended to be committed to Spirit, because CSDS represented to ZED that a more substantial lender had actually provided and was continuing to provide more comprehensive financing that would replace ZED's loan. ZED's capital always remained ZED'S capital, it was never pledged to Spirit, and ZED undertook no obligation whatsoever in respect of the aircraft transaction.

22. In short, ZED negotiated the Loan Agreement as a lender protecting its capital. The terms ZED insisted upon (that the Loan Amount remain ZED's sole loaned property at all times; that it be held solely to ZED's order; that it be automatically refunded on the earliest of maturity, a third-party take-out, or three business days after demand; that CSDS's principal personally

guarantee repayment; and that CSDS indemnify ZED) are the terms a lender obtains to protect itself from its borrower, not the terms of a partner or co-venturer.

**The February 13, 2026 Escrow Terms Placed ZED's Funds Under the McAfee & Taft's Protection and Monitoring**

23. On February 13, 2026, ZED (as Lender), CSDS (as Borrower), and McAfee & Taft A Professional Corporation (as Escrow Agent) entered into Escrow Terms and Conditions (the "ZED Escrow Terms"). A true and correct copy is attached hereto as **Exhibit C**. Mr. Iacono executed them on ZED's behalf as Vice President. Mr. Sirimanne executed them for CSDS, and Maria Gonzalez, Vice President, executed them for McAfee & Taft, each the same day.

24. The ZED Escrow Terms provide, in Section 1, that they were entered into in connection with "a short-term loan to be made by Lender to Borrower in connection with the Borrower's purchase of twenty (20) aircraft from Spirit Airlines." Section 2 provides that ZED would deposit up to US$46,350,000 with McAfee & Taft as Escrow Agent under the reference "ZED AeroCapital - CSDS Asset Management - Spirit Aircraft Bridge Loan," that "[t]he Escrow Funds shall at all times be held solely to the order of the Lender," that the Escrow Agent would return the Escrow Funds to ZED within three business days of ZED's written instruction, and that "[a]ll Escrow Funds will be returned to the Lender by the Escrow Agent to the same account from which it was received." Section 4 provides that the Escrow Agent "will only release the Escrow Funds (or any portion thereof) solely in accordance with the Lender's unilateral written instructions."

25. The ZED Escrow Terms further provide that the Escrow Agent "shall only distribute the Escrow Funds in accordance with the Lender's written instructions." As Mr. Iacono understood when he executed them, the escrowed funds were ZED's loaned funds.

26. Exhibit A to the ZED Escrow Terms sets out ZED's wire instructions, identifying an account in the name of ZED AeroCapital, LLC at Seacoast Bank, Stuart, Florida. ZED disclosed that account in writing, at the outset, to McAfee & Taft as Escrow Agent — the same escrow agent Spirit selected themselves and used. Nothing about ZED's account or ZED's role was concealed from McAfee & Taft as Escrow Agent.

**ZED Funded a Segregated Escrow**

27. ZED deposited the loan proceeds, totaling US$46,350,000, with McAfee & Taft as Escrow Agent. ZED did so only after ZED, CSDS, and McAfee & Taft as Escrow Agent had executed the ZED Escrow Terms, which made clear the conditions on which McAfee & Taft as Escrow Agent held those funds: that they were ZED's loan proceeds, held at all times solely to ZED's order, releasable only on ZED's unilateral written instructions, and returnable to ZED's own disclosed account. As Section 2 of the ZED Escrow Terms specified, ZED wired its funds to the Escrow Agent's "McAfee & Taft Aircraft Account" at Bank of America, N.A., 222 Broadway, New York, New York (Account No. [redacted]407; ABA Routing No. [redacted]593; SWIFT Code BOFAUS3N), under the reference "ZED AeroCapital – CSDS Asset Management – Spirit Aircraft Bridge Loan."

28. ZED has since learned through this litigation that Spirit's escrow was held elsewhere and that McAfee & Taft as Escrow Agent was also acting for Spirit in connection with the aircraft sale, under an escrow agreement with Spirit that appears to have been signed on February 9, 2026, four days before the ZED Escrow Terms. That Spirit escrow account, however, is at a different financial institution – J.P. Morgan, with the account number ending in -2956 – an account at a different bank from the Bank of America account into which ZED wired its funds. ZED's funds were never deposited into, held in, or transferred out of Spirit's escrow account.

29. Nothing in the ZED Escrow Terms, which McAfee & Taft as Escrow Agent itself signed, refers to any escrow duties or obligations owed to Spirit or anyone else with respect to ZED's funds, and McAfee & Taft never advised ZED of any such duty or obligation. ZED relied on McAfee & Taft as Escrow Agent to hold ZED's funds strictly in accordance with the ZED Escrow Terms.

**ZED Is a Bridge Lender, Not an Investor in or Affiliate of CSDS**

30. As noted, ZED is an aviation finance company. Its business is providing short-term, asset-backed financing — bridge loans — to counterparties in aviation transactions.

31. ZED is not, and has never been, an equity holder, member, manager, partner, joint venturer, or affiliate of CSDS. ZED holds no ownership interest of any kind in CSDS, and CSDS holds no ownership interest in ZED.

32. ZED exercises no control over CSDS and has no right to direct CSDS's management, operations, or business decisions. ZED and CSDS do not share offices, premises, employees, officers, directors, bank accounts, books and records, or back-office functions.

33. ZED's relationship with CSDS was an arm's-length lender-borrower relationship, documented in writing, with a personal guaranty from CSDS's principal, an indemnity running in ZED's favor, a fixed loan fee, daily extension fees, and default interest.

**ZED Never Dealt with Spirit, Its Professionals, or the Court**

34. ZED is not a party to the Asset Purchase Agreement between Spirit and CSDS. ZED did not negotiate, review, or participate in the negotiation of that agreement.

35. ZED is not a party to Spirit's escrow agreement dated February 9, 2026. ZED did not negotiate it, never saw it, was not asked to sign it.

36. Neither I, nor to my knowledge any other person at ZED, ever communicated with Spirit, with any of Spirit's professionals, or with this Court, at any time prior to the events giving rise to this Motion. Other than communications through ZED's counsel after this adversary proceeding was commenced, as described below, ZED has never communicated with Spirit, with any officer, director, or employee of Spirit, with any of Spirit's professionals, or with this Court, and has never made any representation, oral or written, to Spirit or to this Court. ZED made no representation of any kind to Spirit or to this Court.

**CSDS Defaulted, and ZED Entered into a Forbearance Agreement in Good Faith Pending Replacement Financing**

37. CSDS did not repay the Loan Amount or the Loan Fee when due. On March 30, 2026, ZED and CSDS executed a Forbearance and Reservation of Rights Agreement (the "**Forbearance Agreement**"), a true and correct copy of which is attached hereto as **Exhibit D**.

38. In the Forbearance Agreement, CSDS "acknowledge[d] and agree[d] that the Loan Amount is due and payable to Lender as of the date hereof and that Borrower has failed to make repayment." Although ZED was entitled to immediate repayment, without evidence of replacement funds ZED agreed to leave the Loan Amount in place pending CSDS's receipt of the replacement funds that CSDS represented its new lender would provide. ZED agreed to forbear from exercising remedies only until 3:00 p.m. (New York time) on April 17, 2026. ZED's objective throughout was repayment of its principal and, secondarily, to be paid its fees if the aircraft transaction succeeded.

39. Section 3 of the Forbearance Agreement provided for an Aircraft Success Fee of US$200,000 per Spirit aircraft acquired by CSDS, payable upon CSDS's later resale, lease, or consignment of such aircraft. ZED therefore had a direct financial interest in CSDS completing

the purchase of the Spirit aircraft. ZED gained nothing — and stood to lose a substantial fee — if the transaction failed.

**ZED Properly Recovered $8,000,000 of Its Own Escrowed Funds on April 7, 2026**

40. On April 6, 2026 at 2:12 p.m., Mr. Iacono wrote to Erin Van Laanen and Maria Gonzalez of the Escrow Agent, copying Mr. Sirimanne, Mr. Lesnik, and me, under the subject line "CSDS Incoming Wire and ZED SEACOAST INSTRUCTIONS," stating: "Per Bens incoming wire and instructions, please wire $8m to our Seacoast Bank Account at your earliest convenience." A true and correct copy of that email chain is attached hereto as **Exhibit E**.

41. Mr. Iacono sent that instruction in his capacity as an authorized officer of ZED, directing the return of ZED's own escrowed funds to ZED's own disclosed account, as the ZED Escrow Terms expressly permitted ZED to do unilaterally. Mr. Sirimanne of CSDS was copied on the instruction. Nothing was hidden from CSDS.

42. On the morning of April 7, 2026, Ms. Gonzalez replied on the same chain, again copying Mr. Sirimanne: "Hi Jim, We will get this wire out today, and send the confirmation once we have it." That afternoon, Ms. Gonzalez confirmed that the wire had been sent, under Fed reference FEDR:20260407B6B7HU2R014507. I confirmed by email that the wire had been received into ZED's Seacoast account.

43. The reference to "Ben's incoming wire and instructions" in the April 6 email was to a replacement wire that Mr. Sirimanne of CSDS represented to ZED had been received from CSDS's new lender in the amount of $8 million. Because CSDS represented that only $8 million in replacement funds had arrived, ZED instructed the Escrow Agent to return only $8 million of ZED's loaned funds, and the balance of $38,350,000 was left in the ZED escrow pending receipt of the remaining replacement funds from CSDS's new lender. I understood that the $8 million was

not an arbitrarily selected amount; it was the amount confirmed by CSDS and McAfee & Taft as actually replaced and the amount ZED, in turn, subsequently called for its return. CSDS further advised ZED that CSDS's new lender was providing replacement funds and financing such that the balance of ZED's loan could be replaced.

44. ZED requested the $8,000,000 return exactly as the ZED Escrow Terms permitted, and McAfee & Taft as Escrow Agent complied. At no point did McAfee & Taft as Escrow Agent indicate that ZED's request conflicted with any escrow arrangement between CSDS and Spirit, that any of ZED's funds constituted a deposit for the Spirit transaction, or that the funds could not be returned to ZED. Neither Ms. Gonzalez nor Mr. Sirimanne questioned the premise of Mr. Iacono's instruction — that CSDS's incoming wire was replacing $8 million of ZED's loan — or suggested that ZED's funds were subject to any obligation to Spirit.

**ZED Properly Recovered the Remaining $38,350,000 on April 17, 2026**

45. On April 17, 2026 — the date the Forbearance Period expired by its terms at 3:00 p.m. New York time — at 10:41 a.m., I wrote to Ms. Maria Gonzalez at M&T, copying Mr. Iacono, Mr. Lesnik, Mr. Sirimanne, and Ms. Van Laanen, requesting the "return of all remaining funds from ZED Aerocapital's escrow today." I stated that "Ben of CSDS is CC'd here for visibility and fully supports the plan for full capital return today," and that "[w]e are expecting two wires from M&T today. The first is a return of our escrow, and the second wire is a payment from Ben to ZED Aerocapital that he will further instruct." A true and correct copy of that email chain is attached hereto as **Exhibit F.**

46. At 10:51 a.m., Mr. Lesnik replied: "Please let this email serve as my approval to wire all remaining funds from the Zed AeroCapital escrow account to our Seacoast account. Please confirm the amounts of the wires so we can have Seacoast on the look out." Ms. Gonzalez then

responded: "Can you provide additional information regarding the second wire? At this time, we only have the funds in the escrow account. Further, per Zed's instructions, we are to receive authorization from Gary (below) and either Jim or Zander. Can Jim or Zander also confirm?" I replied: "Yes, please send the funds from our escrow account. Ben will provide further instructions for additional funds delivered today. I approve this wire." At 12:13 p.m., Mr. Iacono replied: "I authorize the wire to be released and leave from the Zed AeroCapital account."

47. At 12:28 p.m., Ms. Gonzalez wrote: "With regard to the wire for the escrow, the starting balance was $46,350,000 USD. We sent $8,000,000 back to ZED on April 7 . . . The current balance in the escrow is $38,350,000. . . . I understand that Ben is working on the second wire." The wire was sent later that day, under Fed reference FEDR:20260417B6B7HU1R013607. The Escrow Agent itself thus maintained and reported on a discrete "Zed AeroCapital escrow account."

48. Once again, ZED requested the return of its funds exactly as the ZED Escrow Terms permitted, but McAfee & Taft as Escrow Agent did not immediately send the wire – it indicated it was waiting for additional funds from CSDS before wiring. McAfee & Taft as Escrow Agent confirmed the balance of the "Zed AeroCapital escrow account," obtained the dual authorization ZED itself had required, and sent the wire. McAfee & Taft as Escrow Agent also distinguished between ZED's escrowed funds and the separate incoming wire from CSDS, noting that "we only have the funds in the escrow account" and later advising: "***As soon as we receive the additional wire from Ben, we will send both wires to Zed***." That sequencing matched exactly what CSDS had represented to ZED: that CSDS's replacement funds were arriving, and ZED's bridge funds were being returned as they were replaced. At no point did McAfee & Taft as Escrow Agent indicate that the return conflicted with any escrow arrangement between CSDS and Spirit, that any

portion of ZED's funds constituted a deposit for the Spirit transaction, or that the funds could not be released to ZED. Nor did Mr. Sirimanne, who was copied throughout and "fully support[ed] the plan for full capital return," raise any such objection.

49. The fact that ZED's funds were returned in two tranches, 10 days apart, corroborates what ZED was being told: that its bridge funds were being returned as CSDS's replacement financing arrived. If ZED had been doing anything other than recovering funds as they were replaced, there would have been no reason to stage the return. ZED could have demanded, and the Escrow Agent could have sent, the entire $46,350,000 at once. Instead, ZED took back only the $8,000,000 that CSDS represented had been replaced on April 6, left the remaining $38,350,000 in escrow pending the balance of the replacement funds, and requested the remainder only on April 17 when it was again represented by CSDS and McAfee & Taft as Escrow Agent that its money had been replaced for a second time.

50. The total returned to ZED was $46,350,000 — exactly the amount ZED had deposited into its own escrow. ZED did not receive one dollar in excess of its own principal from the escrow. By the end of the day on April 17, 2026, ZED had recovered all of its funds — before Mr. Sirimanne submitted his declaration on or about April 20, 2026, before the sale hearing on April 23, 2026, and before the Court entered the HFS Sale Order on April 24, 2026.

51. At no time did ZED request, receive, or direct any payment of funds from Spirit's escrow under Spirit's February 9, 2026 escrow agreement. ZED received only its own $46,350,000 from the escrow established under the ZED Escrow Terms.

52. Other than a single payment of $1,000,000, CSDS failed to pay ZED the interest and fees owed under the Loan Agreement and the Forbearance Agreement, including the Loan Fee of $4,635,000, the accrued Extension Fees, late interest, and any Aircraft Success Fee. Apart from

that payment, ZED received nothing from CSDS beyond the return of its own loaned principal from the ZED escrow. ZED is itself initiating legal action against CSDS for its default under the Loan Agreement and the Forbearance Agreement.

