**DAVIS POLK & WARDWELL LLP**
450 Lexington Avenue
New York, New York 10017
Tel.: (212) 450-4000
Marshall S. Huebner
Ben S. Kaminetzky
Marc J. Tobak
Nicholas D'Angelo

*Counsel to Plaintiff Spirit Airlines, LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>SPIRIT AVIATION HOLDINGS, INC., *et al.*,<br><br>Debtors. | Chapter 11 |
| SPIRIT AIRLINES, LLC,<br><br>Plaintiff,<br><br>v.<br><br>CSDS ASSET MANAGEMENT LLC, ZED AEROCAPITAL LLC, WIKERT INVESTMENTS COMPANY LLC, SRIYANTHA BENEDICT SIRIMANNE, CHRISTOPHER KELLER, GERALD GLASS, JIM IACONO, ZANDER FUTERNICK, and GARY LESNIK,<br><br>Defendants. | Case No. 25-11897 (SHL)<br><br>(Jointly Administered)<br><br>Adv. Proc. No. 26-01102 (SHL) |

**PLAINTIFF'S OBJECTION TO THE EMERGENCY MOTION OF ZED AEROCAPITAL LLC, ZANDER FUTERNICK, JIM IACONO, AND GARY LESNIK TO DISSOLVE THE AMENDED TEMPORARY RESTRAINING ORDER [ADV. ECF NO. 15] AS TO THE ZED PARTIES**

## TABLE OF CONTENTS

PAGE


PRELIMINARY STATEMENT ....... 1

ARGUMENT ....... 6

I. THE AMENDED TRO SHOULD REMAIN IN PLACE BECAUSE EACH OF THE FACTORS FOR INTERIM RELIEF IS SATISFIED AS TO THE ZED PARTIES ....... 6

A. Plaintiff is Likely to Succeed on the Merits of Their Claims Against the Zed Parties ....... 6

B. Plaintiff Will Suffer Irreparable Harm if the Amended TRO Is Dissolved ....... 9

C. The Balance of Equities and the Public Interest Favor Maintaining the Amended TRO ....... 11

II. THE AMENDED TRO IS AN EXERCISE OF EQUITABLE AUTHORITY CONSISTENT WITH *GRUPO MEXICANO* ....... 12

III. THE ZED PARTIES' PROCEDURAL OBJECTIONS DO NOT WARRANT DISSOLUTION ....... 15

A. The Amended TRO Complies with Rule 65(b) ....... 15

B. The Amended TRO Contains the Findings Required by Rule 65(b)(2) and Satisfies Rule 65(d)(1) ....... 17

IV. NO BOND IS REQUIRED ....... 18

RESERVATION OF RIGHTS ....... 18

CONCLUSION ....... 19

## TABLE OF AUTHORITIES

CASES

PAGE(S)

*In re Atlas Fin. Mortg., Inc.*,
No. 13-32683-BJH-7, 2014 WL 172283 (Bankr. N.D. Tex. Jan. 14, 2014) ................ 9, 11-13

*725 Eatery Corp. v. City of New York*,
408 F. Supp. 3d 424 (S.D.N.Y. 2019) ................ 6

*Brenntag Int'l Chems., Inc. v. Bank of India*,
175 F.3d 245 (2d Cir. 1999) ................ 5

*Deckert v. Independence Shares Corp.*,
311 U.S. 282 (1940) ................ 13-14

*Great-West Life & Annuity Ins. Co. v. Knudson*,
534 U.S. 204 (2002) ................ 14

*Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*,
527 U.S. 308 (1999) ................ 4, 12-13

*Gucci Am., Inc. v. Weixing Li*,
768 F.3d 122 (2d Cir. 2014) ................ 13-14

*Int'l Equity Investments, Inc. v. Opportunity Equity Partners, Ltd.*,
427 F. Supp. 2d 491 (S.D.N.Y. 2006) ................ 5

*Leadenhall Cap. Partners LLP v. Advantage Cap. Holdings LLC,*
171 F.4th 155 (2d Cir. 2026) ................ 13-14

*LVM v. Lloyd*,
318 F. Supp. 3d 601 (S.D.N.Y. 2018) ................ 6

*Lyondell Chem. Co. v. CenterPoint Energy Gas Servs. Inc. (In re Lyondell Chem. Co.)*,
402 B.R. 571 (Bankr. S.D.N.Y. 2009) ................ 17

*Newby v. Enron Corp.*,
188 F. Supp. 2d 684 (S.D. Tex. 2002) ................ 13

*In re Owens Corning*,
419 F.3d 195 (3d Cir. 2005) ................ 12-13

*Rabbi Jacob Joseph Sch. v. Province of Mendoza*,
342 F. Supp. 2d 124 (E.D.N.Y. 2004) ................ 15

*In re Sears Holding Corp.*,
659 B.R. 236 (Bankr. S.D.N.Y. 2024) ................ 5

*Shubert v. Premier Paper Prods., LLC (In re Am. Tissue, Inc.)*,
Adv. No. 06-50929 (KG), 2006 WL 3498065 (Bankr. D. Del. Dec. 4, 2006) .................. 5, 11

*In re Soundview Elite Ltd.*,
543 B.R. 78 (Bankr. S.D.N.Y. 2016) .......................................................................... 9, 11-14

*United States ex rel. Rahman v. Oncology Assocs., P.C.*,
198 F.3d 489 (4th Cir. 1999) ........................................................................................ 13