**ZED Had No Knowledge of the Sirimanne Declaration**

53. Neither ZED nor its principals had any knowledge of the declaration submitted by Mr. Sirimanne in the Chapter 11 cases on or about April 20, 2026 [Main Case ECF No. 966], or of its contents, until after this litigation commenced. Neither ZED nor its principals reviewed it, were consulted about it, or provided any information for it. The same is true of the HFS Sale Order entered on April 24, 2026.

54. ZED's funds had already been returned in full by April 17, 2026 — three days before Mr. Sirimanne's declaration, six days before the sale hearing on April 23, 2026, and seven days before the HFS Sale Order. Whatever Mr. Sirimanne told the Court on April 20, 2026 about CSDS's Good Faith Deposit, it could not have rested on ZED's funds, because by then the ZED escrow held nothing and both CSDS and McAfee & Taft as Escrow Agent were fully aware of this fact. ZED had no role in, and no knowledge of, anything CSDS and McAfee & Taft as Escrow Agent represented to the Court.

**ZED Was Never Served But Has Fully Complied with the Amended TRO**

55. ZED was never served with a summons and complaint in this adversary proceeding. Neither Mr. Iacono, nor Mr. Lesnik, nor I was served with a summons and complaint either. ZED first learned of the Amended Temporary Restraining Order entered October 21, 2026 [Adv. ECF No. 15] when a copy was sent by email to ZED's aviation counsel, who forwarded it to ZED. Neither I nor, to my knowledge, anyone at ZED received any notice from Spirit or its counsel before the Amended TRO was entered that Spirit would seek to restrain the ZED Parties' assets.

56. Attached hereto as **Exhibit G** is a true and correct copy of an email, dated October 19, 2026, from ZED's counsel, Cole Schotz P.C. ("**Cole Schotz**"), to Spirit's counsel, advising that Cole Schotz represents ZED in this matter. I understand that this email was followed by a virtual Microsoft Teams meeting on October 20, 2026, during which ZED's counsel discussed ZED's willingness to work with Spirit to get to the bottom of CSDS's actions. Despite Spirit's counsel being fully aware of Cole Schotz's representation of ZED, Spirit sought the Amended TRO without providing any notice whatsoever to ZED or its counsel.

**57.** Since receiving notice of the Amended TRO, neither I, nor Mr. Iacono, nor Mr. Lesnik, nor to my knowledge ZED or any of its other personnel, has transferred, withdrawn, encumbered, disbursed, secreted, or moved any assets in contravention of its terms.

**The Asset Freeze Is Causing Severe and Irreparable Harm to ZED and Its Principals**

58. ZED is an active operating business. It is engaged in lending and financing transactions on a continuous basis, and it is known in the aviation finance market for its speed in providing financing. ZED's ability to move capital promptly is central to its business and to its reputation with counterparties. The Amended TRO has frozen ZED's assets and, in full effect, shut down ZED's business: ZED cannot fund pending or new transactions, cannot meet its ordinary operating obligations, and is suffering ongoing harm to the relationships and reputation on which its business depends.

59. The extension of the Amended TRO to ZED's principals, Mr. Iacono, Mr. Lesnik, and me, is unwarranted and unjust. None of us received any of the funds at issue in our personal capacities, yet our personal assets have been restrained. As a result, we cannot pay our ordinary bills or meet basic living expenses, down to buying a cup of coffee.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated October 25, 202

Signed by:

Alexander Futernick

AA04E270C57F4F1...

**Alexander Futernick**
Managing Partner, ZED AeroCapital LLC

# EXHIBIT A

---------- Forwarded message ----------
From: Jim Iacono <jetvision7@gmail.com>
Date: Saturday, February 14 2026 at 5:09 AM JST
Subject: Fwd: Investment agreement between CSDS-Indonesian Firm / Confidential
To: Zander Futernick <zander@zedaerocapital.com>

---------- Forwarded message ---------
From: **Benedict Sirimanne** <ben@csdsjets.com>
Date: Fri, Feb 13, 2026 at 1:47 PM
Subject: Investment agreement between CSDS-Indonesian Firm / Confidential
To: Jim Iacono <jetvision7@gmail.com>

Hi! Jim,

Please see attached the investment agreement signed between CSDS and Batavia in Indonesia,
For your reference. This is where the $53.35 Million is coming from.

Brgds

**Benedict Sirimanne**
President
*CSDS Aircraft*
609 Deep Valley Drive, Suite 200,
Rolling Hills Estates, Ca 90274. USA
Tel: (520)614-6691
Fax: (310)734 1691
Mobile: (310)980 4158
www.csdsaircraft.com

This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you have received this email in error please notify the sender. This message contains confidential information and is intended only for the individual named. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. If you are not the intended recipient you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited

--
**Jim Iacono**
**781-439-0180**

# INVESTMENT AND PROFIT SHARE MASTER AGREEMENT

AGREEMENT NO. 001 /SPA/BKI-CSDS/I/2026
DATED ON January 26th, 2026

PERJANJIAN JUAL BELI
PERJANJIAN NO. 001 /SPA/BKI-CSDS/I/2026
DITETAPKAN PADA TANGGAL 26 Januari 2026

---

This INVESTMENT AGREEMENT is made and signed **on** January 26th, 2026 by and between:

**Perjanjian Jual Beli ini dibuat dan ditandatangani pada tanggal 26 Januari 2026 oleh dan antara:**

**PT. BATAVIA KREATIF INDONESIA**, a limited company engaged in general contractor, trading and supplier, with offices at CEO Building floor 2, ASKRIDA TOWER 2nd Floor Room 201 Jln. Pramuka Raya Kav 151 Jakarta, Indonesia and Represented By **H.F SUKIMAN ARDHALIWA,SH.,M.M,**
("hereinafter referred to as the Buyer's Representative and on Behalf of the Investor or Guarantor")

> ***PT. BATAVIA KREATIF INDONESIA****, sebuah Perusahaan terbatas yang bergerak dibidang Kontraktor, Perdagangan Umum dan Supplier, beralamat di CEO Building lantai 2, ASKRIDA TOWER 2nd Floor Room 201 Jln. Pramuka Raya Kav 151 Jakarta, Indonesia dan diwakili oleh* ***H.F SUKIMAN ARDHALIWA,SH.,M.M***

*("selanjutnya disebut perwakilan Pembeli Dan Atas Nama Pemilik Collateral Atau Garantor")*

AND / DAN

**CSDS ASSET MANAGEMENT LLC** a Company, Incorporated under the company Registration No E0171842017-1 issued by the Government of Carson City, Nevada, USA., having its registered office at 701 E Carson Street, #200, Carson City, Nevada 89701, USA and represented by **MR.SHANYA SIRIMANNE**
(Hereinafter referred to as the Beneficiary or Guarantee).

> **CSDS ASSET MANAGEMENT LLC***, suatu Perseroan yang didirikan berdasarkan tanda daftar perusahaan No. E0171842017-1 yang dikeluarkan oleh Pemerintah Carson City, Nevada, USA berkantor pusat di . 701 E Carson Street, #200, Carson City, Nevada 89701, USA dan diwakili oleh Bapak* ***Benedict Sirimanne***
> *(Selanjutnya disebut PENJUAL ATAU PENYEWA COLLATERAL).*

The Buyer and the Seller hereby explain:
**Pembeli dan PENJUAL Atau PENYEWA COLLATERALdengan ini menjelaskan:**



CSDS Asset Management LLc,
Nevada,USA. Reg# 0171942017-1

1. That investor hereby intends to fund the purchase of Twenty (20) **Airbus Spirit Airlines A320 - A 321 Fleet Aircraft** (hereinafter reffered to as PRODUCT) and the Beneficiary states that it is willing to perform the duties of securing the collateral and further sell them for profit.

**Bahwa PENJUAL Atau PENYEWA COLLATERALdengan ini bermaksud untuk menjual The Airbus Spirit Airlines A320 - A 321 Fleet Aircraft (selanjutnya disebut PRODUK) dan Pembeli menyatakan bersedia untuk membeli Produk tersebut, dengan harga dan spesifikasi sebagai berikut**

| Product Description | Unit Price |
|---|---|

| Type | Build | Tail | MSN | ESN 1 | TSN | CSN | RSV1 Date | ESN 2 | TSN | CSN | RSV1 Date |
|---|---|---|---|---|---|---|---|---|---|---|---|
| A320 | 2015 | 638 | 6463 | V17579 | 31,826 | 14,315 | Jun-24 | V17588 | 30,794 | 13,966 | Jul-21 |
| A320 | 2018 | 694 | 8632 | V18891 | 19,353 | 8,716 | N/A | V18892 | 12,142 | 5,451 | N/A |
| A320 | 2019 | 696 | 8824 | V18936 | 15,794 | 7,261 | N/A | V18937 | 18,030 | 6,060 | N/A |
| A321 | 2015 | 658 | 6736 | V17844 | 17,019 | 7,791 | Oct-25 | V17872 | 25,986 | 11,566 | Aug-22 |
| A321 | 2017 | 674 | 7462 | V18452 | 21,113 | 9,297 | Aug-22 | V18453 | 25,314 | 11,193 | Nov-25 |
| A320 | 2017 | 647 | 7635 | V18426 | 26,212 | 11,902 | Nov-25 | V18430 | 24,864 | 11,203 | Nov-25 |
| A321 | 2017 | 673 | 7395 | V18413 | 24,635 | 10,875 | Nov-24 | V18415 | 24,212 | 10,758 | Oct-23 |
| A320 | 2017 | 650 | 7724 | V18570 | 24,842 | 11,199 | Nov-25 | V18571 | 24,838 | 11,199 | Nov-25 |
| A320 | 2015 | 641 | 6566 | V17693 | 31,927 | 14,599 | Jun-25 | V17704 | 31,881 | 14,607 | Jul-24 |
| A320 | 2017 | 649 | 7679 | V18466 | 24,597 | 11,149 | Dec-25 | V18483 | 25,568 | 11,566 | Oct-25 |
| A320 | 2015 | 642 | 6586 | V17669 | 31,766 | 14,456 | Jan-24 | V17709 | 31,900 | 14,503 | Nov-24 |
| A321 | 2017 | 678 | 7857 | V18594 | 23,651 | 10,487 | Oct-25 | V18599 | 22,874 | 10,098 | Jan-26 |
| A320 | 2015 | 639 | 6487 | V17626 | 30,462 | 13,807 | Apr-24 | V17628 | 32,285 | 14,681 | Apr-24 |
| A320 | 2015 | 640 | 6507 | V17639 | 32,086 | 14,514 | Aug-24 | V17648 | 31,542 | 14,255 | Nov-24 |
| A321 | 2017 | 681 | 7908 | V18648 | 21,687 | 9,588 | Jan-26 | V18649 | 22,817 | 10,090 | Feb-26 |
| A320 | 2018 | 693 | 8659 | V18897 | 16,552 | 7,594 | N/A | V18902 | 19,837 | 9,043 | N/A |
| A321 | 2017 | 675 | 7668 | V18479 | 23,620 | 10,435 | Oct-25 | V18481 | 24,301 | 10,735 | Mar-26 |
| A320 | 2018 | 691 | 8614 | V18888 | 17,446 | 8,120 | N/A | V18886 | 18,595 | 8,591 | N/A |
| A320 | 2018 | 692 | 8611 | V18881 | 19,351 | 8,889 | N/A | V18878 | 19,351 | 8,889 | N/A |
| A321 | 2017 | 682 | 7957 | V18670 | 22,534 | 9,965 | Oct-25 | V18671 | 23,133 | 10,157 | Apr-26 |




2. Purchase of goods using the payment method of Standby Letter Of Credit *(Hereinafter referred to as SBLC)* which will be issued by the BUYER'S BANK.

**Pembelian barang menggunakan metode pembayaran dengan menggunakan standby letter of credit (selanjutnya disebut SBLC) yang akan diterbitkan oleh BANK PEMBELI.**

3. That the Investor agrees to fund the initial deposit of $53 Million to the escrow of McAfee & Taft in Oklahoma City, OKlahoma, USA, as a cash deposit.

CSDS Asset Management LLc, Nevada, USA. Reg# 0171942017-1

4. All funds for this transaction being provided by the investor/ Guarantor is coming from the investor owned assets which are free & clear and of no criminal origins.

   Seluruh dana untuk transaksi ini yang disediakan oleh investor/ penjamin berasal dari aset milik investor yang bebas dari beban dan tidak berasal dari tindak kriminal.

**Oleh karena itu, berdasarkan keadaan di atas, Para Pihak dengan ini sepakat untuk mengatur dan melaksanakan Kontrak ini dengan syarat dan ketentuan sebagai berikut:**

**CLAUSE 1 : PURPOSE AND OBJECTIVES**

**KLAUSULA 1 : MAKSUD DAN TUJUAN**

The Investor and the Beneficiary, under full corporate responsibility, hereby agrees on the following matters:

**PENJUAL Atau PENYEWA COLLATERALdan Pembeli, dengan tanggung jawab penuh, dengan ini menyetujui hal-hal berikut:**

1. That the Beneficiary has full corporate authority to sell the Product, quality and in the quantity as herein specified, and

   **Bahwa PENJUAL Atau PENYEWA COLLATERALmemiliki kewenangan penuh secara korporat untuk menjual Produk, dengan kualitas dan dalam jumlah seperti yang ditentukan di sini, dan**

2. That the Investor has full corporate authority to perform and pay for the funds, as specified.

   **Bahwa Pembeli memiliki kewenangan penuh untuk membeli dan membayar Produk, kualitas dan kuantitas seperti yang ditentukan di sini.**

**CLAUSE 2 : QUANTITY AND DELIVERY**

**KLAUSUL 2 : KUANTITAS DAN PENGIRIMAN**

1. Collateral of Product in this contract is **20 units (twenty units)** and it is valid for 1 (one)) year contract supply.

   **Kuantitas Produk dalam kontrak ini adalah 20 unit (dua puluh unit) dan berlaku untuk pasokan selama 1 (satu) tahun kontrak**

2. Each order will begin with the issuance of a Purchase Order (PO) and be followed by a **SBLC** addressed from the Buyer to the Seller. The PO will state the items ordered and the number of items.

   **Setiap pemesanan akan dimulai dengan penerbitan Purchase Order (PO) dan diikuti dengan SBLC yang ditujukan dari Pembeli kepada PENJUAL Atau PENYEWA COLLATERAL. PO akan mencantumkan barang yang dipesan dan jumlah barang.**



CSDS Asset Management LLc, Nevada,USA. Reg# 0171942017-1

3. The delivery schedule for Product as referred to in Clause 2.1 above will be submitted by the Seller to the Buyer within 3 (three) Month after the Seller receives the SBLC

   **Jadwal pengiriman Produk sebagaimana dimaksud dalam Klausul 2.1 di atas akan disampaikan oleh PENJUAL Atau PENYEWA COLLATERAL kepada Pembeli dalam jangka waktu 3 (tiga) Bulan setelah PENJUAL Atau PENYEWA COLLATERAL menerima SBLC**

4. Each delivery, Buyer will issue a Purchase Order containing description of goods, quantity, destination of delivery, etc. The quantity ordered may different on each PO Not always the same quantity.