STATUTES & RULES

Fed. R. Civ. P. 65 ........................................................................................................ 5, 14-17

Fed. R. Bankr. P. 7065 ....................................................................................................... 17

OTHER AUTHORITIES

Black's Law Dictionary (12th ed. 2024)............................................................................. 3

Spirit Airlines, LLC (the "Plaintiff" or "Spirit"), a debtor and debtor in possession in the above-captioned chapter 11 cases (the "Chapter 11 Cases"), together with its debtor affiliates (collectively, the "Debtors"), hereby files this objection (this "Objection") to the *Emergency Motion of ZED AeroCapital LLC, Zander Futernick, Jim Iacono, and Gary Lesnik to Dissolve the Amended Temporary Restraining Order [Adv. ECF No. 15] as to the ZED Parties* [Adv. ECF No. 30] (the "Motion"), filed by ZED AeroCapital LLC ("Zed") and its principals Zander (Alexander) Futernick, Jim Iacono, and Gary Lesnik (the "Zed Principals," and together with Zed, the "Zed Parties"), and the accompanying *Declaration of Alexander Futernick* [Adv. ECF No. 31] (the "Futernick Declaration" or "Futernick Decl.").[1] In support of this Objection, Plaintiff respectfully states as follows:

## PRELIMINARY STATEMENT

1. The TRO restrains the Zed Parties from further dissipating funds that should rightfully be property of the estates. Zed's own Motion confirms that Zed received $46.35 million from the Escrow Agent that Zed had deposited with the Escrow Agent, and that Zed and its principals were willing participants in a fraud on Spirit. Even under Zed's view of the law, this is ample basis for the TRO because Zed received specific, identifiable property in which the estates have an interest. If the TRO is dissolved, the estates will be irreparably harmed by further dissipation of this property.

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Amended Adversary Complaint (the "Amended Complaint" or "Am. Compl.") [Adv. ECF No. 17], the Plaintiff's Motion for an Order Amending and Clarifying the Temporary Restraining Order on Sources of Escrow Funds (the "Motion to Amend") [Adv. ECF No. 16], or the Temporary Restraining Order entered October 21, 2026 (the "Amended TRO") [Adv. ECF No. 15]. References to the "Tobak Declaration" and the "Second Tobak Declaration" are to the Declaration of Marc J. Tobak dated October 19, 2026 [Adv. ECF No. 18] and the Second Declaration of Marc J. Tobak dated October 20, 2026 [Adv. ECF No. 19], respectively, each filed in support of the Motion to Amend. The background and factual assertions set forth in the Amended Complaint, the Motion to Amend, and the exhibits thereto are incorporated herein by reference.

2. Zed's own dubious narrative establishes that Zed knowingly and willingly joined with CSDS, Sirimanne, and others in tricking the Debtors into believing that CSDS had deposited $53.35 million with the Escrow Agent. Mr. Futernick's declaration details all of the essential steps Zed played in the fraud:

- Sirimanne informed Zed that an Indonesian investor was going to send $53.35 million to be used "to fund the initial deposit of $53 Million to the escrow of McAfee & Taft in Oklahoma City, OKlahoma [sic], USA, as a cash deposit" in connection with CSDS's purchase of Spirit aircraft. (Futernick Decl. ¶ 10).

- Sirimanne asked Zed for a so-called "bridge loan in connection with CSDS's potential acquisition of Spirit Airlines aircraft." (Futernick Decl. ¶ 7).

- Zed believed Sirimanne needed money "for what would likely be only three days, while he awaited final funding from a more substantial international partner." (Futernick Decl. ¶ 7).

- Zed believed that the "international partner" was the Indonesian investor, because Sirimanne told Zed "this is where the $53.35 Million is coming from" and gave Zed a copy of the purported agreement between CSDS and the Indonesian investor. (Futernick Decl. ¶ 9).

- Zed understood that CSDS needed funds before the "international partner"—the Indonesian investor—funded so that CSDS could "demonstrate its ability to raise the funds necessary for the transaction" with Sprit. (Futernick Decl. ¶ 8).

- CSDS and Zed entered into a "Loan Agreement" on February 16, 2026. Under this agreement, CSDS "borrowed" $46.35 million from Zed, but CSDS was not allowed to use or even possess the money; instead, the money would "remain under Zed's control" (Futernick Decl. ¶ 16) at an escrow account at Spirit's Escrow Agent, McAfee & Taft.

- Zed's Loan Agreement stated that the <u>only purpose</u> of the Loan was to trick Spirit into believing that CSDS had the funds on escrow: the Loan Amount "shall solely be used to evidence proof of funds in connection with Borrower's purchase of 20 used Airbus A320-A321 aircraft from Spirit Airlines, Inc." (Futernick Decl. ¶ 20).

- For its agreement to allow CSDS to evidence "proof of funds" to Spirit through money over which Zed retained absolute control <u>and which Zed could withdraw from escrow three days later</u>, Zed agreed to accept a "fee" of $4.635 million. (Futernick Decl. ¶ 16).

- <u>Zed ensured that CSDS would conceal anything related to the Loan Agreement from Spirit</u>. Zed and CSDS agreed that "Borrower agrees to keep this transaction,

this Agreement and the Loan Documents and the subject matter thereof completely confidential at all times until the Total Amount Owed has been paid in full and for two (2) years after the Total Amount Owed has been paid in full." (Futernick Decl. Ex. B ("Loan Agreement) at 5).