   **Setiap pengiriman, Pembeli akan menerbitkan Purchase Order yang berisi deskripsi barang, jumlah, tujuan pengiriman, dll. Jumlah yang dipesan mungkin berbeda pada setiap PO. Tidak selalu dalam jumlah yang sama.**

**CLAUSE 3 : DURATION**

**KLAUSUL 3 : DURASI**

1. This Contract shall be valid for a period of 1 (one) year from the date of signature of this contract which will be revised every 3 (three) months upon the agreement of the Parties.

   **Kontrak ini berlaku untuk jangka waktu 1 (satu) tahun sejak tanggal penandatanganan kontrak ini yang akan direvisi setiap 3 (tiga) bulan berdasarkan kesepakatan Para Pihak.**

2. The duration of the contract can be extended if the parties agree to implement it.

   **Jangka waktu kontrak dapat diperpanjang apabila para pihak sepakat untuk melaksanakannya**

**CLAUSE 4 : PRICE**

**KLAUSUL 4 : HARGA**

1. The parties have agreed that the price of Product in this agreement is **based on the price at the time the PO was issued and in US$ DOLLARS** per unit excluding value added tax and income tax and if the transaction is taxed then the tax becomes the responsibility of the buyer and the price FOT Buyer Warehouse in Jakarta, Indonesia

   **Para pihak telah sepakat bahwa harga Produk dalam perjanjian ini adalah berdasarkan harga pada saat PO diterbitkan dan dalam mata uang USD per unit tidak termasuk pajak pertambahan nilai dan pajak penghasilan dan apabila transaksi tersebut dikenakan pajak maka pajak tersebut menjadi tanggung jawab pembeli dan harga tersebut. FOT Gudang Pembeli di Jakarta, Indonesia.**

2. This price is valid for 1 (one) year since the date of agreement signed by both parties. It means that this price does not change during the contract period for the agreed quantity of goods.

   **Harga ini berlaku selama 1 (satu) tahun sejak tanggal perjanjian ditandatangani oleh kedua belah pihak. Artinya harga ini tidak berubah selama masa kontrak untuk jumlah barang yang telah disepakati.**

3. Total price is $ 250.000.000. USD (Two Hundred fify Million United Stated Dollar )**.**

   **Total harga adalah $ 250.000.000. USD (Dua Ratus Lima Puluh Juta Dollars USD ).**



CSDS Asset Management LLc,
Nevada, USA. Reg# 0171942017-1

**CLAUSE 5 : PAYMENT AND IMPLEMENTATION MECHANISM**

**KLAUSUL 5 : PEMBAYARAN DAN MEKANISME PELAKSANAAN**

1. The buyer will issue an SBLC in irrevocable and transferable form. The SBLC value stated in the PO is $250,000,000 USD (two hundred and fifty million US dollars).

   **Pembeli akan menerbitkan SBLC dalam bentuk irrevocable dan transferable. Nilai SBLC yang tercantum dalam PO Adalah Sebesar $ 250.000.000. USD (Dua Ratus Lima Puluh Juta Dollars USD ).**

2. **Swift MT.760 will be issued no later than 3 (three) banking days after the signing of this contract, and a copy of the swift will be provided as proof of delivery from Applicant bank officer.**

   **Swift MT.760 akan diterbitkan selambat-lambatnya 3(Tiga) hari Jam kerja Bank setelah penandatanganan kontrak ini dan akan diberikan copy swift sebagai bukti sudah terkirim Dari Bank Officer Applicant**

3. **After the SWIFT MT 760 is received by the SBLC Recipient Bank and submitted to the Bank Officer Applicant, that the Bank Officer Beneficiary states that it has received the MT.760, and sends proof of the Swift MT.760 Copy, then CSDS ASSET MANAGEMENT LLC carries out RTGS and/or Overbooking of its funds for payment of a 1% (One Percent) Provision fee of $ 2,500,000.- USD – (Two Million Five Hundred Thousand Dollars) Equivalent to Rp. 41,250,000,000.,- (Forty One Billion Two Hundred and Fifty Million Rupiah) and Collateral Rental Fee 8% (Eight Percent) $20,000,000.- USD (Twenty Million Dollars) Equivalent to Rp.330,000,000,000.,- (Three Hundred and Thirty Billion Rupiah) And For Mediation Fee 3% $7,500,000.- USD – (Seven Million Five Hundred Thousand Dollars) equivalent to Rp.123,750,000,000.,- (One Hundred and Twenty Three Billion Seven Hundred and Fifty Million Rupiah) Total of 12% (Twelve Percent) ) $30,000,000.- USD (Thirty Million Dollars) equivalent Rp.495,000,000,000.- (Four Hundred Ninety Five Billion Rupiah) to the bank account designated by the Buyer or Applicant, from the official fees according to the applicable banking regulations and submitted by the Bank Officer to the MT 760 receiving bank for SBLC payment.**

   **Setelah SWIFT MT 760 diterima oleh Bank Penerima SBLC Dan disampaikan kepada Bank Officer Applicant,Bahwa Bank Officer Benefiacary Menyatakan sudah menerima MT.760, Dan Mengirim bukti Copy Swift MT.760 ,Maka CSDS ASSET MANAGEMENT LLC melakukan RTGS dan/atau Over booking dananya untuk pembayaran biaya Provisi 1% (Satu Persen) $ 2,500,000.- USD – (Dua Juta Lima Ratus Ribu Dollars)Setara Rp. 41,250,000,000.,- (Empat Pulh Satu Milyar Dua Ratus Lima Puluh Juta Rupiah) dan Biaya Sewa Collateral 8%(Delapan Persen)$20,000,000.- USD(Dua Puluh Juta Dollars ) Setara Rp.330,000,000,000.,- (Tiga Ratus Tiga Puluh Milyar Rupiah) Dan Untuk Fee Para Mediasi 3% $7,500,000.- USD – (Tujuh Juta Lima Ratus Ribu Dollars ) setara Rp.123,750,000,000.,- (Seratus Dua Puluh Tiga Milyar Tujuh Ratus Lima Puluh Juta Rupiah) Total sebesar 12% (Dua Belas persen) )$30,000,000.- USD(Tiga Puluh Juta Dollars ) setara Rp.495,000,000,000.,- (Empat Ratus Sembilan Puluh Lima Milyar Rupiah) ke rekening bank yang ditunjuk oleh Pihak Pembeli Atau Pihak Applicant, dari biaya resmi menurut regulasi perbankan yang berlaku dan disampaikan oleh Bank Officer pada bank penerima MT 760 untuk pembayaran SBLC**

CSDS Asset Management LLc, Nevada, USA. Reg# 0171942017-1

**OWNER/APPLICANT,BUYER-CIS (Details of Bank Account)**

| | |
|---|---|
| Bank Name | HSBC HOLDINGS PLC LONDON UNITED KINGDOM |
| Bank Address | 8 CANADA SQUARE, LONDON E14 5HQ, UNITED KINGDOM |
| Bank Swift | MIDLGB22 |
| Account Name | SRI SATRIO SAWUNGGALING |
| Account Number | [redacted]459 |
| Account Signatory Name and Title | SRI SATRIO SAWUNGGALING |
| Bank Officer Name | Mr.GEORGES ELHEDRY,CEO<br>Mr.MARK E TUCKER,Chairman |
| Bank Officer Phone Number | **+44(0) 20 7991 8888 / 44(0)20 7992 4880** |
| Bank Officer Email | Georges.elhedry@hsbc.com<br>mark.tucker@hsbc.com |
| FOR THE BENEFIT OF | TBA |

**MONETIZER'S/BENEFITCIARY,SELLER-CIS (Details of Bank Account)**

| | |
|---|---|
| Bank Name | CITIBANK |
| Bank Address | 100 City Drive, San Antonio, TX 78245, USA |
| Bank Swift | CITIUS33 |
| Account Name | **CSDS AIRCRAFT<br>609 Deep Valley Drive, Suite 200, Rolling Hills Estates, Ca 90274 USA.Tel: (520) 614-6691** |
| Account Number | [redacted]323 |
| Account Signatory Name and Title | SRI SATRIO SAWUNGGALING |
| Bank Officer Name | **MONICA** |
| Bank Officer Phone Number | TBA |
| Bank Officer Email | **trade.csu@citi.com** |
| FOR THE BENEFIT OF | TBA |

**CLAUSE 6 : FORCE MAJEURE**

**KLAUSUL 6: KEADAAN DARURAT/BENCANA**

1. If the delivery of all or part of the Product in this Contract is delayed and / or delayed and / or can not be transmitted as a result of factors beyond the control of the Seller and Buyer, such as war, civil violence, operations m, iliter, riots, Sabotage, quarantine, prohibition, rebellion, extreme weather conditions on land or sea, floods, tsunamis, volcanic eruptions, earthquakes, explosions, epidemics, blockades, revolutions, mobilizations, strikes, chaos or any other will of God, Buyers and Sellers must be freed Of his responsibility for carrying out the contract, which has been pre- arranged. The obligations of the parties concerned to deliver the goods under this contract rule may be suspended for duration and force majeure without penalty, but not more than 3 (three) months. If the duration of force majeure exceeds 3 (three) months, the other party has the option to cancel this contract in accordance with the quantity of the undisanded item.

   **Apabila penyerahan seluruh atau sebagian Produk dalam Kontrak ini tertunda dan/atau tertunda dan/atau tidak dapat disalurkan sebagai akibat dari faktor-faktor yang berada di luar kendali PENJUAL Atau PENYEWA COLLATERALdan Pembeli, seperti perang,**



CSDS Asset Management LLc,
Nevada,USA. Reg# 0171942017-A

**kekerasan sipil, operasi m,iliter, huru-hara, sabotase, karantina, pelarangan, pemberontakan kondisi cuaca ekstrim di darat atau laut, banjir, tsunami, letusan gunung berapi, gempa bumi, ledakan, epidemi, blokade, revolusi, mobilisasi, pemogokan, kekacauan atau kehendak Tuhan lainnya, Pembeli dan PENJUAL Atau PENYEWA COLLATERALharus dibebaskan dari tanggung jawabnya dalam melaksanakan kontrak yang telah diatur sebelumnya. Kewajiban para pihak yang bersangkutan untuk menyerahkan barang berdasarkan aturan kontrak ini dapat ditangguhkan untuk jangka waktu dan keadaan kahar tanpa denda, tetapi tidak lebih dari 3 (tiga) bulan. Jika durasi keadaan kahar melebihi 3 (tiga) bulan, pihak lain memiliki opsi untuk membatalkan kontrak ini sesuai dengan kuantitas barang yang belum dikirim.**

2. If force majeure conditions arise as written in clause 6.1 above, then the party concerned shall notify the other party by fax or e-mail as soon as possible and within 1 (one) week of the incident informing in particular the circumstances in which the execution is pending as a result of the circumstances In article 6.1 and notify further at the same time or at the latest within 1 (one) week after the event, with evidence of force majeure occurrence. The party stating the force majeure shall, within the time period of force majeure, undertake the best to perform its obligations under this contract with a minimum pling delay and the party shall always inform the other party of the progressive details of the occurrence of force majeure, the prospect of settlement of these circumstances and the forwarding the performance of its obligations under this contract.

   **Apabila terjadi keadaan DARURAT/BENCANA seperti yang tertulis pada pasal 6.1 di atas, maka pihak yang bersangkutan wajib memberitahukan kepada pihak lainnya melalui faksimili atau e-mail sesegera mungkin dan dalam waktu 1 (satu) minggu sejak kejadian yang menginformasikan secara khusus keadaan di mana eksekusi tertunda sebagai akibat dari keadaan pada pasal 6.1 dan memberitahukan lebih lanjut pada saat yang sama atau paling lambat dalam waktu 1 (satu) minggu sejak kejadian tersebut, dengan disertai bukti-bukti terjadinya keadaan kahar. Pihak yang menyatakan keadaan kahar harus, dalam jangka waktu keadaan kahar, berusaha sebaik mungkin untuk melaksanakan kewajibannya berdasarkan kontrak ini dengan penundaan yang seminimal mungkin dan pihak tersebut harus selalu memberitahukan kepada pihak lainnya mengenai rincian perkembangan terjadinya keadaan kahar, kemungkinan penyelesaian keadaan tersebut dan meneruskan pelaksanaan kewajibannya berdasarkan kontrak ini.**

**CLAUSE 7 : DELIVERY FAILURE**

**KLAUSUL 7 : KEGAGALAN PENGIRIMAN**

In the event of failure by the Seller affecting the delivery of cargo or by the Purchaser of the cargo shipments, as defined herein, resulting from liability to the Seller or Buyer, the injured party has the right to claim financial compensation from the responsible party, The option to cancel this contract for an undeliverable quantity or to receive supplies in a manner that will be mutually agreed upon by both parties.

**Jika terjadi kegagalan oleh PENJUAL Atau PENYEWA COLLATERAL yang mempengaruhi pengiriman kargo atau oleh Pembeli atas pengiriman kargo, sebagaimana didefinisikan di sini, yang diakibatkan oleh tanggung jawab kepada PENJUAL Atau PENYEWA COLLATERAL atau Pembeli, pihak yang dirugikan memiliki hak untuk mengklaim kompensasi finansial dari pihak yang bertanggung jawab, Pilihan untuk membatalkan kontrak ini untuk jumlah yang tidak dapat dikirim atau untuk menerima pasokan dengan cara yang akan disepakati bersama oleh kedua belah pihak.**

CSDS Asset Management LLc,
Nevada,USA. Reg# 0171942017-1

**CLAUSE 8 : COST & EXPENSES**

**KLAUSUL 8 : BIAYA & PENGELUARAN**

1. All expenses and expenses incurred by the Seller to provide, transport and load the Product until the Product has been delivered to the Buyer warehouse shall be borne by the Seller including costs and expenses, any other expenses incurred by Seller to perform its obligations in providing Productunder this contract.