- After the Loan Agreement was signed, Zed wired $46.35 million to the Escrow Agent. (Futernick Decl. ¶ 27).

3. After Zed entered into the secret "Loan Agreement"[2] and wired $46.35 million to the Escrow Agent, and after $7 million from Wikert had been wired to the Escrow Agent, the Escrow Agent confirmed to Spirit that it had the full $53,350,000.00 in escrow—$7 million from Wikert, and $46.35 million from Zed.

4. At that point, on February 17, 2026, Zed had defrauded Spirit (and ultimately this Court) into proceeding with the HFS Aircraft sale to CSDS. The sham "loan" to CSDS had accomplished its stated purpose of providing (false) "proof of funds" to Spirit, inducing Spirit to select CSDS as the Stalking Horse Buyer, and exposing Spirit to the consequences of CSDS's later frauds on Spirit and the Court.

5. Zed also admits that it received the full $46.35 million back from the Escrow Agent by April 17, 2026.

6. For the purpose of this TRO, the rest is just noise. Zed's own declaration and deal documents show that Zed helped CSDS defraud Spirit and that Zed received $46.35 million from the Escrow Agent. Zed's admissions demonstrate that what Spirit showed on October 21 remains true today, and that the TRO should remain in place.

[2] Notably, the "loan" is not any type of loan at all since CSDS never had the right to use any of the funds that Zed was depositing with the Escrow Agent. *See* BLACK'S LAW DICTIONARY (12th ed. 2024) (defining "loan" as "an act of lending; a grant of something for temporary use" or A thing lent for the borrower's temporary use; esp., a sum of money lent at interest.").

7. On the one hand, Zed would have this Court believe that "ZED or its principals [did not] know of . . . the April 24 HFS Sale Order until after this litigation began." Motion ¶ 22. On the other, Zed admits that it had "a direct financial stake in CSDS closing" the sale of the HFS Aircraft because "ZED also bargained for a US$200,000 Aircraft Success Fee per Spirit aircraft CSDS acquired." Motion ¶ 17. CSDS could not close on any such aircraft, and Zed could earn no Aircraft Success Fee, unless the Court approved the sale and entered the Sale Order.

8. Zed's self-contradictory attempt to obscure its role even extends to its papers. Nowhere in Zed's Preliminary Statement will the Court find any mention that the funds in question were provided as "proof of funds" for the Spirit transaction, nor that not only did Zed never tell Spirit of its secret fronting agreement, but specifically contracted to keep its role hidden, despite Zed liberally citing the surrounding terms it agreed to with CSDS. Instead, Zed attempts to cast itself as innocent lender that did "the most ordinary thing a lender does" Motion ¶ 3. But Zed never loaned CSDS anything. In Zed's own words, the money Zed provided was never CSDS's: "[t]he money was ZED's from the day it was deposited to the day it came back." Motion ¶ 4. Zed wasn't an "ordinary" lender. Indeed it wasn't any kind of lender at all. Zed was a coconspirator who let CSDS provide "proof of funds" using $46.35 million that Zed contracted to retain control of and did retain control of for the express purpose of defrauding Spirit into believing CSDS had the funding necessary to meet its contractual requirements.

9. Spirit is likely to succeed on its claims against Zed. Zed's own admissions, detailed above, demonstrate that Zed knew that CSDS wanted to defraud the debtors—provide "proof of funds" that CSDS didn't own, didn't possess, and didn't have any right to use—knew that CSDS wanted to do so in connection with the HFS Aircraft Sale, and knew that it was substantially helping CSDS. Indeed, it helped CSDS so much that CSDS agreed to pay Zed at least $4.635

million as a "loan fee" for money CSDS would never have any right to use or possess. And Zed's biggest complaint is that it only received $1 million of its fee. Motion ¶ 4.

10. The Debtors will be irreparably harmed if the funds are released. The Court has already found that the enjoined transfers "may frustrate the Court's ability to enforce its prior orders and Debtors' ability to obtain relief." Zed admits it received $46.35 million in funds from the Escrow Agent. Nothing raised in Zed's papers calls this finding into question or suggests that the Court's conclusion that Zed may further dissipate the funds distributed from the Escrow Agent, and thus frustrate this Court's orders, is incorrect. For similar reasons, the balance of harms and the public interest also weigh against dissolution of the Amended TRO. The Zed Parties provide no evidentiary support for their assertion that Zed's business has been effectively shuttered as a result of the Amended TRO and, in any event, such consequences are only due to the Zed Parties' own illicit actions. And it is in the public interest to ensure that assets cannot be further dissipated after the commission of a wide-scale fraud.

11. *Finally*, the Zed Parties raise several legal and procedural arguments that are equally meritless. Zed argues that *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.,* 527 U.S. 308 (1999), forecloses this Court's ability to enter the Amended TRO, but that is not what that case held. It is settled law that *Grupo Mexicano*'s restrictions do not apply in the bankruptcy context, where an equitable interest is asserted, or where an accounting claim is brought. Zed also argues that the Amended TRO was defective because Zed did not receive proper notice, but the Amended TRO was entered on a record that the Court found "clearly show[s] that immediate and irreparable injury, loss, or damage will result" before the restrained parties could be heard, and that sets forth "the reasons why notice should not be required." Amended TRO at 2; Hr'g Tr. at 32–33 (Oct. 21, 2026) (the "October 21 Transcript" or "Tr."). In any event, the Zed

Parties now have notice, counsel, and a full opportunity to be heard, and the question before the Court is whether interim relief is warranted on the present record. It is for the reasons outlined in ***Zed's*** own papers.