   **Seluruh biaya dan pengeluaran yang dikeluarkan oleh PENJUAL Atau PENYEWA COLLATERALuntuk menyediakan, mengangkut dan memuat Produk hingga Produk tersebut dikirim ke gudang Pembeli akan ditanggung oleh PENJUAL Atau PENYEWA COLLATERAL termasuk biaya dan pengeluaran, setiap biaya lainnya yang dikeluarkan oleh PENJUAL Atau PENYEWA COLLATERAL untuk melaksanakan kewajibannya dalam menyediakan Produk berdasarkan kontrak ini.**

2. In respect of all written contracts between the parties, each party shall pay all of its own expenses and expenses pertaining to the negotiation, preparation, execution and delivery of this contract and any other contracts or documents to be entered or signed connected to this contract

   **Sehubungan dengan semua kontrak tertulis antara para pihak, masing-masing pihak harus membayar semua biaya dan pengeluarannya sendiri yang berkaitan dengan negosiasi, persiapan, pelaksanaan dan penyerahan kontrak ini dan kontrak atau dokumen lain yang akan dibuat atau ditandatangani yang terkait dengan kontrak ini**

3. All actions taken by Buyer or Seller to perform its obligations under this contract shall be made at cost and expense alone unless otherwise stated in this contract.

   **Semua tindakan yang dilakukan oleh Pembeli atau PENJUAL Atau PENYEWA COLLATERAL untuk melaksanakan kewajibannya berdasarkan kontrak ini harus dilakukan atas biaya dan pengeluaran sendiri kecuali dinyatakan lain dalam kontrak ini.**

**CLAUSE 9 : ARBITRATION**

**KLAUSUL 9 : ARBITRASE**

1. The validity, construction and performance of this contract shall be assessed and prepared in accordance with the laws of Indonesia.

   **Keabsahan, konstruksi, dan pelaksanaan kontrak ini akan dinilai dan disiapkan sesuai dengan hukum Indonesia.**

   This contract will be executed in English and Indonesian. In the event of a dispute arising in connection with this contract will be settled through peace negotiations. In cases where no agreement is reached, the case will be settled through arbitration by 3 (three) members of the arbitral panel held in Jakarta in connection with the Indonesian Arbitration Act (BANI).

   **Kontrak ini akan dilaksanakan dalam bahasa Inggris dan Indonesia. Apabila terjadi perselisihan yang timbul sehubungan dengan kontrak ini akan diselesaikan melalui negosiasi perdamaian. Dalam hal tidak tercapai kesepakatan, maka kasus tersebut akan diselesaikan melalui arbitrase oleh 3 (tiga) orang anggota panel arbitrase yang diselenggarakan di Jakarta sesuai dengan Undang-Undang Arbitrase Indonesia (BANI).**

CSDS Asset Management LLc,
Nevada,USA. Reg# 0171942017-1

2. The decision of the Arbitration shall be final and binding on both parties. The losing party shall pay all losses incurred by the other party.

   **Keputusan Arbitrase bersifat final dan mengikat kedua belah pihak. Pihak yang kalah wajib membayar seluruh kerugian yang diderita oleh pihak lainnya**

**CLAUSE 10 : AMENDMENTS**

**KLAUSUL 10 : AMANDEMEN**

This contract will apply when the representative appointed by the Seller and Buyer signs the contract and this contract is emailed to both parties. Any changes, modifications or additions to the terms and conditions of this contract may only be made in writing and in effect when both the Seller and Buyer parties have signed the addendum. Substitution or change to this contract when signed as an addendum shall be a valid part of this main contract.

**Kontrak ini akan berlaku ketika perwakilan yang ditunjuk oleh PENJUAL Atau PENYEWA COLLATERAL dan Pembeli menandatangani kontrak dan kontrak ini dikirim melalui email kepada kedua belah pihak. Setiap perubahan, modifikasi atau penambahan syarat dan ketentuan kontrak ini hanya dapat dilakukan secara tertulis dan berlaku ketika kedua belah pihak PENJUAL Atau PENYEWA COLLATERAL dan Pembeli telah menandatangani adendum. Penggantian atau perubahan pada kontrak ini ketika ditandatangani sebagai adendum akan menjadi bagian yang sah dari kontrak utama ini.**

**CLAUSE 11 : ENTIRETY CONTRACT**

**KLAUSUL 11 : KESELURUHAN KONTRAK**

This contract constitutes the whole agreement between both parties and the terms and conditions set forth therein are the only terms and conditions. All proposals, negotiations and representations if any, made before the signing of this contract are not applicable.

**Kontrak ini merupakan keseluruhan perjanjian antara kedua belah pihak dan syarat dan ketentuan yang tercantum di dalamnya adalah satu-satunya syarat dan ketentuan. Semua proposal, negosiasi, dan representasi, jika ada, yang dibuat sebelum penandatanganan kontrak ini tidak berlaku.**

**CLAUSE 12 : ASSIGNMENT**

**KLAUSUL 12 : PENUGASAN**

No party may assign all or part of its rights or obligations in this contract to a third party without prior notice in writing to the other party

**Tidak ada pihak yang dapat mengalihkan seluruh atau sebagian hak atau kewajibannya dalam kontrak ini kepada pihak ketiga tanpa pemberitahuan sebelumnya secara tertulis kepada pihak lainnya**

**CLAUSE 13 : CONFIDENTIALITY**

**KLAUSUL 13 : KERAHASIAAN**

The contents of this contract are confidential. Each of the parties and employees, consultants and contractors shall keep a copy of this contract and all documents and any communications required under,



CSDS Asset Management LLc,
Nevada,USA. Reg# 0171942017-1

or in connection with this contract. However, each party may present this contract to professional advisors and potential borrowers to that party, to a genuine substitute, and a prospective transferor who, in the case, has agreed to be bound by this confidentiality. Simultaneously, in executing this contract, the Buyer and Seller will enter into an inevitable and open agreement that will be part of this contract.

**Isi dari kontrak ini bersifat rahasia. Masing-masing pihak dan karyawan, konsultan dan kontraktor harus menyimpan salinan kontrak ini dan semua dokumen dan komunikasi yang diperlukan berdasarkan, atau sehubungan dengan kontrak ini. Namun demikian, masing-masing pihak dapat memberikan kontrak ini kepada penasihat profesional dan calon peminjam kepada pihak tersebut, kepada pengganti yang sah, dan calon pengalihan yang, dalam hal ini, telah setuju untuk terikat oleh kerahasiaan ini. Secara bersamaan, dalam melaksanakan kontrak ini, Pembeli dan PENJUAL Atau PENYEWA COLLATERAL akan menandatangani perjanjian yang tak terelakkan dan terbuka yang akan menjadi bagian dari kontrak ini.**

This Agreement is conclusively signed and signed by the parties on the same date as above and is attended and signed by 2 (two) witnesses, and seamless in 2 (two) copies and each having the same legal power.

**Perjanjian ini dibuat dan ditandatangani oleh para pihak pada tanggal yang sama dengan tanggal tersebut di atas dengan dihadiri dan ditandatangani oleh 2 (dua) orang saksi dan dibuat dalam rangkap 2 (dua) dan masing-masing mempunyai kekuatan hukum yang sama.**

THE PARTIES AGREE AND HAVE A COMMITMENT TO SIGN THIS SALES AGREEMENT:

**PARA PIHAK SETUJU DAN MEMILIKI KOMITMEN UNTUK MENANDATANGANI PERJANJIAN PENJUAL ATAU PENYEWA COLLATERALAN INI:**

**For and on behalf of the THE SELLER,**
Signature and stamp/seal:

CSDS Asset Management LLc, Nevada,USA. Reg# 0171942017-1

| | |
|---|---|
| Name | Mr. *Benedict Sirimanne* |
| Designation | Managing Member Csds Asset Management LLC |
| Passport No | [redacted] |
| Nationality | United States Of America |
| Date of Issue | 25 March 2024 |
| Date of Expired | 25 March 2034 |

**For and on behalf of the THE BUYER,**
Signature and stamp/seal:

| | |
|---|---|
| Name | Mr.H.F Sukiman Ardhaliwa,SH.,M.M, |
| Designation | Owner/Aplplicant |
| Passport No | [redacted] |
| Nationality | INDONESIA |
| Date of Issue | 12 JUN 2019 |
| Date of Expired | 12 JUN 2024 |

WITNESS I
SAKSI I

WITNESS II
SAKSI II

WITNESS III
SAKSI III

CSDS Asset Management LLc, Nevada,USA. Reg# 0171942017-1

# EXHIBIT B

# LOAN AGREEMENT

2/16/2026 | 1:19 PM PST

**THIS LOAN AGREEMENT** ("Agreement") is made as of February __, 2026 ("Effective Date") by and **CSDS ASSET MANAGEMENT LLC**, a Nevada limited liability company ("Borrower"), whose address is 609 Deep Valley Dr. Ste 200, Rolling Hills Estates, CA 90274, and **ZED AEROCAPITAL LLC**, a Delaware limited liability company ("Lender"), whose address is 500 S. Dupont Highway, Dover, Delaware 19901. Borrower and Lender shall be individually referred to as a "Party" and referred to jointly herein as the "Parties."

## RECITALS

**A.** Borrower operates an asset management business called CSDS Asset Management LLC and requires additional operating capital for short term business needs.

**B.** Lender has funds available and is willing to loan them to the Borrower on the terms and conditions set forth herein.

**C.** Lender, Borrower and the law firm of McAfee & Taft, having an address at 211 N. Robinson Ave, Two Leadership Square, Oklahoma City, OK 73102, USA (the "Escrow Agent") have entered into those certain escrow terms and conditions dated as of February 13, 2026 (the "Escrow Agreement") pursuant to which, Lender has transferred the Loan Amount (as defined herein) to the Escrow Agent's account to hold in escrow.

**NOW, THEREFORE**, in consideration of the covenants and agreements contained herein, the Parties hereto agree as follows:

## AGREEMENT

## I. TERMS OF LOAN

**1. Loan Amount**. Lender hereby agrees to loan to Borrower the principal amount of US$46,350,000.00 (the "Loan Amount") which shall, at all times, be held in escrow by the Escrow Agent solely at Lender's order until refunded by the Escrow Agent to Lender on the Payment Date (as defined herein) in accordance with Section 1.3.1. As partial consideration for Lender making the Loan Amount available for the express purpose set forth in Section 1.4, Borrower will pay Lender a fee in the amount of US$4,635,000.00 (the "Loan Fee"). The Loan Fee shall, at all times be held in escrow by the Escrow Agent, and shall be released by the Escrow Agent to Lender on the Maturity Date (as defined herein) in accordance with Section 1.3.2. The Loan Amount, the Loan Fee, any Extension Fees (as defined herein) and all accrued interest, fees, expenses, penalties and any additional amounts owed under the Loan Documents shall be referred to herein as "Total Amount".

**2. Promissory Note.** In connection with this Agreement, Borrower will execute and deliver a promissory note in the form set out on Schedule 1 (the "Note") simultaneously with



Initial JI

DS BS

the execution of this Agreement.

**1.3 Repayment.**

1.3.1 Loan Amount. The Loan Amount shall automatically be refunded by the Escrow Agent to Lender's account set forth in Exhibit A of the Escrow Agreement on the date that is the earlier of: (a) March 30, 2026, (b) the date on which the Escrow Agent has received funds from a third-party lender in the Escrow Agent's account for the benefit of Borrower in an amount equal to or greater than the Loan Amount plus the Loan Fee, and (c) within 3 Business Days of Lender's written demand to the Escrow Agent for a refund of the same (the "Payment Date").

1.3.2 Loan Fee. The Loan Fee shall be due and payable to Lender on or before the date that is the earlier of: (a) March 30, 2026; and (b) the date on which Lender delivers the Aircraft Sale Notice (as defined herein) to the Escrow Agent in accordance with Section 1.6 of this Agreement (the "Maturity Date"). Upon the Escrow Agent's receipt of either: (x) a written notice from Lender stating that the Maturity Date has not been extended past March 30, 2026; or (z) the Aircraft Sale Notice signed by Lender, the Escrow Agent will transfer the Loan Fee to Lender's account set forth in Exhibit A of the Escrow Agreement. In the event that Lender elects, in its sole and absolute discretion, to grant Borrower any extension of the Maturity Date, Lender will deliver a written notice signed by Lender to the Escrow Agent and the Borrower setting forth the revised Maturity Date.

1.3.4 Extension Fees. In the event that the Loan Fee is not received by Lender by March 30, 2026 for any reason (including but not limited to, any extension of the Maturity Date by Lender pursuant to Section 1.3.2 above), Borrower will be obligated to pay Lender a daily fee in the amount of US$20,000.00 per calendar day (each an "Extension Fee") for each calendar day after March 30, 2026 until the date the Loan Fee plus any accrued Extension Fees and interest has been received in full by Lender. All Extension Fees will be payable in arrears on the last Business Day of each calendar month for the prior calendar month.

1.3.5 Late Interest. Should any amount due and payable to Lender under the Loan Documents (as defined herein) is not received by Lender when due, such outstanding amount(s) will accrue interest at a rate of 0.1% per calendar day (the "Interest Rate") accruing from the date such payment is due until the date such payment is actually received by Lender.

1.3.6 Lender Payment Account. In the event that Lender requires the Escrow Agent to pay the Loan Amount or the Loan Fee to any account other than the Lender's account specified in Exhibit A of the Escrow Agreement, Lender will provide the Escrow Agent with written instructions signed by Gary Lesnik (a member of Lender) and either Jim Lacono or Alexander Futernick (each members of Lender) which sets forth the bank account information to where such amounts are to be transferred together with any other information or documentation required by the Escrow Agent in accordance with Section 3(c) of the Escrow Agreement.

1.3.7 Business Day. As used herein, a "Business Day" is a day on which commercial banks in New York, NY and Oklahoma City, OK are open for the conduct of regular



Initial JI

DS BS

business that is not a Saturday or a Sunday.

**3. Escrow.** The Loan Amount shall at all times be held in escrow by the Escrow Agent to Lender's order until refunded to Lender on the Payment Date and shall solely be used to evidence proof of funds in connection with Borrower's purchase of 20 used Airbus A320-A321 aircraft from Spirit Airlines, Inc. (the "Aircraft Transaction"). Borrower hereby acknowledges and agrees that Borrower shall have no rights, title or interest in the Loan Amount and that the Loan Amount shall at all times remain the sole and unencumbered property of the Lender and not subject to any claims by Borrower, Spirit Airlines, Inc. or any other person. Borrower expressly warrants and represents that it has not and will not pledge or grant any security interest in the Loan Amount to Spirit Airlines or any other party and that Borrower has not and will not enter into any agreement purporting to convey or pledge the Loan Amount to Spirit Airlines, Inc. or any other person as security or partial payment of amounts owed in connection with the Aircraft Transaction or any other transaction. Borrower and Lender each acknowledge and agree that neither this Agreement nor any other Loan Document is for the benefit of Spirit Airlines, Inc. and shall not for any reason be deemed to be part of Spirit Airline's estate for any reason nor subject to the Spirit bankruptcy proceeding for any reason. The Loan Amount and Loan Fee will be held subject to the terms and conditions of this Agreement and the Escrow Agreement, and in no event will be released to any party other than Lender and that no consent or authorization from Borrower or any third-party (including, but not limited to Spirit Airlines, Inc.) will be required in order for the Escrow Agent to refund the Loan Amount or the Loan Fee to Lender and that Lender's unilateral written instruction to the Escrow Agent to refund the Loan Amount to Lender or pay the Loan Fee to Lender shall be sufficient for all purposes of refunding the Loan Amount to Lender. In no event will Lender have any obligation or liability in respect of the Aircraft Transaction and Borrower will indemnify and hold harmless Lender and each other Indemnified Party (as defined in Section 3 herein) in relation thereto in accordance with the provisions of Section 3 herein.