## ARGUMENT

### I. THE AMENDED TRO SHOULD REMAIN IN PLACE BECAUSE EACH OF THE FACTORS FOR INTERIM RELIEF IS SATISFIED AS TO THE ZED PARTIES

12. On a motion to dissolve under Rule 65(b)(4), the original movant must justify continued relief by making the same showing as when relief was granted in the first place: (1) a likelihood of success on the merits, (2) a likelihood of irreparable injury absent relief, (3) that the balance of equities tips in its favor, and (4) that relief is in the public interest. *In re Sears Holding Corp.*, 659 B.R. 236, 248 (Bankr. S.D.N.Y. 2024) (Lane, J.); Motion ¶ 38. The purpose of such relief remains to "preserv[e] the status quo pending resolution of the underlying action." *Brenntag Int'l Chems., Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999). In the bankruptcy setting, "the Court should be especially sensitive to situations which could result in the dissipation of estate assets," and "[t]he duty of the Court is to preserve the relative positions of the parties pending a trial on the merits." *Shubert v. Premier Paper Prods., LLC (In re Am. Tissue, Inc.)*, Adv. No. 06-50929 (KG), 2006 WL 3498065, at *3 (Bankr. D. Del. Dec. 4, 2006).[3]

#### A. Plaintiff is Likely to Succeed on the Merits of Their Claims Against the Zed Parties

13. Plaintiff has already established—and the Court has agreed—that it is likely to succeed in their claims against Zed. The Court found, on the evidentiary record it accepted at the

[3] Courts routinely revisit an ex parte asset restraint on the fuller record developed once the restrained party appears, and continue it where warranted. *See, e.g.*, *Am. Tissue*, 2006 WL 3498065, at *1–5 (continuing, on a record of "declarations, deposition testimony and the live testimony of a witness," relief first granted by ex parte TRO); *Int'l Equity Investments, Inc. v. Opportunity Equity Partners, Ltd.*, 427 F. Supp. 2d 491, 501 (S.D.N.Y. 2006) (preliminary injunction "should be modified only when the changed circumstances demonstrate that 'continuance of the injunction is no longer justified and/or [] will work oppressively against the enjoined parties").

October 21 hearing, that "it seems pretty clear that the debtors are likely to succeed on their claims," and "that's true, I think, for all the additional parties against whom . . . the relief is requested." Tr. at 30, 32. The original record presented is now further confirmed by the Zed Parties' own submissions, which offer additional support for Plaintiff's claims. Each of the Zed Principals personally participated in the conduct at issue: Mr. Iacono executed the Zed Escrow Terms and the Zed Loan Agreement and directed the April 6 transfer; Mr. Futernick created the February 14 wire and directed the April 17 transfer; and Mr. Lesnik authorized the February 14 wire, imposed the dual-approval control on April 7, and approved the April 17 transfer. Second Tobak Decl. Exs. F–G; Tobak Decl. Ex. E; Futernick Decl. Exs. E–F.

14. Although Plaintiff is confident that each cause of action will be successful, it need only show a likelihood of success on one of their claims against each Zed Party to support continuation of the Amended TRO. *725 Eatery Corp. v. City of New York*, 408 F. Supp. 3d 424, 459 (S.D.N.Y. 2019) (finding likelihood of success on certain of plaintiffs' claims making up the "crux of their complaints."); *LVM v. Lloyd*, 318 F. Supp. 3d 601, 618 (S.D.N.Y. 2018) (same). The clearest cause of action against the Zed Parties is aiding and abetting fraudulent misrepresentation. The Zed Parties argue that Plaintiff cannot show the Zed Parties' actual knowledge of, or substantial assistance to, the underlying fraud. Motion ¶¶ 57–61. But the Motion essentially admits that each element is satisfied.

15. ***Actual knowledge.*** The Motion contends that Plaintiff alleges only that the Zed Parties knew CSDS was not the source of the funds, and that the Zed Parties could not have known the funds were being used as a deposit. Motion ¶ 59; Futernick Decl. ¶¶ 8, 20.

16. Zed's own declarant shows that this is false, and Zed knew—or should have known—that the funds would be used for a deposit.

17. *First,* Mr. Futernick's declaration states that CSDS told Zed that it needed a bridge loan because it anticipated that a $53.35 million "cash deposit" was to be placed "to the escrow of McAfee & Taft" explicitly for CSDS's transaction to purchase aircraft from Spirit. Futernick Decl. ¶ 9 & Ex. A § 3. Zed then lent precisely the $46,350,000 that, together with the $7,000,000 Zed understood was "already funded," completed that deposit. Futernick Decl. ¶ 20. It makes no sense to argue, as Zed does, that it understood its "bridge loan" was going to take the place of deposit money, but that it had no idea the "bridge loan" funds would be used as a deposit until replaced.

18. *Second*, contemporaneous documents Spirit received contradict Mr. Futernick's sworn statement that "[a]t no time did CSDS or Mr. Sirimanne inform ZED that CSDS needed or intended to use ZED's funds as a deposit." Futernick Decl. ¶ 8. A document sent to Spirit as a record of a Zed wire states that the purpose of the first $7.9 million transfer—created by Mr. Futernick and authorized by Mr. Lesnik—was "Aircraft Deposit in Escrow." Tobak Decl. Ex. E.