**4. Collateral.** As security for Borrower's performance under the Loan Documents, Lender hereby collaterally assigns all of its right, title and interest in and to the aircraft sale and purchase agreement in respect of the Aircraft Transaction between Borrower, as buyer, and Spirit Airlines, Inc., as seller. The foregoing lien will be released simultaneously with Borrower's repayment of the Total Amount to Lender.

**5. Guaranty.** Simultaneously with the execution of this Agreement, Borrower shall cause Sriyantha Benedict Sirimanne (the "Guarantor") to execute and deliver guaranty in form and substance acceptable to Lender, whereby Guarantor provides a full recourse guaranty of Borrower's obligations under the other Loan Documents (the "Guaranty"). This Agreement, the Note, the Guaranty, the Escrow Agreement and each other instrument, certificate or agreement executed in connection herewith or therewith being the "Loan Documents".

**6. Aircraft Sale Notice.** Borrower and Lender acknowledge, that Buyer is currently in negotiations to sell (a) one Embraer Legacy 600, aircraft bearing manufacturer's serial



Initial JI

DS BS

number 145711 and U.S. registration number N135SL; and (b) one Embraer Legacy 600, aircraft bearing manufacturer's serial number 145989 and U.S. registration number N135SK (collectively the "Aircraft" and each one individually, an "Aircraft") both of which are currently owned by Lender. In the event that Buyer is able to sell either or both Aircraft to a third-party prior to March 30, 2026, Buyer will acquire title to such Aircraft from Lender and simultaneously grant Lender a first priority security interest in such Aircraft pursuant an industry standard aircraft security agreement(s) (which will be filed with the FAA and registered on the International Registry) for an amount equal to the Loan Fee. As a condition precedent to Borrower's sale of an Aircraft to a third-party, Borrower shall cause the third-party buyer of such Aircraft to pay Lender an amount equal to the Loan Fee in exchange for Lender's termination and release of its security interest in such Aircraft at closing. Upon Lender's receipt of an amount equal to the Loan Fee from the third-party buyer of the Aircraft, Lender will send a written notice to the Escrow Agent confirming that such Aircraft has been sold ("Aircraft Sale Notice") and Lender will hold such amount in trust until such time as the Loan Fee has been received by Lender from the Escrow Agent in accordance with Section 1.3.2. Upon Lender's receipt of the Loan Fee from the Escrow Agent, Lender will transfer such amount as it has actually received from the third-party buyer of such Aircraft to Borrower.

## II. BORROWER'S REPRESENTATIONS AND COVENANTS

1. **Existence.** Borrower is duly organized and in good standing under the laws of its jurisdiction of organization and is duly qualified and in good standing to do business in in each jurisdiction where such qualification is required because of the nature of its activities or properties and where the failure to qualify would have an adverse effect on Borrower's financial condition, prospects, profits, operations, business or properties. Borrower has all requisite power and authority to own, pledge, mortgage and operate its properties and to conduct its business as now or currently proposed to be conducted and to enter into the transactions contemplated by this Agreement and the other Loan Documents and the Aircraft Transaction.

2. **Authorization; No Conflict.** Borrower's execution, delivery and performance of the documents necessary to memorialize this Agreement and the Loan Documents and the additional obligations contemplated in this Agreement and the Loan Documents are within Borrower's organizational powers, have been duly authorized by all necessary organizational action, require no governmental, regulatory, or other approval, and do not and will not contravene or conflict with any provision of: (i) law, (ii) any judgment, decree or order, or (iii) any provision of any agreement binding upon Borrower or upon any property of Borrower.

3. **Validity and Binding Nature.** This Agreement and the other Loan Documents are (or, when duly signed and delivered, will be) the legal, valid and binding obligations of Borrower enforceable against Borrower in accordance with their respective terms.

4. **Compliance with Applicable Laws.** Borrower is in compliance with the requirements of all applicable laws, rules, regulations and orders of all governmental authorities (including, without limitation, environmental laws, rules, regulations, and orders).



Initial JI

DS BS

5. **Absence of Defaults.** Borrower is not (i) in default under any indenture, contract or agreement to which it is a party or by which is bound, (ii) in violation to is organizational documents and/or rules and regulations, as applicable, or any other governing documents, (iii) in default with respect to any order, writ, injunction or decree of any court, or (iv) in default under any order or license of any international, federal, state, municipal or county departments.

6. **Financial Condition.** Borrower has furnished to the Lender financial assumptions and information which fairly and accurately reflect the financial assumptions and condition the operations of Borrower.

7. **Litigation.** There are no actions, suits or proceedings in existence or pending against or affecting the Borrower or its respective property in any court, or before or by any federal, state, municipal, county or other governmental departments, commission, board, bureau or agency.

8. **Confidentiality.** Borrower agrees to keep this transaction, this Agreement and the Loan Documents and the subject matter thereof completely confidential at all times until the Total Amount Owed has been paid in full and for two (2) years after the Total Amount Owed has been paid in full.

9. **Taxes and Liabilities.** Borrower shall pay and discharge: (a) all taxes, assessments, and governmental charges or levies imposed on Borrower or the assets pledged as security, (b) all lawful claims that, if unpaid, might by law become a lien on Borrower's assets pledged as security, and (c) all other payments when due to creditors whose liens on assets pledged as security are senior to Lender's liens.

10. **Adverse Material Change.** Borrower shall notify Lender in writing of any material adverse change to its business within twenty-four (24) hours of such material adverse change. If such an adverse material change occurs, Lender has the right, at its sole option, to demand full repayment of the Total Amount immediately, and foreclose on its security.

## III. INDEMNIFICATION

Borrower shall indemnify defend and hold harmless Lender, and its affiliates and each of its and their respective officers, directors, employees and consultants (each, an "Indemnified Party") from and against all claims, injury, damage, loss and liability, cost and expense (including attorneys' fees, costs and expenses) of any and every kind to any persons or property by reason of (i) the Loan Documents, (ii) the Aircraft Transaction, (iii) any brokerage commissions or finder's fees claimed by any broker in connection with this Agreement and the Loan Documents; (iv) the operation or maintenance of Borrower's business; (v) any breach of representation or warranty, event of default under this Agreement and the other Loan Documents; (v) any matter relating to the condition of the security being pledged as collateral for this Agreement and the Loan Documents; or (v) any other matter arising in connection with this Agreement and the Loan

Initial
JI

DS
BS

Documents, Borrower or the assets that relate to this Agreement, the Loan Documents and the Aircraft Transaction.

## IV. GENERAL PROVISIONS

1. **Commercial Purposes of Loan.** By executing this Agreement, Borrower expressly represents and warrants that the sole purpose of this loan is for the express purpose set forth in Section 1.4.

2. **Default Provisions.** The occurrence of one or more of the following events shall constitute an event of default (each an "Event of Default"):

   2.1. Any failure to make a payment in full when due and payable under this Agreement and the other Loan Documents.

   2.2. A breach of any of the other terms and conditions of this Agreement and the other Loan Documents.

   2.3. There shall have occurred a material adverse change.

Upon the occurrence of an Event of Default, without demand or notice, the Total Amount shall become immediately due and payable, and Lender shall, at its sole option, be entitled to enforce the terms of this Agreement and the other Loan Documents by (i) suing for all past amounts due hereunder; and/or (ii) pursuing all other appropriate legal remedies available under this Agreement and the other Loan Documents. Failure to exercise any of these options shall not constitute a waiver of the right to exercise the same in the event of any subsequent default or Event of Default.

If to Borrower: CSDS Asset Management LLC
609 Deep Valley Dr. Ste 200
Rolling Hills Estates, CA 90274
Email:

If to Lender: ZED Aerocapital LLC
500 S Dupont Hwy,
Dover, Delaware 19901
Attn: James Iacono
Email: Jim@zedaerocapital.com

If to Guarantor: Sriyantha Benedict Sirimanne
1412 Via Arco
Palos Verdes Estates, CA 90274
Email: ben@csdsjets.com



Initial JI

DS BS

If to Escrow Agent: McAfee & Taft, PC
8th floor
Two Leadership Square
211 North Robinson
Oklahoma City, OK 73102-7103
Attn: Erin Van Laanen and Maria Gonzalez
Email: erin.vanlaanen@mcafeetaft.com and
maria.gonzalez@mcafeetaft.com

3. **Governing Law.** THIS AGREEMENT SHALL IN ALL RESPECTS BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF DELAWARE, INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE. THIS AGREEMENT IS BEING DELIVERED IN THE STATE OF DELAWARE.

4. **Waiver of Jury Trial**. AS A MATERIAL INDUCEMENT FOR LENDER TO MAKE THE LOAN EVIDENCED HEREBY, LENDER AND BORROWER HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT EITHER WAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY LITIGATION ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS LOAN EVIDENCED HEREBY, ALL DOCUMENTS AND AGREEMENTS EXECUTED OR CONTEMPLATED TO BE EXECUTED IN CONNECTION WITH THE LOAN EVIDENCED HEREBY, AND ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF EITHER PARTY.

5. **Expenses, Costs and Taxes.** Borrower shall pay on demand all costs and expenses of the Lender, and all Related Expenses (as defined below), including, but not limited to, (a) administration, travel and out-of-pocket expenses, including, but not limited to attorneys' fees and expenses of the Lender in connection with the preparation, negotiation and closing of this Agreement and the other Loan Documents and the administration of this Agreement and the Loan Documents, the collection and disbursement of all funds hereunder and the other instruments and documents to be delivered hereunder, (b) extraordinary expenses of the Lender in connection with the administration of this Agreement and the other Loan Documents, (c) the reasonable fees and out-of-pocket expenses of counsel for Lender, with respect to the foregoing, and of local counsel, if any, who may be retained with respect thereto, (d) all fees due hereunder or in the Loan Documents, and (e) all costs and expenses, including reasonable attorneys' fees, in connection with the determination of the Lender's lien priority in any collateral or secured interest in securing this Agreement and the Loan Documents, or the restructuring or enforcement of this Agreement and the Loan Documents. In addition, Borrower shall pay any and all stamp and other taxes and fees payable or determined to be payable or determined to be payable in connection with the execution and delivery of this Agreement and the Loan Documents, and the other instruments and documents to be delivered hereunder, and agrees to hold each Indemnified Party from and against any and all liabilities with respect to or resulting from any delay in paying or omission to pay such taxes or fees. "Related Expenses" means any and all costs, liabilities and expenses (including, without limitation,



Initial JI

DS BS

losses, damages, penalties, claims, actions, reasonable attorneys' fees, legal expenses, judgments, suits and disbursements) reasonably incurred by, or imposed upon, or asserted against Lender in any attempt by Lender:

(1) to obtain, preserve, perfect or enforce any security interest evidenced by (x) the Loan Documents, or (y) any other pledge agreement, mortgage, deed of trust, hypothecation agreement, guaranty, security agreement, assignment, or security instrument executed or given by Borrower to or in favor of Lender;

(2) to obtain payment, performance and observance of any and all of the obligations and terms of this Agreement and the Loan Documents;

(3) to maintain, insure, audit, inspect, collect, preserve, repossess and dispose of any of the collateral or secured assets, including, without limitation, costs and expenses for appraisals, assessments and audits of Borrower or the collateral or secured assets; or,

(4) incidental or related to (1) through (3) above, including, without limitation, interest thereupon from the date incurred, imposed or asserted until paid at the rate payable as set forth in this Agreement and the Loan Documents.

6. **Additional Assurance.** Borrower shall upon request of the Lender promptly take such action and promptly make, execute and deliver all such additional and further items, deeds, assurances and instruments as the Lender may require, so as to completely vest in and ensure to Lender its rights under the Loan Documents and in or to the collateral or secured interest of the Lender.

7. **Entire Agreement.** This Agreement contains the entire understanding between and among the Parties and supersedes any prior understandings and agreements among them respecting the subject matter of this Agreement.

8. **Waivers.** No waiver of any provision of this Agreement shall be deemed to be a waiver of any other provision hereof or of any subsequent breach of the same or any other provision. Any consent to or approval of any act requiring consent or approval shall not be deemed to render unnecessary obtaining the consent to or approval of any subsequent act, whether or not similar to the act so consented to or approved.

9. **Successors and Assignees.** This Agreement shall be binding upon and enforceable by, and shall inure to the benefit of, the Parties hereto and their respective heirs, executors, administrators, successors and assignees, provided, however, that Borrower may not assign this Agreement without the prior written consent of Lender.

10. **Modification.** This Agreement cannot be changed, modified or supplemented, except in a writing that is signed by the Lender.

11. **Counterparts.** This Agreement may be executed in two or more counterparts, in original form, scanned or by facsimile, each of which shall be deemed to be an original but all of which shall constitute one and the same agreement. Scanned signature shall have the same effect as original signatures.



Initial JI

DS BS

[signature page follows]



Initial
JI

DS
BS

**IN WITNESS WHEREOF,** The Lender and Borrower have executed this Agreement and this Agreement is made effective as of the Effective Date.

| LENDER: | BORROWER: |
|---|---|
| **ZED AEROCAPITAL LLC** | **CSDS ASSET MANAGEMENT LLC** |
| By: Signed by: [signature] D1A0661FB159459... 2/16/2026 \| 1:15 PM PST | By: DocuSigned by: Benedict Sirimanne 18DE3684AA1A495... 2/16/2026 \| 1:19 PM PST |
| Name: Jim Iacono | Name: Sriyantha Benedict Sirimanne |
| Title: Vice President | Title: Managing Member |

**Schedule 1**

**Form of Promissory Note**

PROMISSORY NOTE

Date: 2/16/2026 | 1:19 PM PST

CSDS ASSET MANAGEMENT LLC, a Nevada limited liability company, whose address is 609 Deep Valley Dr. Ste 200, Rolling Hills Estates, CA 90274 ("**Borrower**"), hereby promises to pay to ZED AEROCAPITAL LLC, a Delaware limited liability company, whose address is 500 S. Dupont Highway, Dover, Delaware 19901("**Lender**"), the principal sum of U.S.$46,350,000.00 (the "**Loan Amount**"), together with Loan Fee (defined in the Loan Agreement), any Extension Fees (defined in the Loan Agreement) plus any interest accrued on a daily basis at the Interest Rate set forth in the Loan Agreement (the "**Interest**"). The Loan Amount will be paid on the Payment Date (defined in the Loan Agreement) and the Loan Fee will be paid on the Maturity Date (defined in the Loan Agreement). The Loan Amount, the Loan Fee, the Extension Fees and Interest are collectively referred to herein as the "**Total Amount**". Notwithstanding anything to the contrary contained herein, if any date on which a payment under this Promissory Note becomes due and payable is not a Business Day then such payment shall not be made on such scheduled date but shall be made on the immediately preceding Business Day.