19. *Third*, the Zed Loan Agreement explicitly states that the funds "shall solely be used to evidence proof of funds in connection with Borrower's purchase of 20 used Airbus A320-A321 aircraft from Spirit Airlines, Inc." Second Tobak Decl. Ex. G § I.3. Proof of funds is, by definition, a representation made to someone else—here, the seller. Yet the same agreement required CSDS to keep the arrangement "completely confidential at all times," *id.* § II.8, and permitted Zed to withdraw the funds without the consent of "Spirit Airlines, Inc." or anyone else, *id.* § I.3. In other words, Zed knew that the "loan" was a sham. An arrangement designed to show the seller funds for the purpose of creating comfort to close a transaction, but that the lender could unilaterally and almost immediately withdraw—a detail that the borrower was forbidden to disclose—is an arrangement designed to create a false impression. Am. Compl. ¶ 43.

20. ***Substantial assistance.*** The Zed Parties argue they could not have assisted a fraud committed on April 20 because their funds were gone by April 17. Motion ¶ 60. That argument misses the point.

21. The fraud that Zed substantially assisted was complete when, in February 2026, Spirit went forward with the transaction with CSDS on the false belief that CSDS had placed the full $53,350,000.00 in escrow. That would not have been possible without Zed's substantial assistance. Without showing $46,350,000 of Zed funds in escrow, CSDS could not have satisfied the Escrow Agreement, could not have been confirmed as having funded the Deposit Amount, and could not have been designated the Successful Bidder on April 2. Am. Compl. ¶¶ 40, 47, 140–141.

22. On this evidentiary record, it is clear that Plaintiff is likely to succeed ***on at least*** its claim for aiding and abetting fraudulent misrepresentation against the Zed Parties.

**B. Plaintiff Will Suffer Irreparable Harm if the Amended TRO Is Dissolved**

23. The Zed Parties argue that Plaintiff seeks only money, that there is no evidence of dissipation, and that Plaintiff delayed in seeking relief. Motion ¶¶ 70–73. None of these arguments withstand scrutiny.

24. *First*, Plaintiff does not seek merely a general money judgment but the return of a specific, court-supervised fund—the Escrow Funds—that was removed from escrow and wired, by identified Fedwire transfers, into an identified account. Am. Compl. ¶¶ 7, 79, 107, 113; Tobak Decl. Exs. B, D. The harm the Amended TRO prevents is the further transfer of those funds beyond the reach of the Court, which would "frustrate the Court's ability to enforce its prior orders and Debtors' ability to obtain relief." Amended TRO at 2. That is consistent with the standard approved by other courts in the Second Circuit. *See Soundview*, 543 B.R. at 120 (explaining "irreparable harm need not be shown as a requirement for issuance of a preliminary injunction in the bankruptcy context where the action to be enjoined is one that . . . would impair the court's

jurisdiction with respect to the case before it," including where relief "is necessary to preserve or protect the debtor's estate." (citations omitted)); *In re Atlas Fin. Mortg.*, 2014 WL 172283, at *5 (Bankr. N.D. Tex. Jan. 13, 2014) ("the mere fact that economic damages may be available does not always mean that a remedy at law is 'adequate.'"). This Court reached the same conclusion on October 21: "it's pretty clear [as to] the irreparable harm at issue here. . . . [T]he funds have disappeared. And to the extent that there's any recovery there needs to be . . . the relief requested to keep funds in place so that some meaningful relief can occur." Tr. at 32.

25. *Second*, the risk of dissipation is concrete. The Zed Parties have already moved these very funds once—$46,350,000, in two transfers ten days apart—without notice to the Debtors, out of an escrow that the Debtors and this Court understood secured CSDS's performance. Am. Compl. ¶¶ 78–79. Zed describes itself as a firm whose business model is speed: it "evaluates opportunities within 48 hours and deploys between $1 million and $50 million per transaction," and its "ability to move capital promptly is central to its business." Futernick Decl. ¶¶ 3, 58. A defendant whose stated business is moving tens of millions of dollars on 48 hours' notice, and who has already removed the specific funds at issue without notice, presents exactly the risk the Amended TRO addresses. The Zed Parties' assurance that they have not violated the Amended TRO since receiving it, Futernick Decl. ¶ 57, shows only that the Amended TRO is working. The Declaration says nothing about what would happen if it were dissolved. Notably, the Futernick Declaration does not state where the $46,350,000 is today, or whether any portion of it remains in the Seacoast account. *See generally* Futernick Decl.

26. *Third*, Plaintiff did not delay. The Zed Parties argue that Plaintiff "knew of ZED's involvement in February 2026," citing CSDS's counsel's February 14 email. Motion ¶¶ 6, 23–24, 73. That email represented only that the wire was one that "Jerry Glass caused to be initiated" in

support of "the Stalking Horse Deposit" and the "bona fides of the Stalking Horse Buyer," and, as described above, disclosed none of the terms of the secret Zed side agreements. Tobak Decl. Ex. E. Four days later, the Escrow Agent confirmed to the Debtors that it held the full $53,350,000. Am. Compl. ¶ 40. Far from putting Plaintiff on notice of a problem, the February transmission was part of the deception. Plaintiff learned on October 13, 2026 that the Escrow Account was empty, obtained the TRO on October 14, served discovery on Zed on October 16, and sought the Amended TRO on October 19 upon reviewing the Escrow Agent's production. Am. Compl. ¶¶ 77, 81; Motion ¶ 28; Motion to Amend ¶ 15. That is diligence, not delay.