For purposes hereof, the term "Loan Agreement" means that certain Loan Agreement dated as of February ___, 2026 between Lender and Borrower, as the same may be amended or supplemented from time to time. All other capitalized terms used in this Promissory Note and not defined herein shall have the respective meanings assigned in the Loan Agreement.

The Loan Amount, the Loan Fee, any Extension Fees, any Interest and all other amounts due hereunder shall be payable in US Dollars in immediately available funds at Lender's Bank Account set forth in the Escrow Agreement. Each such payment shall be made on the date such payment is due and without any presentment or surrender of this Promissory Note. The Loan Amount and Loan Fee may be prepaid, in full or in part, (a) as provided in the Loan Agreement, and (b) otherwise at the option of Borrower at any time prior to its respective due date, without penalty.

This Promissory Note is the Note referred to in the Loan Agreement which has been issued by Borrower pursuant to the terms of the Loan Agreement.

If an Event of Default occurs and is not cured within any applicable cure period set forth in the Loan Agreement, at Lender's option, exercisable in its sole discretion, all sums of principal, interest and fees due under this Note shall be accelerated and become immediately due and payable without notice of default, presentment or demand for payment, protest or notice of nonpayment or dishonor, or other notices or demands of any kind or character, except as specifically provided in the Loan Agreement.

Borrower hereby waives presentment, protest, notice of protest and dishonor. Borrower expressly consents to any extension or renewal, in whole or in part, and all delays in time of payment or other



Initial
JI

DS
BS

performance which Lender may grant at any time and from time to time without limitation and without any notice or further consent of the undersigned.

The remedies of Lender as provided herein or the Loan Agreement shall be cumulative and concurrent and may be pursued singularly, successively or together, at the sole discretion of Lender, and may be exercised as often as the occasion therefor shall arise.

All payments made by Borrower under this Note will be made without setoff, counterclaim or other defense of any kind.

No failure on the part of Lender to exercise, and no delay in exercising, any right, power, privilege or remedy hereunder or under applicable Law shall operate as a waiver thereof, nor shall any single or partial exercise thereof by Lender preclude any other or further exercise thereof or the exercise of any other right, power, privilege or remedy of Lender. No amendment or waiver of any provision of this Promissory Note, shall in any event be effective unless the same shall be in writing and signed by Lender, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

Any provision hereof that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective only to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof or affecting the validity or enforceability of such provision in any other jurisdiction.

Lender may, in the sole discretion of Lender, accept payments made by Borrower after any default has occurred, without waiving any of Lender's rights herein.

THIS PROMISSORY NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF DELAWARE.

[signature page follows]



Initial
JI

DS
BS

**IN WITNESS WHEREOF**, Borrower has caused this Promissory Note to be executed in its corporate name by its officer thereunto duly authorized on the date hereof.

| **LENDER:** | **BORROWER:** |
|---|---|
| **ZED AEROCAPITAL LLC** | **CSDS ASSET MANAGEMENT LLC** |
| Signed by: | DocuSigned by: |
| By: | By: Benedict Sirimanne |
| D1A0661FB159459... | 18DE3684AA1A495... |
| 2/16/2026 \| 1:15 PM PST | 2/16/2026 \| 1:19 PM PST |
| Name: Jim Iacono | Name: Sriyantha Benedict Sirimanne |
| Title: Vice President | Title: Managing Member |

# EXHIBIT C

Docusign Envelope ID: BDCA045D-12AC-430E-80C3-4ACD1FC0A09B

McAFEE & TAFT
A PROFESSIONAL CORPORATION

8TH FLOOR • TWO LEADERSHIP SQUARE
211 NORTH ROBINSON • OKLAHOMA CITY, OK 73102-7103
(405) 235-9621 • FAX (405) 235-0439
www.mcafeetaft.com

ERIN M. VAN LAANEN
ATTORNEY AT LAW

WRITER DIRECT
(405) 552-2208
FAX: (405) 228-7408
erin.vanlaanen@mcafeetaft.com

# McAfee & Taft A Professional Corporation Escrow Terms and Wire Instructions

CONFIRM WIRE INSTRUCTIONS VIA PHONE CALL
MCAFEE & TAFT DOES NOT ALTER OR CHANGE ITS WIRE INSTRUCTIONS

**Bank of America, N.A.**
**222 Broadway, New York, NY USA 10038**
**Swift Code: BOFAUS3N**
**ABA# [redacted]593**
**Account # [redacted]407**
**McAfee & Taft Aircraft Account**
**Attn: Tracy Thornton - (405) 235-9621**
**Re: ZED AeroCapital LLC – CSDS Asset Management LLC**
**Spirit Aircraft Bridge Loan**

NEVER WIRE FUNDS UNTIL THE WIRE INSTRUCTIONS HAVE BEEN CONFIRMED VIA PHONE CALL. GO TO THE MCAFEE WEBSITE AND LOCATE THE PHONE NUMBER FOR THE FIRM TO REACH THE ATTORNEY IN CHARGE OF THE MATTER TO CONFIRM THE WIRE INSTRUCTIONS. NEVER USE THE PHONE NUMBER PROVIDED IN THE EMAIL WITH THESE WIRE INSTRUCTIONS

**All funds remitted to McAfee & Taft A Professional Corporation shall be held pursuant to the attached Escrow Terms and Conditions

Docusign Envelope ID: BDCA045D-12AC-430E-80C3-4ACD1FC0A09B

MCAFEE & TAFT
A PROFESSIONAL CORPORATION

8TH FLOOR • TWO LEADERSHIP SQUARE
211 NORTH ROBINSON • OKLAHOMA CITY, OK 73102-7103
(405) 235-9621 • FAX (405) 235-0439
www.mcafeetaft.com

ERIN M. VAN LAANEN
ATTORNEY AT LAW

WRITER DIRECT
(405) 552-2208
FAX: (405) 228-7408
erin.vanlaanen@mcafeetaft.com

**ESCROW TERMS & CONDITIONS (the "Escrow Terms")**

1. TRANSACTION. These Escrow Terms are dated as of February 13, 2026 and are entered into in connection with potential transaction between ZED AeroCapital LLC ("**Lender**"), as lender, and CSDS Asset Management LLC ("**Borrower**"), as borrower, in connection with a short-term loan to be made by Lender to Borrower in connection with the Borrower's purchase of twenty (20) aircraft from Spirit Airlines, Inc. pursuant to a short-term loan agreement (the "**Loan Agreement**") to be entered into between Lender and Borrower.

For purposes of these Escrow Terms Borrower and Lender may collectively be referred to as the "**Parties**" or each individually as a "**Party**"

2. BANK INFORMATION. Following execution of these Escrow Terms, Lender will deposit up to US$46,350,000.00 (the "**Escrow Funds**") by wire transfer to the escrow account (the "**Escrow Account**") of McAfee & Taft A Professional Corporation ("**Escrow Agent**") as follows, with the bank listed below (the "**Bank**"):

**Bank of America, N.A.**

**222 Broadway**

**New York, New York USA 10038**

**Swift Code: BOFAUS3N**

**ABA Routing Number: [redacted]593**

**Account Number: [redacted]407**

**Account Name: McAfee & Taft Aircraft Account**

**Attn: Tracy Thornton - (405) 235-9621**

**REF: ZED AeroCaptial - CSDS Asset Management - Spirit Aircraft Bridge Loan**

The Escrow Funds shall at all times be held solely to the order of the Lender and, the Escrow Agent shall, upon its receipt of written instructions from the Lender, promptly (and in any event within three (3) business days of such instruction) return the Escrow Funds to the Lender. The Escrow Agent agrees that it shall only distribute the Escrow Funds in accordance with the Lender's written instructions. The Escrow Account is an interest-bearing sweep account, in which the Escrow Funds are swept on a nightly basis into U.S. Treasury bills, notes and other obligations issued or guaranteed as to principal and interest by the U.S. Treasury, and swept back into the Escrow Account at the beginning of each business day. Any interest associated with the Escrow Account will be retained by the Escrow Agent. The Bank's wiring deadline for transferring funds out of the Escrow Account is 3:00 p.m., Central Time. The Escrow Agent shall not be liable or responsible in any respect for any losses or damages as may result or allegedly result from any (i) act or omission of the Bank, including any failure of the Bank to correctly follow any instructions of the Escrow Agent, or (ii) the failure, insolvency or bankruptcy of the Bank or the appointment of any receiver or similar official for the Bank, or (iii) failure, insolvency, or default by the United States government. All Escrow Funds will be returned to the Lender by the Escrow Agent to the same account from which it was received. The wire instructions for Lender are listed on **Exhibit A** attached hereto. Promptly following the execution of these Escrow Terms and the execution of the Loan Agreement by the Parties, the Parties agree to provide the Escrow Agent with a copy of the fully executed Loan Agreement.

3. KNOW YOUR CUSTOMER. (a) The Parties and the Escrow Funds may be subject to the following ("**Laws and Regulations**"): (i) the Trading With the Enemy Act of 1917, the International Emergency Economic Powers Act,

Docusign Envelope ID: BDCA045D-12AC-430E-80C3-4ACD1FC0A09B

MCAFEE & TAFT
A PROFESSIONAL CORPORATION

8TH FLOOR • TWO LEADERSHIP SQUARE
211 NORTH ROBINSON • OKLAHOMA CITY, OK 73102-7103
(405) 235-9621 • FAX (405) 235-0439
www.mcafeetaft.com

ERIN M. VAN LAANEN
ATTORNEY AT LAW

WRITER DIRECT
(405) 552-2208
FAX: (405) 228-7408
erin.vanlaanen@mcafeetaft.com

the Arms Export Control Act, the Export Administration Act, the Export-Import Bank Act, the Patriot Act and the Nuclear Proliferation Prevention Act; (ii) applicable Executive Orders issued by the President of the United States; (iii) regulations administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury ("**OFAC**"), the Export Administration Regulations ("**EAR**") administered by the U.S. Department of Commerce ("**DOC**"), and the International Traffic in Arms Regulations ("**ITAR**") administered by the U.S. Department of State ("**DOS**"); and (iv) any other applicable law or regulation of the United States that may be in effect from time to time and which may restrict, limit, or prohibit transactions with a foreign government, Person (as defined in such Laws and Regulations), or country. The Patriot Act requires certain due diligence in connection with transactions involving "financial institutions" as defined therein. The Escrow Agent takes the position it is either not a "financial institution" as defined in the Patriot Act, or this transaction is otherwise specifically exempt from the requirements of the Patriot Act.

(b) In support of this position, (i) each wire transfer must be wired to the Escrow Agent directly from an account held in the name of the remitter (not a parent, subsidiary, related company, officer or director), (ii) all funds are funds which are an integral part of the transaction, and (iii) the Escrow Agent may only wire funds at closing to parties that are an integral part of the transaction.

(c) If any of the Escrow Funds are to be wired to anyone other than the Lender, information must be provided to the Escrow Agent with a written explanation acceptable to the Escrow Agent in its sole discretion as to why the funds wired to such party would be considered an integral part of the transaction.

(d) If any of the Escrow Funds are provided by any party other than the Lender ("**Funding Party**"), that Funding Party must provide Escrow Agent with (i) sufficient information as to allow the Escrow Agent to perform the due diligence set forth herein, and (ii) a written statement as to the Funding Party's relationship with the buyer and that any such funds are provided for the benefit of the buyer for use in connection with the purchase of the equipment subject to this escrow transaction, that such funds shall be deemed to be part of the Escrow Funds and subject to these Escrow Terms and that such party understands it will not receive any interest in the equipment which is a part of the transaction contemplated by the Loan Agreement. Such statement must be acceptable in form and substance to the Escrow Agent in its sole discretion. If the Escrow Agent is not provided with an acceptable statement within a reasonable period of time after the Escrow Funds have been deposited with Escrow Agent, the Escrow Agent is under no obligation to proceed hereunder and Escrow Agent may terminate its role to act as escrow agent hereunder upon five (5) days written notice to the Parties, at which time it will return any funds deposited (i) by or for a Party, to that Party, and (ii) by a Funding Party to such Funding Party (unless prohibited pursuant to applicable law).

(e) As a precautionary matter, the Escrow Agent may in its sole discretion choose to implement part of the procedures suggested in the Customer Identification Program of the Patriot Act (however, the Escrow Agent is not required to follow the Customer Identification Program). Each Party hereby (i) acknowledges that the name of the Party as noted in the Loan Agreement is accurate and the address noted in the Loan Agreement is its principal place of business, and (ii) agrees to provide Escrow Agent with information pertaining to the formation, existence, management and ownership of any party who will send or receive funds as part of the transaction contemplated by these Escrow Terms. Each Party hereby confirms that it complies with the Laws and Regulations and neither it nor its owners, management or any affiliates appear on or are based or do business in the following list of known or suspected terrorist organizations and sanctioned or prohibited countries: Financial Action Task Force on Money Laundering list of High-risk and non-cooperative jurisdictions (http://www.fatf-gafi.org); United States Department of the Treasury, Office of Foreign Assets Control Specifically Designated Nationals and Blocked Persons (SDN List) (http://www.treasury.gov/resource-center/sanctions/SDN-List/Pages/default.aspx); United States Department of Commerce, Bureau of Industry and Security Lists of Parties of Concern (http://www.bis.doc.gov/index.php/policy-guidance/lists-of-parties-of-concern). **The Parties, and not the Escrow Agent, must confirm if the transaction and/or parties involved therein are in**

Docusign Envelope ID: BDCA045D-12AC-430E-80C3-4ACD1FC0A09B



ERIN M. VAN LAANEN
ATTORNEY AT LAW

WRITER DIRECT
(405) 552-2208
FAX: (405) 228-7408
erin.vanlaanen@mcafeetaft.com

**compliance with the Laws and Regulations, and the Escrow Agent makes no representation as to whether the transaction and/or the parties involved therein comply with the Laws and Regulations.**

(f) By sending and/or receiving Escrow Funds, each of the Parties represents and warrants that no portion of the Escrow Funds is derived from, or will be used for, activities regulated or prohibited by Anti-Money Laundering Laws, meaning those laws, regulations and sanctions, state and federal, criminal and civil, that (a) limit the use of and/or seek the forfeiture of proceeds from illegal transactions; (b) limit commercial transactions with designated countries or individuals believed to be terrorists, narcotics dealers, or otherwise engaged in activities contrary to the interests of the United States; (c) require identification and documentation of the parties with whom a financial institution conducts business; or (d) are designed to disrupt the flow of funds to terrorist organizations. Such laws, regulations and sanctions shall be deemed to include the Patriot Act, the Bank Secrecy Act, the Trading with the Enemy Act, 50 U.S.C. App. Section 1 et seq, the International Emergency Economic Powers Act, 50 U.S.C. Section 1701 et seq, and the sanction regulations promulgated pursuant thereto by the OFAC, as well as laws relating to prevention and detection of money laundering in 18 U.S.C. Sections 1956 and 1957.