27. Moreover, the secret side deal was deliberately constructed to ensure that Spirit ***would not*** know the truth about Zed's involvement. Pursuant to the terms of the Zed Loan Agreement, CSDS was required to "keep this transaction, this Agreement and the Loan Documents and the subject matter thereof completely confidential" for ***two years*** after the $46 million was repaid to Zed. *See* Futernick Decl., Ex. B at 36. And Zed admits that it had a "direct financial stake in CSDS closing" because of the additional $200,000 it would recoup as part of a forbearance agreement, Motion ¶ 17, but that closing could never have happened (and Zed's direct financial stake could never be realized) if Spirit knew the truth.

### C. The Balance of Equities and the Public Interest Favor Maintaining the Amended TRO

28. The Zed Parties contend that the Amended TRO has effectively shut down Zed's business and left the Zed Principals unable to meet basic living expenses. Motion ¶¶ 74–76; Futernick Decl. ¶¶ 58–59. These assertions are unsupported. The Futernick Declaration offers no financial statements, no account balances, no identification of any pending transaction Zed has been unable to fund, and no information about the Zed Principals' personal finances. Futernick Decl. ¶¶ 58–59. On the other hand, "it is in the public interest that commercial obligors not

dissipate their assets—or, when they have already done so, that they not do it again." *Soundview*, 543 B.R. at 120. "The public interest is served when the Court imposes relief which maintains integrity in financial and business dealings and protects bankrupt estates from misappropriation of assets." *Am. Tissue*, 2006 WL 3498065, at *4. This Court has likewise recognized "a value . . . for the public interest in having court orders be honored and having a court in bankruptcy be able to have these transactions come in front of the Court, having them approved and have them carried out as has been approved." Tr. at 33.

29. The Zed Parties seize on Plaintiff's acknowledgment that the Zed Principals "are natural persons who may be required to spend assets to pay for their or their dependents' daily needs." Motion ¶ 75 (quoting Motion to Amend ¶ 39). That acknowledgment was not a concession of overbreadth. It was an offer, which Plaintiff reiterates here: "If they provide an accounting and security sufficient to satisfy the Court that they will retain the financial wherewithal to make the Estates whole, the Debtors are willing to narrow the relief sought." Motion to Amend ¶ 39. The Zed Parties have provided neither. Any residual prejudice to them is "greatly diminished" where, as here, they may seek modification on notice to permit legitimate transfers. *Atlas Fin. Mortg.*, 2014 WL 172283, at *6; *see* Amended TRO ¶ 8. Instead of accepting that invitation, they ask the Court to dissolve the Amended TRO in its entirety.

## II. THE AMENDED TRO IS AN EXERCISE OF EQUITABLE AUTHORITY CONSISTENT WITH *GRUPO MEXICANO*

30. The Zed Parties argue that *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308 (1999), forecloses any restraint of their assets because the Debtors assert no lien or equitable interest in specific property. Motion ¶¶ 8, 48–55. The argument fails for several reasons: *Grupo Mexicano*'s restrictions do not apply in the bankruptcy context, where an equitable interest is asserted, or where an accounting claim is brought.

31. *First*, the Zed Parties fundamentally misunderstand *Grupo Mexicano*. The question before the Court in that case was, in the Court's words, "whether, in an action for money damages, a United States District Court has the power to issue a preliminary injunction preventing the defendant from transferring assets in which no lien or equitable interest is claimed." 527 U.S. at 310. The Supreme Court drew a sharp distinction between the legal claims at issue in *Grupo Mexicano* and the equitable powers exercised by bankruptcy courts. *See* 527 U.S. at 322. As the Third Circuit has explained, *Grupo Mexicano* "was not a bankruptcy case," and "[t]he extensive history of bankruptcy law and judicial precedent renders the issue of equity authority in the bankruptcy context different to such a degree as to make it different in kind." *In re Owens Corning*, 419 F.3d 195, 208–09 n.14 (3d Cir. 2005). Consequently, bankruptcy courts have "repeatedly held" that "*Grupo Mexicano* does not constrain the powers to freeze the disposition of assets held by bankruptcy courts, whose equitable authority is not derived from generally applicable, pre–1789 authority." *Soundview*, 543 B.R. at 120–21. Applying that principle, *Soundview* held that where an estate fiduciary seeks "to protect . . . creditors from efforts to dissipate property that may technically not yet be estate property but will be imminently, the Third Circuit's analysis in *Owens Corning* makes for a perfect fit." 543 B.R. at 121. So too here, where the Debtors seek to recover for the estates' Escrow Funds that the court-approved Escrow Agreement committed to the Debtors' protection. *See id.* at 118 (Section 105(a) authority includes "an injunction freezing the assets of a defendant when the plaintiff is seeking equitable relief, such as the recovery of property or an accounting"); *Atlas Fin. Mortg.*, 2014 WL 172283, at *3–6 (bankruptcy court enjoining transfer of defendant's assets after considering *Grupo Mexicano*).