4. NOTICES. Whether or not specifically required under the Loan Agreement, the Parties agree to provide Escrow Agent with joint written instructions (which may be by email) or verbal instruction (via a closing conference call) instructing Escrow Agent to file, date and or release any relevant documents, or to perform any of the actions required under the Loan Agreement ***provided that***, the Escrow Agent will only release the Escrow Funds (or any portion thereof) solely in accordance with the Lender's unilateral written instructions. All other notices to Escrow Agent under the Loan Agreement shall be sent in writing by email, via overnight courier service, or by certified mail, return receipt requested, to the Escrow Agent at the following address: **McAfee & Taft A Professional Corporation, 8th Floor, Two Leadership Square, 211 North Robinson, Oklahoma City, OK 73102-7103; Attn: Erin M. Van Laanen; Direct Dial: (405) 552-2208; Fax: (405) 228-7408; Email: erin.vanlaanen@mcafeetaft.com**. The Escrow Agent will rely on the contact information set forth in the Loan Agreement or as otherwise instructed by the Parties, for persons authorized to instruct the Escrow Agent. Escrow Agent may rely on an email or facsimile of any notice or instruction from any contact listed in the Loan Agreement. Further, the Parties hereto agree that at least one (1) contact listed in the Loan Agreement will be available to provide instructions at closing.

5. LIMITATION OF LIABILITY. The Escrow Agent's duties hereunder are limited to the safekeeping of the Escrow Funds and any documents ("**Escrow Documents**") received by Escrow Agent under the terms of the Loan Agreement and delivery of same under the terms hereof or thereof, and Escrow Agent shall not be liable for any action taken or omitted to be taken by it while acting in good faith and in the exercise of its judgment under these Escrow Terms, the Loan Agreement or any instrument executed pursuant hereto or thereto, or in connection herewith or therewith, except for its own willful, criminal misconduct or gross negligence, nor be responsible for the collectability of funds or documents or effectiveness, enforceability, validity or due execution of the Loan Agreement or any instrument executed pursuant thereto. The Escrow Agent shall be entitled to rely upon advice of counsel concerning legal matters and upon any notice, consent, certificate, statement, signature or writing which it believes to be genuine and to have been presented by a proper person. Any document or instrument delivered to the Escrow Agent which purports to have been signed or executed by any of the Parties and/or other persons shall be conclusive evidence (absent the Escrow Agent's willful misconduct or gross negligence) that the person or entity signing on behalf of the Parties and/or other person, as applicable, had full and complete authority to sign and deliver the document or instrument on behalf of such Party and/or person, and the Escrow Agent shall be entitled to rely, without investigation, upon the authenticity thereof.

6. DISAGREEMENT OF PARTIES. In the event of any disagreement between any of the Parties, or between them or any of them and any other person, resulting in divergent or adverse claims or demands being made in connection with the subject matter of these Escrow Terms or the Loan Agreement, or in the event the Escrow Agent, in good faith, is in doubt as to what action should be taken hereunder or under the Loan Agreement, the Escrow Agent may, at its option, refuse to comply with any claims or demands on it, or refuse to take any other action hereunder so long as such

Docusign Envelope ID: BDCA045D-12AC-430E-80C3-4ACD1FC0A09B

MCAFEE&TAFT
A PROFESSIONAL CORPORATION

8TH FLOOR • TWO LEADERSHIP SQUARE
211 NORTH ROBINSON • OKLAHOMA CITY, OK 73102-7103
(405) 235-9621 • FAX (405) 235-0439
www.mcafeetaft.com

ERIN M. VAN LAANEN
ATTORNEY AT LAW

WRITER DIRECT
(405) 552-2208
FAX: (405) 228-7408
erin.vanlaanen@mcafeetaft.com

disagreement continues or such doubt exists, and in any such event, the Escrow Agent shall not be or become liable in any way or to any person for its good faith failure or refusal to act; and the Escrow Agent shall be entitled to continue to so refrain from acting until (i) the rights of the Parties shall have been fully and finally adjudicated by a court of competent jurisdiction, or (ii) all differences shall have been adjusted and all doubt resolved to the satisfaction of the Escrow Agent by agreement among all of the interested persons, and the Escrow Agent shall be notified thereof in writing signed by all such persons and entities. Further, in the event of any such dispute or controversy, the Escrow Agent may, in its sole discretion, institute an interpleader action, a declaratory judgment or other appropriate legal action in the District Court of Oklahoma County, Oklahoma or the United States District Court of the Western District of Oklahoma, to determine the rights of the parties involved, which courts shall have exclusive jurisdiction in respect to such disputes against the Escrow Agent. The foregoing shall not affect the governing law and jurisdiction provisions contained in other agreements between the Parties to the extent that any dispute does not involve the Escrow Agent. Should action be instituted, or should the Escrow Agent become involved in legal proceedings in any manner whatsoever on account of these Escrow Terms, the Loan Agreement, the Escrow Documents or the Escrow Funds, the Parties hereby bind and obligate themselves and their heirs, personal representatives, successors and assigns on a joint and several basis to pay Escrow Agent the reasonable attorneys' fees incurred by Escrow Agent to retain legal counsel, as well as any other disbursements, expenses, losses, costs or damages in connection with or resulting from such litigation, except such as may have been caused by the gross negligence or willful, criminal misconduct of the Escrow Agent. The Parties further agree that Escrow Agent shall not be liable for any losses or damages as may result from any act or failure to act by the Bank, or the financial failure of the Bank.

7. INDEMNIFICATION. The Parties hereby bind and obligate themselves and their heirs, personal representatives, successors and assigns on a joint and several basis to: (i) indemnify and pay Escrow Agent the reasonable attorneys' fees incurred by Escrow Agent to retain legal counsel for any action required under Section 5 of these Escrow Terms, as well as any other direct disbursements, expenses, losses, costs or damages (excluding all forms of indirect loss and all forms of loss of profit) in connection with or resulting from such litigation, except such as may have been caused by the gross negligence or willful misconduct of the Escrow Agent; and (ii) as between themselves and the Escrow Agent, to indemnify and hold the Escrow Agent harmless from all direct losses, costs, damages, expenses and reasonable attorneys' fees (excluding all forms of indirect loss and all forms of loss of profit) suffered or incurred by Escrow Agent arising from acts or omissions of the Escrow Agent in the good faith performance of or pursuant to or in connection with the Loan Agreement, except such acts or omissions as may be the result of the Escrow Agent's gross negligence or willful misconduct. The Parties hereby agree and acknowledge that any and all of the rights, protections, indemnifications and limitations of liability extended to the Escrow Agent under this section extend to the officers, shareholders, employees and agents of the Escrow Agent, and the terms of this section shall survive the closing of the transaction or the termination of the Loan Agreement and these Escrow Terms. Escrow Agent may retain its fee and any fees or cost owed to Escrow Agent pursuant to these Escrow Terms from the funds placed in Escrow (which fees may be retained prior to interpleading the Escrow Funds or may be paid out of any remaining Escrow Funds that have been interplead).

8. ESCROW AGENT’S FEES. Escrow Agent shall be paid a reasonable fee and shall be reimbursed for all reasonable costs and expenses incurred when acting in such capacity, which shall be paid by the Borrower. If the transaction under the Loan Agreement does not close for any reason, the Escrow Agent’s fees shall still be due and payable.

9. ASSIGNMENT. Neither Party shall have the right to assign its rights or obligations under these Escrow Terms and any such purported assignment will be null and void.

10. GOVERNING LAW. These Escrow Terms and any performance hereunder shall be governed by, and construed in accordance with the laws of the State of Oklahoma.

Docusign Envelope ID: BDCA045D-12AC-430E-80C3-4ACD1FC0A09B

McAFEE & TAFT
A PROFESSIONAL CORPORATION

8TH FLOOR • TWO LEADERSHIP SQUARE
211 NORTH ROBINSON • OKLAHOMA CITY, OK 73102-7103
(405) 235-9621 • FAX (405) 235-0439
www.mcafeetaft.com

ERIN M. VAN LAANEN
ATTORNEY AT LAW

WRITER DIRECT
(405) 552-2208
FAX: (405) 228-7408
erin.vanlaanen@mcafeetaft.com

11. ENTIRE AGREEMENT. These Escrow Terms constitute the entire agreement of the Parties regarding the terms of the escrow, shall supersede all other agreements with respect to the terms of the escrow, and shall not be amended, altered or otherwise modified except by written agreement signed by all the Parties and the Escrow Agent. In the event of any conflict between the terms of the Loan Agreement and these Escrow Terms regarding the escrow, these Escrow Terms shall prevail.

12. WAIVER OF CONFLICT. The Parties acknowledge and agree that the Escrow Agent may perform FAA and International Registry legal services for one or more of the Parties or third parties, including, but not limited to, such legal services in connection with the transaction of which these Escrow Terms are a part. The Parties hereby agree to that representation and hereby waive any and all conflicts of interest that may arise from that representation and the Escrow Agent's performance of the undertakings provided in these Escrow Terms.

[signature page follows]

McAFEE & TAFT
A PROFESSIONAL CORPORATION
8TH FLOOR • TWO LEADERSHIP SQUARE
211 NORTH ROBINSON • OKLAHOMA CITY, OK 73102-7103
(405) 235-9621 • FAX (405) 235-0439
www.mcafeetaft.com

ERIN M. VAN LAANEN
ATTORNEY AT LAW

WRITER DIRECT
(405) 552-2208
FAX: (405) 228-7408
erin.vanlaanen@mcafeetaft.com

Agreed to and acknowledged on the date executed below by each party hereto.

CSDS ASSET MANAGEMENT LLC., as Borrower

DocuSigned by:
Benedict Sirimanne
By: 18DE3684AA1A495...
Name: Benedict Sirimanne
Title: Managing Member
Date: 2/13/2026

ZED AEROCAPITAL LLC, as Lender

Signed by:
By: BBB1F3CCA3FD40C...
Name: Jim Iacono
Title: Vice President
Date: 2/13/2026

MCAFEE & TAFT, A P.C., as Escrow Agent

Signed by:
Maria Gonzalez
By: CA127D679E05467...
Name: Maria Gonzalez
Title: Vice President
Date: 2/13/2026

Docusign Envelope ID: BDCA045D-12AC-430E-80C3-4ACD1FC0A09B

McAFEE & TAFT
A PROFESSIONAL CORPORATION

8TH FLOOR • TWO LEADERSHIP SQUARE
211 NORTH ROBINSON • OKLAHOMA CITY, OK 73102-7103
(405) 235-9621 • FAX (405) 235-0439
www.mcafeetaft.com

ERIN M. VAN LAANEN
ATTORNEY AT LAW

WRITER DIRECT
(405) 552-2208
FAX: (405) 228-7408
erin.vanlaanen@mcafeetaft.com

# EXHIBIT A

## Lender's Wire Instructions

Bank Name: Seacoast Bank
Bank Address: 815 Colorado Ave., Stuart, FL 34995
ABA Routing No.: [redacted]158
Account No.: [redacted]731
Beneficiary Name: ZED AeroCapital, LLC
Reference: ZED AeroCaptial - CSDS Asset Management - Spirit Aircraft Bridge Loan

# EXHIBIT D

Docusign Envelope ID: 7E60A9A8-8FDA-4DAA-8F2A-D0B3E318D25A

# FORBEARANCE AND RESERVATION OF RIGHTS AGREEMENT

March 30, 2026

Via Electronic Mail

CSDS Asset Management LLC
609 Deep Valley Dr. Ste 200
Rolling Hills Estates, CA 90274
Attention: Sriyantha Benedict Sirimanne

Email: ben@csdsjets.com

Re**: Loan Agreement ("Loan")** dated as of February 16, 2026 (as amended, restated, supplemented, or otherwise modified from time to time, the "**Loan Agreement**"), between **CSDS ASSET MANAGEMENT LLC**, as borrower ("**Borrower**") and **ZED AEROCAPITAL LLC** ("**Lender**")

Dear Sir:

Reference is made to the Loan. All capitalized terms used herein shall have the meanings assigned to such terms in the Loan.

The Borrower acknowledges and agrees that the Loan Amount is due and payable to Lender as of the date hereof and that Borrower has failed to make repayment of the Loan Amount in accordance with the terms of the Loan (herein the "**Payment Default**").

The Borrower has requested that the Lender forbear from the exercise of its rights and remedies under the Loan Documents and Lender has agreed to such forbearance subject to the terms and conditions set forth herein.

Accordingly, this **Forbearance Agreement** confirms the following:

1. **Forbearance Period.** For the period beginning on the date hereof and ending at **3:00 p.m. New York City time on April 17, 2026** (the "**Forbearance Period**"), the Lender, without waiving or curing any Payment Default, hereby agrees to forbear from exercising its rights and remedies in respect thereof (excluding the accrual of the Extension Fee as provided in Section 1.3.4 of the Loan and late interest accrued in accordance with Section 1.3.5 of the Loan, each of which shall continue to accrue in accordance with the terms of the Loan Documents) (the "**Forbearance**"), subject to satisfaction of the terms and conditions set forth herein and continued compliance with the covenants set forth herein.

2. **Scope.** The Forbearance shall be effective only with respect to the Payment Default and shall automatically terminate and cease to be of force and effect, and the Lender may exercise all of its rights and remedies available under the Loan Documents and at law, immediately and without notice, upon the occurrence of any Forbearance Default (as defined below).



Initial
JIZ
DS
BS

3. **Consideration for Forbearance.** In consideration for the Lender's Forbearance:

   Borrower hereby agrees that Lender will be entitled to a fee in the amount of US$200,000.00 per Spirit Aircraft that is acquired by Borrower (or Borrower's lender, affiliate, nominee or special purpose vehicle, including an owner trust) (herein "Borrower Party") (each referred to an "Aircraft Success Fee"). The Aircraft Success Fee will be due and payable by Borrower to Lender on (a) the closing date of a subsequent sale by a Borrower Party of each Spirit Aircraft or related engine (the "Closing Date"), or (b) the date on which a Spirit Aircraft or a related engine is delivered to a lessee under a subsequent lease (whether a finance or operating lease) (the "Delivery Date"), or (c) the date on which a Spirit Aircraft or related engine is delivered to a consignee for disassembly and sale (the "Consignment Date"). If any sale involves an escrow agent, Borrower shall ensure that Lender is paid directly out of escrowed funds on the Closing Date. "Spirit Aircraft" used herein means each of the 20 used Airbus A320-A321 aircraft that are subject to the Aircraft Transaction. Borrower acknowledges that its obligations under this Section 3 shall survive a termination of the Forbearance Period and/or repayment of the Loan Amount.