32. *Second*, Plaintiff asserts an equitable interest in specific, identifiable property: the Escrow Funds. The Amended Complaint seeks "a judgment declaring Spirit entitled to, and

directing the return of, the $48,015,000 in Escrow Funds," together with restitution, disgorgement, and an accounting. Am. Compl. ¶¶ 7, 107, 113, 128 & Prayer for Relief (d). Courts applying *Grupo Mexicano* have consistently recognized that its holding "was limited to actions for money damages," *Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122, 130 (2d Cir. 2014), and that where equitable relief is sought, "the controlling authority is not *Grupo* but *Deckert*." *Newby v. Enron Corp.*, 188 F. Supp. 2d 684, 696 (S.D. Tex. 2002) (quoting *United States ex rel. Rahman v. Oncology Assocs., P.C.*, 198 F.3d 489, 496 (4th Cir. 1999)). In *Deckert v. Independence Shares Corp.*, the Supreme Court held "that the injunction was a reasonable measure to preserve the status quo pending final determination of the [merits]" when a complaint "contains allegations which, if proved, entitle petitioners to some equitable relief." 311 U.S. 282, 289–90 (1940).

33. The authority relied on by the Zed Parties is inapposite. Unlike the non-pledging guarantor in *Capital Partners LLP v. Advantage Capital Holdings LLC*, 171 F.4th 155 (2d Cir. 2026), Zed is the recipient of the very funds Plaintiff seeks to recover, traced by the Zed Parties' own account to a specific Seacoast account. Motion ¶¶ 4, 45; Tobak Decl. Exs. B, D. *Leadenhall* itself explains that "claims for money can still implicate equitable interests: 'a plaintiff could seek restitution in equity, ordinarily in the form of a constructive trust or an equitable lien, where money or property identified as belonging in good conscience to the plaintiff could clearly be traced to particular funds or property in the defendant's possession.'" 171 F.4th at 163 (quoting *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 213 (2002)). That describes the Escrow Funds precisely. And "[t]he propriety of a preliminary injunction in relation to a court's equitable powers is determined by the nature of the final relief sought." *Id.* at 164. The plaintiff in *Leadenhall* failed because its contract claims sought "no other final relief beyond monetary damages," and it conceded that its fraud allegations were "not the basis for the injunction." *Id.* at 159 n.3, 165.

Here, by contrast, the Amended TRO rests on the Debtors' fraud, conversion, unjust enrichment, and accounting claims directed at specific, traced funds. Am. Compl. ¶¶ 100–113, 123–128, 136–143; Motion to Amend ¶¶ 33–36. At this stage, that is enough. *See Leadenhall*, 171 F.4th at 163 n.7 (quoting *Deckert*, 311 U.S. at 289).

34. *Third,* it is well-understood that a cause of action for an accounting "is a classic basis for an asset-freezing order." *See Soundview*, 543 B.R. at 122; *see also Gucci*, 768 F.3d at 131–33 (affirming asset freeze ancillary to an accounting and rejecting argument that plaintiffs first had to identify "particular property"). That is precisely one of the causes of action that Plaintiff asserts here, further underscoring the appropriateness of the Amended TRO in this case.

## III. THE ZED PARTIES' PROCEDURAL OBJECTIONS DO NOT WARRANT DISSOLUTION

### A. The Amended TRO Complies with Rule 65(b)

35. The Zed Parties argue that the Amended TRO must be dissolved because Plaintiff did not submit a verified complaint or affidavit showing immediate and irreparable injury, or a separate attorney certification under Rule 65(b)(1)(B). Motion ¶¶ 2, 41–45. The Motion to Amend, signed by Plaintiff's counsel, expressly set forth why notice should not be required. *See e.g.*, Motion to Amend ¶¶ 37, 41. The Motion to Amend was also supported by sworn declarations detailing the risk of irreparable harm, attaching the Escrow Agent's wire records, the Zed Escrow Terms, and the Zed Loan Agreement. Adv. ECF No. 4 ("Ball Decl.") ¶¶ 15–19; Tobak Decl. ¶¶ 3–7; Second Tobak Decl. ¶¶ 3–4. On that record, the Court expressly found that "the specific facts set forth in the evidence entered into the record clearly show that immediate and irreparable injury, loss, or damage will result" and that "the evidence entered into the record sets forth the reasons why notice should not be required." Amended TRO at 2. At the hearing, the Court accepted into evidence "all of the documents that have been filed under seal," and explained on the record that

"there are very good reasons to believe that notification about this proceeding in advance could lead to an even worse situation in terms of the ability of the debtors to recover the funds at issue." Tr. at 30–31.

36. More fundamentally, Rule 65(b)(1)'s requirements govern the issuance of relief *without notice*. The Zed Parties now have notice, are represented by counsel, and have submitted their Motion. The Court will decide the Motion with an adversarial record, and the relevant question is whether interim relief is warranted on that record—not whether a separately captioned certification accompanied the original application. The Zed Parties' own authority involved an order "issued without notice to the attorney for the Defendant whose identity was known, without declaring in an affidavit or verified complaint that immediate and irreparable harm would result." Motion ¶ 42 n.66 (quoting *Rabbi Jacob Joseph Sch. v. Province of Mendoza*, 342 F. Supp. 2d 124, 127 (E.D.N.Y. 2004)). Here, by contrast, the record included sworn declarations and the Court made express findings.

37. The Zed Parties' contention that Plaintiff's dissipation concern "was manufactured" because Plaintiff's counsel met with Zed's counsel on October 20, Motion ¶ 44, is also unavailing. Zed's counsel's email arrived at 5:07 p.m. on October 19, 2026—after the Motion to Amend and Amended Complaint had been prepared and dated—and identified the firm as counsel only to Zed. Futernick Decl. Ex. G; Motion to Amend at 18; Am. Compl. at 36. A meet-and-confer call in which the Debtors' counsel listened to Zed's offer to "help facilitate getting you the information you are seeking," Futernick Decl. Ex. G, does not diminish the risk that advance notice of a motion to restrain specific accounts would prompt movement of the funds in those accounts—especially when the funds had already moved from the Escrow Agent without any

notice to the Debtors and where the Defendants are in the business of quickly moving large sums of money.