4. **Reporting Requirements**. Borrower agrees that it shall provide written notice to Lender as to the date on which:

   (a) the sale and purchase agreement between Spirit and a Borrower Party in respect of the Spirit Aircraft is executed;
   (b) the relevant bankruptcy court and/or creditors committee approval related to Spirit Airlines, Inc.'s ("Spirit") entry into and consummation of the Aircraft Transaction is obtained;
   (c) the scheduled closing date for a Borrower Party's acquisition of each Spirit Aircraft;
   (d) the date on which a Borrower Party (as seller) enters a sale and purchase agreement ("SPA") in respect of Spirit Aircraft or a related engine, and Borrower shall provide Lender with a copy of such SPA;
   (e) the date on which a Borrower Party (as lessor or headlessor) enters into a lease agreement for a Spirit Aircraft or a related engine ("Lease"), and Borrower shall provide Lender with a copy of such Lease;
   (f) the date on which a Borrower Party (as consignor) enters into a consignment agreement for the disassembly of a Spirit Aircraft or a related engine ("Consignment Agreement"), and Borrower shall provide Lender with a copy of such Consignment Agreement; and
   (g) the date on which an SPA, Lease, or Consignment Agreement is terminated; provided that such notice with respect to a Lease shall only be required prior to the relevant Delivery Date, and such notice with respect to a Consignment Agreement shall only be required prior to the delivery of the Spirit Aircraft or related engine to a relevant consignee.

   The foregoing notice will be made no later than 2 Business Days following each such relevant date.

   Borrower acknowledges that its obligations under this Section 4 shall survive a termination of the Forbearance Period and/or repayment of the Loan Amount.

5. **Forbearance Defaults.** The Lender's agreement to forbear shall immediately and automatically terminate, and the Forbearance shall cease without notice, upon the occurrence of any of the following events (each a "**Forbearance Default**"):

Initial JIZ

DS BS

Docusign Envelope ID: 7E60A9A8-8FDA-4DAA-8F2A-D0B3E318D25A

(a) any Event of Default (other than the Payment Default) occurs under the Loan Documents;

(b) the Aircraft Transaction is terminated, or Spirit or Borrower breaches any terms and conditions of its obligations with respect thereto;

(c) Borrower becomes insolvent, admits its inability to pay its debts when due or becomes subject to a voluntary or involuntary bankruptcy or restructuring proceeding; or

(d) Borrower repudiates or challenges its obligations under the Loan Documents or this Forbearance Agreement.

6. **Conditions to Effectiveness.** This Agreement shall become effective only upon the Lender's receipt of a duly executed counterpart of this Agreement from Borrower.

7. **Reservation of Rights.** Nothing in this Agreement shall constitute or be deemed to constitute a waiver of any Payment Default or any other Event of Default, or of any right, remedy, power, or privilege available to the Lender under the Loan Agreement or applicable law. All such rights and remedies are expressly reserved.

8. **Acknowledgment and Reaffirmation.** The Borrower acknowledges that all obligations under the Loan and other Loan Documents remain outstanding and unmodified, and the Borrower hereby ratifies and confirms all terms, covenants, and conditions thereof. The parties agree that this Agreement is a Loan Document.

9. **Governing Law.** This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to conflict-of-law principles.

10. **Counterparts.** This Agreement may be executed in counterparts (including by electronic transmission), each of which shall constitute an original and all of which together shall constitute one and the same instrument.

**[Signature Page Follows]**



Initial
JIZ

DS
BS

**ZED AEROCAPITAL LLC**

Signed by:

By: Jim Iacono ZED

Name: Jim Iacono ZED

Title: Vice President

3/30/2026 | 11:07 AM PDT

**CSDS ASSET MANAGEMENT LLC**

DocuSigned by:

By: Benedict Sirimanne

Name: Benedict Sirimanne

Title: Owner

3/30/2026 | 11:34 AM PDT

# EXHIBIT E

**From:** Gary Lesnik <gary@zedaerocapital.com>
**Date:** April 7, 2026 at 23:34:25 GMT+2
**To:** Maria Gonzalez <maria.gonzalez@mcafeetaft.com>
**Cc:** Zander Futernick <zander@zedaerocapital.com>, Jim Iacono <jim@zedaerocapital.com>, Erin Van Laanen <erin.vanlaanen@mcafeetaft.com>, Danielle Morse <danielle.morse@mcafeetaft.com>
**Subject: Re: CSDS Incoming Wire and ZED SEACOAST INSTRUCTIONS**

TYVM
Gary
Sent from my iPhone

On Apr 7, 2026, at 5:31 PM, Maria Gonzalez <maria.gonzalez@mcafeetaft.com> wrote:

[removing Ben]

Gary,

Thank you for the call. Pursuant to your instructions, I will add a note to our file that we are NOT authorized to release funds from escrow unless we receive your approval, along with the approval from either Jim or Zander.

Kind regards,
Maria

McAfee & Taft

**Maria Gonzalez**

Attorney
(405) 552-2358 phone
(405) 228-7358 fax
8th Floor, Two Leadership Square
211 N Robinson Ave
Oklahoma City, Oklahoma 73102
maria.gonzalez@mcafeetaft.com
www.mcafeetaft.com

This email is sent by McAfee & Taft, a law firm, and may contain information that is privileged or confidential. If you received this email in error, please notify the sender by reply email and delete the email and any attachments. If you are a client of McAfee & Taft, you should not share this email with others. Sharing this email may result in a loss of the attorney-client privilege.

---

**From:** Zander Futernick <zander@zedaerocapital.com>
**Sent:** Tuesday, April 7, 2026 2:48 PM
**To:** Maria Gonzalez <maria.gonzalez@mcafeetaft.com>
**Cc:** Jim Iacono <jim@zedaerocapital.com>; Erin Van Laanen <erin.vanlaanen@mcafeetaft.com>; Benedict Sirimanne <ben@csdsjets.com>; Gary Lesnik <gary@zedaerocapital.com>
**Subject:** Re: CSDS Incoming Wire and ZED SEACOAST INSTRUCTIONS

Wire received. Thank you, Maria!

Zander

Zander Futernick
*Managing Partner*

**ZED AEROCAPITAL**

On Apr 7, 2026, at 15:45, Maria Gonzalez <maria.gonzalez@mcafeetaft.com> wrote:

The wire has been sent, federal reference below.

FEDR:20260407B6B7HU2R014507

Kind regards,
Maria

**Maria Gonzalez**

Attorney
(405) 552-2358 phone
(405) 228-7358 fax
8th Floor, Two Leadership Square
211 N Robinson Ave
Oklahoma City, Oklahoma 73102
maria.gonzalez@mcafeetaft.com
www.mcafeetaft.com

This email is sent by McAfee & Taft, a law firm, and may contain information that is privileged or confidential. If you received this email in er please notify the sender by reply email and delete the email and any attachments. If you are a client of McAfee & Taft, you should not share email with others. Sharing this email may result in a loss of the attorney-client privilege.

---

**From:** Maria Gonzalez
**Sent:** Tuesday, April 7, 2026 9:22 AM
**To:** 'Jim Iacono' <jim@zedaerocapital.com>; Erin Van Laanen <Erin.VanLaanen@mcafeetaft.com>; Benedict Sirimanne <ben@csdsjets.com>; Gary Lesnik <gary@zedaerocapital.com>; Zander Futernick <zander@zedaerocapital.com>
**Subject:** RE: CSDS Incoming Wire and ZED SEACOAST INSTRUCTIONS

Hi Jim,

We will get this wire out today, and send the confirmation once we have it.

Kind regards,
Maria

**Maria Gonzalez**

Attorney
(405) 552-2358 phone
(405) 228-7358 fax

8th Floor, Two Leadership Square
211 N Robinson Ave
Oklahoma City, Oklahoma 73102
maria.gonzalez@mcafeetaft.com
www.mcafeetaft.com

This email is sent by McAfee & Taft, a law firm, and may contain information that is privileged or confidential. If you received this email in er
please notify the sender by reply email and delete the email and any attachments. If you are a client of McAfee & Taft, you should not share
email with others.  Sharing this email may result in a loss of the attorney-client privilege.

---

**From:** Jim Iacono <jim@zedaerocapital.com>
**Sent:** Monday, April 6, 2026 2:12 PM
**To:** Erin Van Laanen <erin.vanlaanen@mcafeetaft.com>; Maria Gonzalez <Maria.Gonzalez@mcafeetaft.com>; Benedict Sirimanne <ben@csdsjets.com>; Gary Lesnik <gary@zedaerocapital.com>; Zander Futernick <zander@zedaerocapital.com>
**Subject:** CSDS Incoming Wire and ZED SEACOAST INSTRUCTIONS

Good Afternoon Erin and Maria,
I hope you are both well.

Per Bens incoming wire and instructions, please wire $8m to our Seacoast Bank Account at your earliest convenience.

Our instructions are attached.

Thank you,
Jim

Jim Iacono
ZED AeroCapital, LLC
781-439-0180

<image001.png>
<image002.png>

# EXHIBIT F

---------- Forwarded message ----------
From: Maria Gonzalez <Maria.Gonzalez@mcafeetaft.com>
Date: Saturday, April 18 2026 at 2:17 AM JST
Subject: RE: ZED Aerocapital Escrow Return 4/17
To: Zander Futernick <zander@zedaerocapital.com>
Cc: Gary Lesnik <gary@zedaerocapital.com>, Jim Iacono <jim@zedaerocapital.com>, Benedict Sirimanne <ben@csdsjets.com>, Erin Van Laanen <erin.vanlaanen@mcafeetaft.com>

Thank you. As soon as we receive the additional wire from Ben, we will send both wires to Zed.

Kind regards,
Maria

MCAFEE&TAFT

**Maria Gonzalez**
Attorney
(405) 552-2358 phone
(405) 228-7358 fax
8th Floor, Two Leadership Square
211 N Robinson Ave
Oklahoma City, Oklahoma 73102
maria.gonzalez@mcafeetaft.com
www.mcafeetaft.com

This email is sent by McAfee & Taft, a law firm, and may contain information that is privileged or confidential. If you received this email in error, please notify the sender by reply email and delete the email and any attachments. If you are a client of McAfee & Taft, you should not share this email with others. Sharing this email may result in a loss of the attorney-client privilege.

---

**From:** Zander Futernick <zander@zedaerocapital.com>
**Sent:** Friday, April 17, 2026 12:12 PM
**To:** Maria Gonzalez <maria.gonzalez@mcafeetaft.com>
**Cc:** Gary Lesnik <gary@zedaerocapital.com>; Jim Iacono <jim@zedaerocapital.com>; Benedict Sirimanne <ben@csdsjets.com>; Erin Van Laanen <erin.vanlaanen@mcafeetaft.com>
**Subject:** RE: ZED Aerocapital Escrow Return 4/17

Hi Maria,

Yes, please send the funds from our escrow account. Ben will provide further instructions for additional funds delivered today.

I approve this wire.

Thank you,

Zander

Zander Futernick

*Managing Partner*

**ZED AEROCAPITAL**

On Fri, Apr 17, 2026 at 12:54, Maria Gonzalez <Maria.Gonzalez@mcafeetaft.com> wrote:

> Can you provide additional information regarding the second wire?  At this time, we only have the funds in the escrow account.
>
> Further, per Zed's instructions, we are to receive authorization from Gary (below) and either Jim or Zander.  Can Jim or Zander also confirm?
>
> Kind regards,
> Maria

**Maria Gonzalez**
Attorney
(405) 552-2358 phone
(405) 228-7358 fax
8th Floor, Two Leadership Square
211 N Robinson Ave
Oklahoma City, Oklahoma 73102
maria.gonzalez@mcafeetaft.com
www.mcafeetaft.com

This email is sent by McAfee & Taft, a law firm, and may contain information that is privileged or confidential. If you received this email in error, please notify the sender by reply email and delete the email and any attachments. If you are a client of McAfee & Taft, you should not share this email with others. Sharing this email may result in a loss of the attorney-client privilege.

**From:** Gary Lesnik <gary@zedaerocapital.com>
**Sent:** Friday, April 17, 2026 10:51 AM
**To:** Zander Futernick <zander@zedaerocapital.com>
**Cc:** Maria Gonzalez <maria.gonzalez@mcafeetaft.com>; Jim Iacono <jim@zedaerocapital.com>; Benedict Sirimanne <ben@csdsjets.com>; Erin Van Laanen <erin.vanlaanen@mcafeetaft.com>
**Subject:** Re: ZED Aerocapital Escrow Return 4/17

Good morning

Please let this email serve as my approval to wire all remaining funds from the Zed AeroCapital escrow account to our Seacoast account.

Please confirm the amounts of the wires so we can have Seacoast on the look out

Thanks

Gary Lesnik

Managing partner. Zed AeroCapital

Sent from my iPhone

On Apr 17, 2026, at 10:41 AM, Zander Futernick <zander@zedaerocapital.com> wrote:

Good Morning Maria,

We are writing to request return of all remaining funds from ZED Aerocapital's escrow today. The wire should be returned to the same account from which it was sent, wire instructions reattached here for confirmation. Ben of CSDS is CC'd here for visibility and fully supports the plan for full capital return today. ZED Aerocapital partners Jim & Gary are CC'd here for further confirmation of today's plan.

We are expecting **<u>two wires</u>** from M&T today. The first is a return of our escrow, and the second wire is a payment from Ben to ZED Aerocapital that he will further instruct.

Our bank is prepared to receive both wires in full this afternoon so please let us know when the wire is processed & sent from M&T. Thank you very much!

Kindest regards,

Zander

Zander Futernick

*Managing Partner*

**ZED AEROCAPITAL**

# EXHIBIT G

**From:** Salazar, Luis <LSalazar@coleschotz.com>
**Sent:** Monday, October 19, 2026 5:07 PM
**To:** nicholas.dangelo@davispolk.com
**Cc:** Frumkin, Jacob <JFrumkin@coleschotz.com>; Tsukerman, Mark <MTsukerman@coleschotz.com>
**Subject:** Spirits Airline, LLC v. CSDS Asset Management, LLC

Dear Nick:

My firm was recently retained by ZED Aerocapital, LLC, and we are getting up to speed on your client's dispute with CSDS. Would you be available tomorrow morning for a call to discuss the case and whether we can help facilitate getting you the information you are seeking?

In the meantime, my client reserves all rights and waives none. Thank you.


100 YEARS COLE SCHOTZ P.C.

**LUIS SALAZAR**
**MEMBER**

OFFICE 305.374.4802
CELL 305.776.5916
EMAIL lsalazar@coleschotz.com

80 SW 8th Street | Suite 1900 | Miami, FL 33130

NEW JERSEY NEW YORK DELAWARE MARYLAND TEXAS FLORIDA WASHINGTON, D.C.
VCARD | COLESCHOTZ.COM

Legal Practice Assistant: Maria Lopez | 201.490.1659 | mlopez@coleschotz.com