38. The Zed Parties further argue that Plaintiff took "mutually exclusive" positions by asserting both that the Additional Parties were already bound by the TRO and that immediate relief was necessary. Motion ¶ 42. There is no inconsistency. Under Rule 65(d)(2)(C), the TRO bound persons in active concert or participation with CSDS who received actual notice. Motion to Amend ¶ 29. The Debtors sought the Amended TRO "[t]o ensure that the TRO is explicit as to whom it applies, and to provide clarity to banks across the country that will need to implement it," and to extend the restraint to the Additional Parties' own accounts. *Id.* ¶¶ 1, 4, 29. As counsel explained at the hearing, Plaintiff sought both "to clarify that the TRO . . . prohibited any party in . . . active concert . . . with CSDS from moving CSDS' assets" and "to apply the TRO to the new parties so that they, too, cannot move or dispose of assets while we trace how assets flowed to them from the escrow agent." Tr. at 9.[4]

### B. The Amended TRO Contains the Findings Required by Rule 65(b)(2) and Satisfies Rule 65(d)(1)

39. The Zed Parties contend that the Amended TRO's findings are "boilerplate" and that the word "may" describes only a possibility of harm. Motion ¶¶ 34, 46. But the Amended TRO describes the injury ("any party transferring, disbursing, moving, or secreting assets"), states why it is irreparable ("because such transfers may frustrate the Court's ability to enforce its prior orders and Debtors' ability to obtain relief"), and states why it was issued without notice ("because

[4] Nor does the Amended TRO operate "retroactively." Motion ¶ 1. Its operative restraint is prospective: it prohibits the Additional Parties from transferring assets during the Restraint Period. Amended TRO ¶¶ 3–4, 6. As the Court noted, the TRO is of "limited duration." Tr. at 31. Plaintiff has not sought to hold any Zed Party in contempt for conduct preceding the Zed Parties' receipt of actual notice, and the Zed Parties' argument that pre-injunction conduct cannot constitute "active concert or participation" in violating an injunction, Motion ¶ 5, therefore addresses a question that is not before the Court.

advance notice could prompt CSDS and/or the Additional Parties to transfer, disburse, move, or secrete assets before the Court could act"). Amended TRO at 2. Those are precisely the findings Rule 65(b)(2) requires, and they apply by their terms to the Additional Parties. *Id.* The Court separately found that the record "clearly show[s] that immediate and irreparable injury, loss, or damage will result." *Id.* The Amended TRO also incorporates "the reasons stated on the record on October 21, 2026," *id.*, where the Court addressed each of the four factors as applied to the Additional Parties. Tr. at 31–33.

## IV. NO BOND IS REQUIRED

40. The Zed Parties argue that, if any restraint continues, the Court should require security under Rule 65(c). Motion ¶¶ 78–79. Bankruptcy Rule 7065 provides that "the court may issue a temporary restraining order or preliminary injunction without complying with" Rule 65(c). Fed. R. Bankr. P. 7065; Motion to Amend ¶ 40. The Rule draws no distinction based on the identity of the restrained party. The Court has already determined that no bond is required, Amended TRO ¶ 7, consistent with the general rule in this District. *Lyondell Chem. Co. v. CenterPoint Energy Gas Servs. Inc. (In re Lyondell Chem. Co.)*, 402 B.R. 571, 595 (Bankr. S.D.N.Y. 2009). The Zed Parties' attempt to distinguish *Lyondell* on its facts, Motion ¶ 79, does not alter the text of Bankruptcy Rule 7065.

## RESERVATION OF RIGHTS

41. Plaintiff's investigation is ongoing. Plaintiff reserves all rights to supplement this Objection, to present additional evidence and argument at any hearing on the Motion and at the November 2, 2026 hearing, and to seek further relief in this Adversary Proceeding or the Chapter 11 Cases, including with respect to the release of the Escrow Funds to Spirit. *See* Amended TRO ¶ 9.

## CONCLUSION

42. The Zed Parties' own documents show that Zed knew its $46,350,000 was being placed with the Escrow Agent, that the purpose of that money was to provide Spirit with illusory "proof of funds" for CSDS's purchase obligations, that the arrangement was to be kept confidential, and that Zed withdrew every dollar of those funds. The Amended TRO preserves the status quo. It should remain in full force and effect.

WHEREFORE, for the foregoing reasons, Plaintiff respectfully requests that the Court (i) deny the Motion in its entirety; (ii) order that the Amended TRO [Adv. ECF No. 15] remain in full force and effect as to the Zed Parties and further order of the Court; and (iii) grant such other and further relief as the Court may deem just and proper.

Dated: October 29, 2026
New York, New York

**DAVIS POLK & WARDWELL LLP**

*/s/ Ben S. Kaminetzky*

Marshall S. Huebner
Ben S. Kaminetzky
Marc J. Tobak
Nicholas D'Angelo
450 Lexington Avenue
New York, NY 10017
Tel.: (212) 450-4000

*Counsel to Plaintiff Spirit Airlines, LLC*