COLE SCHOTZ P.C.
1325 Avenue of the Americas, 19th Floor
New York, New York 10019
Telephone: (212) 752-8000
Jacob Frumkin

Brickell City Tower
80 SW 8th Street, Suite 1900
Miami, Florida 33130
Telephone: (305) 374-4848
Luis Salazar

*Counsel to ZED AeroCapital LLC, Zander Futernick,
Jim Iacono, and Gary Lesnik*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| SPIRIT AVIATION HOLDINGS, INC., et al.,<br><br>Debtors. | Case No. 25-11897 (SHL)<br>*(Jointly Administered)* |
| SPIRIT AIRLINES, LLC,<br><br>Plaintiff,<br><br>v.<br><br>CSDS ASSET MANAGEMENT LLC, ZED AEROCAPITAL LLC, WIKERT INVESTMENTS COMPANY LLC, SRIYANTHA BENEDICT SIRIMANNE, CHRISTOPHER KELLER, GERALD GLASS, JIM IACONO, ZANDER FUTERNICK, and GARY LESNIK,<br><br>Defendants. | Adv. Proc. No. 26-01102 (SHL) |

**THE ZED PARTIES REPLY: (A) IN FURTHER SUPPORT OF THEIR EMERGENCY MOTION TO DISSOLVE THE AMENDED TEMPORARY RESTRAINING ORDER [ADV. ECF NO. 15], AND (B) IN OPPOSITION TO PLAINTIFF'S MOTION TO EXTEND THE AMENDED TEMPORARY <u>RESTRAINING ORDER [ADV. ECF NO. 44]</u>**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ........ 1

ARGUMENT ........ 4

I. SPIRIT IS CHARGED WITH EVERYTHING ITS OWN COUNSEL AND AGENT KNEW. ........ 5

A. McAfee & Taft Acted for Spirit Three Times Over: As Estate Counsel, as FAA Counsel, and as Escrow Agent. ........ 5

B. ZED Put the Entire Loan Structure in McAfee & Taft's Hands. ........ 7

C. The Source and Terms of the Deposit Were Central to McAfee & Taft's Duties to Spirit, So Its Knowledge Is Spirit's. ........ 8

D. McAfee & Taft's Dual Role Does Not Break the Chain. ........ 9

II. SPIRIT AND ITS PROFESSIONALS ALSO HAD ACTUAL NOTICE AND PROCEEDED ANYWAY. ........ 10

A. Spirit's Escrow Agreement Barred Third-Party Money, and None of the Deposit Came From CSDS ........ 10

B. McAfee & Taft Breached Those Duties and Misreported the Escrow to Spirit. ........ 11

C. Spirit's Own Professionals Saw the ZED Wire, the Seacoast Source, and the Bank of America Routing in February ........ 11

D. Spirit Cannot Demand Actual Knowledge From ZED While Disclaiming Its Own Notice. ........ 13

III. WITH NOTICE ESTABLISHED, SPIRIT'S FRAUD THEORY FAILS AT EVERY ELEMENT ........ 13

A. There Was No Justifiable Reliance, and Therefore No Underlying Fraud. ........ 13

B. ZED Made No Representation; the Misrepresentations Were CSDS's. ........ 14

C. ZED Had No Actual Knowledge: Its Funds Were Held Separately, Exactly as ZED Required. ........ 14

IV. SPIRIT OBTAINED THE AMENDED TRO BY BLURRING TWO ACCOUNTS, AND IT MUST BE DISSOLVED. ........ 15

A. Spirit Withheld Its Own Escrow Agreement and the February Notice Facts. . 15

B. Spirit Sought a Freeze of "Escrow Funds," Not the "Deposit Amount" It Had Defined. ........ 16

C. *Grupo Mexicano* Independently Bars the Freeze ........ 16

V. THE EXTENSION MOTION SHOULD BE DENIED. ........ 17

A. Spirit Concedes It Cannot Proceed to a Preliminary Injunction, So Rule 65(b) Requires Dissolution, Not Extension. ........ 17

B. As to the ZED Parties, the Requested Extension Exceeds Rule 65(b)'s 28-Day Outer Limit .......... 17

C. The Original Grounds Never Existed as to ZED, and Spirit's Harm Is Self-Inflicted. .......... 18

RESERVATION OF RIGHTS .......... 20

CONCLUSION .......... 20

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Center v. Hampton Affiliates, Inc.*,
66 N.Y.2d 782 (1985) .......... 10, 12

*Centro Empresarial Cempresa S.A. v. América Móvil, S.A.B. de C.V.*,
17 N.Y.3d 269 (2011) .......... 16

*In re Criminal Contempt Proceedings Against Crawford*,
329 F.3d 131 (2d Cir. 2003) .......... 20

*DDJ Mgmt., LLC v. Rhone Grp. L.L.C.*,
15 N.Y.3d 147 (2010) .......... 16

*Farr v. Newman*,
14 N.Y.2d 183 (1964) .......... 10, 11

*Franklin D. Nastasi Tr. v. Bloomberg, L.P.*,
224 A.D.3d 804 (2d Dep't 2024) .......... 16

*Granny Goose Foods, Inc. v. Bhd. of Teamsters*,
415 U.S. 423 (1974) .......... 6, 19, 20

*Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*,
527 U.S. 308 (1999) .......... 18

*HSH Nordbank AG v. UBS AG*,
95 A.D.3d 185 (1st Dep't 2012) .......... 16

*Kirschner v. KPMG LLP*,
15 N.Y.3d 446 (2010) .......... 10, 12

*Krys v. Pigott*,
749 F.3d 117 (2d Cir. 2014) .......... 6

*Leadenhall Cap. Partners LLP v. Advantage Cap. Holdings LLC*,
171 F.4th 155 (2d Cir. 2026) .......... 18

*Oster v. Kirschner*,
77 A.D.3d 51 (1st Dep't 2010) .......... 16

*Pan Am. World Airways, Inc. v. Flight Eng'rs' Int'l Ass'n*,
306 F.2d 840 (2d Cir. 1962) .......... 20

*Tiger v. Verdigris Valley Elec. Coop.*,
2016 OK 74, 410 P.3d 1007 .......... 10

*U.S. D.I.D. Corp. v. Windstream Commc'ns, Inc.*,
775 F.3d 128 (2d Cir. 2014) .......... 19

**Other Authorities**

Fed. R. Bankr. P. 2014(a) .......... 7

Fed. R. Bankr. P. 7065 .......... 19, 22

Fed. R. Civ. P. 65 .......... 19, 22

Restatement (Third) of Agency § 5.03 (2006) .......... 10

ZED AeroCapital LLC ("**ZED**"), Zander Futernick, Jim Iacono, and Gary Lesnik (collectively, the "**ZED Parties**"), appearing specially and reserving all rights and defenses, submit this reply in further support of their Emergency Motion to Dissolve the Amended Temporary Restraining Order (the "**Motion**"), in response to Plaintiff's Objection (the "**Objection**"), and in opposition to Plaintiff's Motion to Extend the Amended Temporary Restraining Order for an Additional Fourteen Days (the "**Extension Motion**")[1] and state:

## PRELIMINARY STATEMENT

> "Is there any point to which you would wish to draw my attention?"
> "To the curious incident of the dog in the night-time."
> "The dog did nothing in the night-time."
> "That was the curious incident," remarked Sherlock Holmes.

— Arthur Conan Doyle, *Silver Blaze* (1892)

1. Sherlock Holmes famously solved the *Silver Blaze* case by noticing what was missing – no dog barking at an unknown intruder. This case has its own silent dog that Spirit has studiously worked to keep hidden – McAfee & Taft.

2. McAfee & Taft was and is – in every way, shape, and form – Spirit's attorney and agent. Spirit *retained* McAfee & Taft as ordinary course counsel to the bankruptcy estate because McAffee & Taft historically served, and continues to serve, as its Aviation law counsel.[2] Further, Spirit *retained* McAfee & Taft as its Aviation counsel on the CSDS Aircraft sale at issue.[3] And

---

[1] Capitalized terms not defined in this reply have the meanings given in the Motion and the *Declaration of Alexander Futernick* [Adv. ECF No. 31] (the "**Futernick Decl**."). "**Escrow Agreement**" means the February 9, 2026 Escrow Agreement among Spirit, CSDS, and McAfee & Taft A Professional Corporation ("**McAfee & Taft**") [Main Case ECF No. 1659 at 111–27; *see also* Adv. ECF No. 49]. "**ZED Escrow Terms**" means the February 13, 2026 Escrow Terms and Conditions among ZED, CSDS, and McAfee & Taft (Futernick Decl. Ex. C). "**Loan Agreement**" means the February 16, 2026 Loan Agreement between ZED and CSDS (Futernick Decl. Ex. B). "**OCP Declaration**" means the *Declaration of Disinterestedness of Erin M. Van Laanen in Support of Employment of McAfee & Taft A P.C. as a Professional Utilized in the Ordinary Course of Business,* executed and filed December 31, 2025 [Main Case ECF No. 657], submitted in connection with the *Order Authorizing the Retention and Compensation of Professionals Utilized in the Ordinary Course of Business* [Main Case ECF No. 223] (the "**OCP Order**"). "**Oct. 21 Tr.**" refers to the transcript of the October 21, 2026 hearing.

[2] OCP Declaration ¶¶ 1–2.

[3] Escrow Agreement §§ 5(b), 17

further still, Spirit *retained* McAfee and Taft to serve as the Escrow Agent on the same transaction.

3. Thus, ZED fully disclosed the details of its loan and escrow agreement to Spirit's counsel and agent. On February 13, 2026, ZED, CSDS, and McAfee & Taft signed a separate escrow arrangement for a short-term bridge loan. Those terms routed ZED's money to a McAfee & Taft account at Bank of America, under the reference "Spirit Aircraft **Bridge Loan**," to be held "solely to the order of the Lender" and returned on three business days' notice.[4] Further, ZED handed McAfee & Taft the executed Loan Agreement itself, which declares that the Loan Amount remains ZED's "sole and unencumbered property," may be used "solely" as proof of funds, and is "not for the benefit of Spirit Airlines, Inc."[5] McAfee & Taft therefore had actual knowledge of every term of ZED's loan. Because McAfee & Taft was Spirit's attorney and its agent for this very deposit, that knowledge is Spirit's knowledge as a matter of law, whether or not McAfee & Taft ever passed it along.

4. What's more, Spirit's own Escrow Agreement told McAfee & Taft exactly why those facts mattered to its client. It required that the Deposit "come directly from the Buyer and from an account held in the name of the Buyer (not a parent, subsidiary, related company, officer or director)."[6] It required McAfee & Taft to "acknowledge receipt from Buyer" of the $53,350,000, to hold it in the Spirit Deposit Account at JPMorgan Chase, and to confirm that "Buyer has funded the Escrow Funds."[7] McAfee & Taft therefore could not accept third-party money as the Deposit, and it was bound to tell Spirit accurately what it had received. It did neither. Not one dollar came from CSDS: $7 million came from Wikert and $46,350,000 came from ZED, into a different account at a different bank, under terms that made the money ZED's and not Spirit's. Yet McAfee

[4] ZED Escrow Terms §§ 2, 4.
[5] Loan Agreement § I.3.
[6] Escrow Agreement § 4(a).
[7] Escrow Agreement §§ 1, 4(a), 8(a); *see also* Objection ¶ 3; *see also* Ball Decl. Ex. A.

& Taft told Spirit it held the full $53.35 million "in escrow."[8] That was not a slip. It was gross negligence by the one professional that held both escrows, both sets of papers, and every wire.

5. But Spirit's professionals did not need McAfee & Taft to tell them. They saw it themselves. On February 13, FTI, Spirit's financial advisor, objected that the deposit structure "is not what was discussed."[9] The next day, CSDS's counsel at Berger Singerman sent FTI, Spirit's Associate General Counsel, and Debevoise a file titled "**ZED Wire 2.14.26 Activity Center Seacoast National Bank.pdf**," described as evidence of a $7.9 million wire that "will hit McAffe [sic] & Taft's escrow account (**now again Bank of America** at its direction)."[10] Spirit thus knew, in writing, that the money was coming from ZED rather than CSDS, through Seacoast rather than a CSDS account, and into Bank of America rather than the Spirit Deposit Account, all in breach of the APA and the Escrow Agreement. The wire itself said what the money was: under the ZED Escrow Terms, the ZED wire carried the reference "Spirit Aircraft **Bridge Loan**."￼ With full and actual notice that the Deposit was not funded, Spirit pressed ahead anyway, through the stalking-horse designation, the sale hearing, and the April 24 Sale Order. And so far as the record shows, no one at Spirit, Davis Polk, Debevoise, or FTI checked the balance of the Spirit Deposit Account at closing or at any time in the six months that followed.

6. Knowing the weakness of its position, Spirit litigated around it. Its papers do not disclose the FTI objection, the ZED wire file, or the Bank of America routing. They do not put into the record the one document that answers the question Spirit asks the Court to assume: its own Escrow Agreement, which on its face sends the Deposit to the Spirit Deposit Account *at JPMorgan Chase* and says nothing of the Bank of America account that held ZED's money. And Spirit's

[8] Ball Decl. Ex. A [Adv. ECF No. 4] at 9; Futernick Decl. ¶¶ 14, 23, 46–48.
[9] Tobak Decl. Ex. E at 14.
[10] Tobak Decl. Ex. E; ZED Mot. ¶¶ 23–24.

choice of words gives the game away. Its *ex parte* application defines what CSDS owed as[11] the "Deposit Amount,"[12] but it did not ask the Court to freeze the Deposit Amount. It asked the Court to freeze assets connected with the "Escrow Funds," a term its motion never directly defines.[13] That substitution was no accident. The Deposit Amount belonged in one place, the JP Morgan Chase Spirit Deposit Account, and not one dollar of ZED's money was ever there, as Spirit's own counsel conceded on the record.[14] The looser label let Spirit recast ZED's separately held bridge loan as a withdrawal from Spirit's "court-supervised fund,"[15] blur two accounts into one, and obtain without notice a freeze it could never have obtained on a straight presentation. Despite the above, Spirit has intentionally failed to name McAfee & Taft in this matter, sought to restrained it.

7. Now Spirit concedes in its Extension Motion that it cannot even make the showing a preliminary injunction requires.[16] A temporary restraining order is a stopgap, not a 35-day freeze of an innocent lender's entire balance sheet while Spirit hunts for a theory. Spirit made this mess. ZED will not pay for it. The Amended TRO must be dissolved as to the ZED Parties, and the Extension Motion must be denied.

## **ARGUMENT**

8. The burden to keep the over broad injunction in place is Spirit's, not ZED's. On a motion to dissolve, the party that obtained the order bears the burden of justifying continued

---

[11] See Escrow Agreement, §§ 1, 4(a); *c.f.* Futernick Decl., Exs. A, B.
[12] Compl. ¶ 19; *see also* Objection ¶ 2; Am. Compl. ¶ 26.
[13] Motion to Amend at 2–3 & n.5 (seeking to restrain the "Additional Parties" as parties "acting in concert with CSDS in connection with the Escrow Funds," and leaving undefined capitalized terms to the Complaint, the TRO motion, the APA, the Escrow Agreement, or the Escrow Motion); *see also* Extension Motion ¶ 16.
[14] Oct. 21 Tr. at 11–12. (Spirit's counsel: ZED funds were held "pursuant to a separate . . . escrow agreement," "not the escrow agreement related to the sale," and went "to the escrow agent's Bank of America account.")
[15] Objection ¶ 24.
[16] Extension Motion ¶ 9.

injunctive relief.[17] Spirit agrees that it must again satisfy each element of the four-factor test.[18] The only claim Spirit defends as "clearest" against the ZED Parties is aiding and abetting fraudulent misrepresentation.[19] But that claim requires an underlying fraud, the defendant's *actual* knowledge of it, and substantial assistance.[20] Constructive knowledge is not enough.[21] As shown below, Spirit is charged with everything its own counsel and agent knew, its professionals had actual notice in any event, and with those facts established the claim fails at every element.

## I. SPIRIT IS CHARGED WITH EVERYTHING ITS OWN COUNSEL AND AGENT KNEW.

### A. McAfee & Taft Acted for Spirit Three Times Over: As Estate Counsel, as FAA Counsel, and as Escrow Agent.

9. McAfee & Taft was not a stranger to Spirit. It was Spirit's lawyer before it was Spirit's escrow agent. On December 31, 2025, Ms. Van Laanen filed a sworn declaration in this Court in support of the "Employment of McAfee & Taft A P.C. as a Professional Utilized in the Ordinary Course of Business."[22] She swore that the Debtors "have requested that the Firm provide legal services to the Debtors in connection with certain matters governed by Title 49, United Stat[e]s Code, Transportation, and the Convention on International Interests in Mobile Equipment," and that the firm "has consented to provide such services."[23]

10. Those are the bodies of law that govern the registration and transfer of interests in aircraft, which is precisely the work an FAA Counsel performs in an aircraft sale. She swore that neither she nor anyone at her firm "holds, or represents any interest adverse to the Debtors or their

---

[17] *Granny Goose Foods, Inc. v. Bhd. of Teamsters,* 415 U.S. 423, 441–43 (1974); Motion ¶ 40.
[18] Objection ¶ 12 (citing *In re Sears Holding Corp.*, 659 B.R. 236, 248 (Bankr. S.D.N.Y. 2024) (Lane, J.)).
[19] Objection ¶ 14.
[20] *Lerner v. Fleet Bank,* N.A., 459 F.3d 273, 292 (2d Cir. 2006).
[21] *Id.*; *Krys v. Pigott*, 749 F.3d 117, 128 (2d Cir. 2014).
[22]OCP Declaration at 1; see Fed. R. Bankr. P. 2014(a).
[23] OCP Declaration ¶ 2.

estates with respect to the matters on which the Firm is to be employed."[24] She swore that, although her firm may serve claimants and other parties in interest in unrelated matters, it "does not perform services for any such person in connection with the Chapter 11 Cases."[25] And she undertook to supplement the declaration if her firm discovered "any facts bearing on the matter described herein."[26]

11. Less than six weeks later, Spirit put that same firm, and that same lawyer, in charge of the Deposit. Spirit appointed McAfee & Taft escrow agent to hold the deposit "for the benefit of Seller and Buyer," paid half its fee, and directed that the bill of sale be delivered to it "in its capacity as FAA Counsel." Every notice was to be forwarded to Spirit and Debevoise.

12. Spirit also made McAfee & Taft its aviation counsel on this very sale. The APA Spirit negotiated and signed with CSDS designates "the law firm of McAfee & Taft, a Professional Corporation" as the transaction's "FAA Counsel."[27] And the APA gave that FAA Counsel the seller-side legal work needed to convey Spirit's aircraft: confirming that Spirit's FAA Bill of Sale was "in the due form for filing with the FAA," filing "the appropriate releases" of the liens on Spirit's aircraft at the FAA, registering the discharges of those interests on the International Registry, and filing Spirit's conveyance concurrently with the Buyer's registration application.[28] That is the work of Spirit's aviation lawyer, performed on the transaction at issue, under a contract to which Spirit is a party and that this Court approved.

13. Spirit acknowledged that McAfee & Taft "has in the past performed legal services for Buyer and/or Seller and may be asked by Buyer and/or Seller to provide legal services to such

---

[24] *Id.* ¶ 4.
[25] *Id.* ¶ 3.
[26] *Id.* ¶ 7.
[27] Escrow Agreement §§ 1, 5(b), 13.
[28] APA § 4.1(a)–(d), (g) [Main Case ECF No. 770 at 76–77]; *see also* Escrow Agreement § 5(b) (FAA Bill of Sale to be delivered to McAfee & Taft "in its capacity as FAA Counsel").

Parties in connection with the transaction of which this Agreement is a part," and it waived "any and all conflicts of interest that may arise from that representation."[29] The OCP Declaration shows that this language described no hypothetical. Spirit had already asked, and McAfee & Taft had already agreed.

14. McAfee & Taft then acted as Spirit's agent throughout. It was Ms. Van Laanen who confirmed each deposit directly to Debevoise and to Spirit's William Serrahn.[30] When the escrow turned up empty, McAfee & Taft's managing partner called Spirit's counsel, not CSDS's.[31]

**B. ZED Put the Entire Loan Structure in McAfee & Taft's Hands.**

15. Spirit's theory depends on a "secret side deal."[32] But there was nothing secret about it. Before a dollar moved, ZED put the whole structure in writing and gave it to McAfee & Taft – Spirit's own escrow agent and counsel:

- The ZED Escrow Terms recite that they are entered into "in connection with a short-term loan to be made by Lender to Borrower in connection with the Borrower's purchase of twenty (20) aircraft from Spirit Airlines."[33]
- They direct that the wire carry the reference "ZED AeroCapital – CSDS Asset Management – **Spirit Aircraft Bridge Loan**."[34]
- They require that the funds be wired to McAfee & Taft's "Aircraft Account" at **Bank of America, N.A.**, account ending -4407, ***not*** to the Spirit Deposit Account designated in Spirit's Escrow Agreement[35] and into which the "Deposit" was to be held.
- They provide that the funds "shall at all times be held solely to the order of the Lender," will be returned "within three (3) business days" of ZED's instruction, and will be released "solely in accordance with the Lender's unilateral written instructions."
- They require that "the fully executed Loan Agreement" be delivered to McAfee & Taft.[36] ZED did so, forwarding the Loan Agreement to Erin Van Laanen, the same McAfee

[29] Escrow Agreement, § 17.
[30] Ball Decl. Ex. A at 9–14; Oct. 21 Tr. at 29-30.
[31] Ball Decl. ¶¶ 13–17.
[32] Objection ¶ 27; Extension Motion ¶ 8.
[33] ZED Escrow Terms § 1.
[34] Id. § 2 & Ex. A.
[35] Id. § 2; Escrow Agreement § 1 & Ex. A.
[36] ZED Escrow Terms §§ 2, 4.

> & Taft shareholder and attorney who had sworn to this Court that her firm had agreed to provide legal services to the Debtors.[37]

McAfee & Taft later produced the Loan Agreement from its own files, and Spirit has put that Bates-Stamped document into evidence before the Court.[38]

16. The Loan Agreement itself, which was in the hands of Spirit's counsel and Escrow Agent, leave no doubt. It provides that the Loan Amount "shall at all times remain the sole and unencumbered property of the Lender and not subject to any claims by Borrower, Spirit Airlines, Inc. or any other person."[39] It prohibits CSDS from pledging the funds "to Spirit Airlines or any other party."[40] And it states that the loan documents are "not for the benefit of Spirit Airlines, Inc."[41] and require no consent from Spirit for the refund. A party planning to trick Spirit into believing it owned this money would not write a contract, deliver it to Spirit's own escrow agent and counsel, and announce on its face that Spirit has no claim to the money.

### C. The Source and Terms of the Deposit Were Central to McAfee & Taft's Duties to Spirit, So Its Knowledge Is Spirit's.

17. The rule is settled in New York and Oklahoma alike. "[K]nowledge acquired by an agent acting within the scope of his agency is imputed to his principal and the latter is bound by such knowledge although the information is never actually communicated to it."[42] Knowledge that agents acquire within the scope of their authority is "presumptively imputed to their principals."[43] The presumption "does not depend on a case-by-case assessment of whether this is likely to

---

[37] Futernick Decl. ¶ 14; OCP Declaration ¶¶ 1–2.
[38] Second Tobak Decl. Ex. G [Adv. ECF No. 19] (MT000009–21).
[39] Loan Agreement § I.3.
[40] *Id.*
[41] *Id.*
[42] *Center v. Hampton Affiliates, Inc.*, 66 N.Y.2d 782, 784 (1985); *accord Tiger v. Verdigris Valley Elec. Coop.*, 2016 OK 74, ¶ 16, 410 P.3d 1007, 1012. Both the Escrow Agreement and the ZED Escrow Terms are governed by Oklahoma law (Escrow Agreement § 14; ZED Escrow Terms § 10). The result is the same under New York law, which governs the APA and on which Spirit's tort claims rely. *See also* Restatement (Third) of Agency § 5.03 (2006).
[43] *Kirschner v. KPMG LLP*, 15 N.Y.3d 446, 465 (2010).

happen" – it is "a legal presumption that governs in every case."[44] And the rule applies to a lawyer acting for a client as fully as to any other agent. [45]

18. Nothing could be more central to McAfee & Taft's duties to Spirit than the source and terms of the money it was confirming as CSDS's Deposit. In fact, the Escrow Agreement made McAfee & Taft responsible for receiving the Deposit "from Buyer," for accepting only funds that "come directly from the Buyer," and for affirming that "Buyer has funded the Escrow Funds." [46] The ZED Escrow Terms and the Loan Agreement answered every one of those questions. They showed that the money came from ZED, sat in a different account, belonged to ZED, could be withdrawn by ZED alone on three days' notice, and could never be paid to Spirit.

19. McAfee & Taft knew all of this because it signed the ZED Escrow Terms and received the Loan Agreement.[47] And the same firm was, by its own sworn account, Spirit's counsel on the aircraft-transfer matters that this Deposit secured. [48] That knowledge is Spirit's.

**D. McAfee & Taft's Dual Role Does Not Break the Chain.**

20. Spirit cannot escape imputation by pointing to McAfee & Taft's dual role. The New York Court of Appeals rejected exactly that argument in *Farr*. There, an attorney represented both buyer and seller, and the buyer was charged with what his conflicted attorney knew: "The mere fact that the attorney acted for both parties . . . cannot insulate defendant from his agent's knowledge," and "[a] conflict of interest does not avoid the imputation of knowledge."[49] Spirit stands where the *Farr* buyer stood. It hired McAfee & Taft as estate counsel, chose it as a dual agent with its eyes open, waived the conflict in writing, and agreed that McAfee & Taft's "rights,

---

[44] *Id*. at 466.
[45] See *Farr v. Newman*, 14 N.Y.2d 183, 187–88 (1964).
[46] Escrow Agreement §§ 1, 4(a), 8(a).
[47] Futernick Decl. ¶¶ 14, 23.
[48] OCP Declaration ¶ 2; Escrow Agreement § 5(b).
[49] *Farr*, 14 N.Y.2d at 187–88.

obligation and duties pursuant to this Agreement are in no way affected by such representation."[50] The parallel waiver in the ZED Escrow Terms confirms that McAfee & Taft was openly serving multiple parties in the same transaction.[51]

21. Nor can Spirit invoke the adverse-interest exception. That exception is reserved for an agent who has "totally abandoned his principal's interests" and is acting "entirely for his own or another's purposes," and it "cannot be invoked merely because he has a conflict of interest."[52] Spirit cannot allege, much less show, that McAfee & Taft abandoned Spirit. McAfee & Taft swore the opposite: that it neither held nor represented any interest adverse to the Debtors on the matters for which it was employed.[53] Spirit has not suggested otherwise, and it tells this Court that the escrow agent "is cooperating" with it."[54] A principal that relies on its agent's cooperation today cannot disown that agent's knowledge from February.

## II. SPIRIT AND ITS PROFESSIONALS ALSO HAD ACTUAL NOTICE AND PROCEEDED ANYWAY.

### A. Spirit's Escrow Agreement Barred Third-Party Money, and None of the Deposit Came From CSDS.

22. The Deposit Escrow Agreement Spirit signed contained a simple, bright-line protection: "Any funds wired to the Escrow Agent must come directly from the Buyer and from an account held in the name of the Buyer (not a parent, subsidiary, related company, officer or director)."[55] Spirit also had McAfee & Taft "acknowledge receipt from Buyer," and it had the parties and the escrow agent "recognize and agree that Buyer has funded the Escrow Funds." [56]

---

[50] Escrow Agreement § 17; OCP Declaration ¶ 2.
[51] ZED Escrow Terms § 12.
[52] *Center*, 66 N.Y.2d at 784–85; *Kirschner*, 15 N.Y.3d at 466–67.
[53] OCP Declaration ¶ 4.
[54] Oct. 21 Tr. at 28–29.
[55] Escrow Agreement § 4(a).
[56] Id. §§ 1, 8(a).

23. But Spirit and its professionals completely ignored that requirement. Not one dollar of the $53,350,000 Spirit was told was "in escrow" came from CSDS.[57] Spirit's own Objection says so: the escrow agent confirmed $53.35 million made up of "$7 million from Wikert, and $46.35 million from Zed."[58] Spirit's counsel told the Court that the $7 million came from Wikert's Amarillo National Bank account.[59] Seven million dollars plus $46,350,000 is $53,350,000. Every dollar was third-party money, and McAfee & Taft, which received each wire, knew exactly where each came from.

**B. McAfee & Taft Breached Those Duties and Misreported the Escrow to Spirit.**

24. Those provisions did not leave McAfee & Taft any discretion. It could not accept third-party money as the Deposit, and it was bound to tell Spirit accurately what it had received and from whom. It did neither. It took $7 million from Wikert and $46,350,000 from ZED, held ZED's money in a different account at a different bank under terms that made it ZED's alone, and then told Spirit it held the full $53.35 million "in escrow."[60] That was not a clerical slip. It was gross negligence by the one professional that held both escrows, both sets of papers, and every wire. Whatever loss Spirit suffered ran through its own agent's reporting, not through anything ZED said or did.

**C. Spirit's Own Professionals Saw the ZED Wire, the Seacoast Source, and the Bank of America Routing in February.**

25. What's more, Spirit's professionals were told the same thing in February. The deposit was due February 12. It was late, and on the evening of February 13, Spirit's financial

[57] Ball Decl. Ex. A [Adv. ECF No. 4] at 9; Futernick Decl. ¶¶ 14, 23, 46–48.
[58] Objection ¶ 3.
[59] Oct. 21 Tr. at 10–11.
[60] Escrow Agreement §§ 1, 4(a), 8(a); Ball Decl. Ex. A at 9–14; Objection ¶ 3; Futernick Decl. ¶¶ 27–28, 46–48.

advisor, FTI, objected that "this is not what was discussed even a few hours ago." [61]

26. The next morning, CSDS's then-counsel sent Marc Bilbao of FTI Consulting (Marc.Bilbao@fticonsulting.com), Spirit's Associate General Counsel Thomas Canfield (Thomas.Canfield@Spirit.com), and Jasmine Ball of Debevoise & Plimpton (jball@debevoise.com) an attachment titled "**ZED Wire 2.14.26 Activity Center Seacoast National Bank.pdf**."[62] The email told them the wire "will hit McAffe [sic] & Taft's escrow account (**now again Bank of America** at its direction)." [63] In one email, then, Spirit's team learned that the money was coming from an entity called ZED rather than from CSDS (in violation of the APA and the Escrow Agreement), that it was coming from Seacoast National Bank, and that it was going to a Bank of America account rather than the Spirit Deposit Account Spirit's agreement required.

27. The wire itself gave further notice to Spirit. Under the ZED Escrow Terms, ZED's wires were to carry the reference "ZED AeroCapital – CSDS Asset Management – Spirit Aircraft **Bridge Loan**," and ZED complied.[64] Spirit concedes that "[a] document sent to Spirit as a record of a Zed wire" stated the purpose of that first $7.9 million transfer.[65] Indeed, the description field in said document explicitly states "Spirit Aircraft Bridge Loan."[66]

28. Spirit and its professionals accepted the late deposit anyway, asked no questions, designated CSDS the successful bidder on April 2, and obtained the Sale Order on April 24.[67] Spirit was, quite literally, told in writing that the deposit was a bridge loan. A sophisticated debtor

[61] Tobak Decl. Ex. E at 14.
[62] *Id*. at 13.
[63] *Id*.
[64] ZED Escrow Terms § 2; Futernick Decl. ¶ 27.
[65] Objection ¶ 18 (citing Tobak Decl. Ex. E).
[66] Tobak Decl. Ex. E
[67] Motion ¶¶ 6, 23–25.

in possession, advised by Davis Polk, Debevoise, FTI, and its own aircraft counsel at McAfee & Taft, that receives a wire labeled "bridge loan," from a lender it has never heard of, into the wrong bank, cannot later claim it was deceived about where the money came from.

### D. Spirit Cannot Demand Actual Knowledge From ZED While Disclaiming Its Own Notice.

29. At a minimum, Spirit was on inquiry notice by February 14.[68] Notice of facts sufficient to prompt inquiry charges a party with what a reasonable inquiry would have revealed. A single question to Spirit's own escrow agent and counsel, "whose money is this, and on what terms?," would have produced the ZED Escrow Terms and the Loan Agreement, which sat in McAfee & Taft's file. The asymmetry in Spirit's position is striking. To hold ZED liable for aiding and abetting, Spirit must prove ZED's *actual* knowledge of CSDS's fraud.[69] Yet Spirit's own pleading falls back on what ZED "knew or had reason to know," which is constructive knowledge and legally insufficient.[70] At the same time, Spirit insists that it is not chargeable with the facts its own professionals received in writing and its own counsel held in its file. Spirit cannot hold ZED to a standard of constructive knowledge that it refuses to apply to itself. Whether Spirit's professionals actually understood in February what they were looking at, and whether they are now choosing not to remember it, is a question for discovery, and *Spirit* is the party that has refused to explain it. On this record, at a minimum, Spirit had every material fact it now says was hidden from it.

## III. WITH NOTICE ESTABLISHED, SPIRIT'S FRAUD THEORY FAILS AT EVERY ELEMENT.

### A. There Was No Justifiable Reliance, and Therefore No Underlying Fraud.

30. New York law does not let Spirit claim it was deceived. "[I]f the facts represented

[68] Tobak Decl. Ex. E at 14.
[69] *Lerner*, 459 F.3d at 292.
[70] *Lerner*, 459 F.3d at 292.

are not matters peculiarly within the party's knowledge, and the other party has the means available to him of knowing, by the exercise of ordinary intelligence, the truth . . . he must make use of those means, or he will not be heard to complain that he was induced to enter into the transaction by misrepresentations."[71] A sophisticated party "cannot establish that it entered into an arm's length transaction in justifiable reliance on alleged misrepresentations if that [party] failed to make use of the means of verification that were available to it."[72] Spirit had more than "means available." It had a contractual source-of-funds requirement, a bank-account designation, an email naming ZED, a wire labeled "bridge loan," and its own counsel holding the loan documents. Without justifiable reliance there is no underlying fraud.[73] And without an underlying fraud there is nothing for ZED to have aided and abetted.[74]

**B. ZED Made No Representation; the Misrepresentations Were CSDS's.**

31. Spirit's real complaint is that CSDS and Mr. Sirimanne lied to it, and later to this Court, in the April 20 declaration.[75] ZED never saw that declaration, was out of the escrow three days before it was signed, and never made a representation of any kind to Spirit or this Court.[76] Tellingly, Spirit does not plead fraud against any ZED Party. [77]

**C. ZED Had No Actual Knowledge: Its Funds Were Held Separately, Exactly as ZED Required.**

32. Spirit describes the $46.35 million ZED placed in its own escrow as the "Escrow Funds"[78] and says ZED caused those funds to be "removed from escrow" in violation of the Escrow

---

[71] *DDJ Mgmt., LLC v. Rhone Grp. L.L.C.*, 15 N.Y.3d 147, 154 (2010) (citation omitted); *see also Centro Empresarial Cempresa S.A. v. América Móvil, S.A.B. de C.V.*, 17 N.Y.3d 269, 278–79 (2011).
[72] *HSH Nordbank AG v. UBS AG,* 95 A.D.3d 185, 194–95 (1st Dep't 2012).
[73] *Oster v. Kirschner*, 77 A.D.3d 51, 55 (1st Dep't 2010); *see also Franklin D. Nastasi Tr. v. Bloomberg, L.P.*, 224 A.D.3d 804, 808 (2d Dep't 2024).
[74] *Id.*
[75] Am. Compl. ¶¶ 48–52.
[76] Futernick Decl. ¶¶ 36, 50, 53–54.
[77] Am. Compl., Fifth Cause of Action.
[78] Am. Compl. ¶ 101.

Agreement.[79] The record says otherwise.

33. Spirit's Escrow Agreement required the "**Deposit**" to be held "in the escrow account of Escrow Agent with JPMorgan Chase Bank, N.A.," an account ending in -2956.[80] But ZED wired every dollar to McAfee & Taft's Bank of America account ending -4407, as the ZED Escrow Terms required.[81] ZED's funds were never deposited into, held in, or transferred out of the Spirit Deposit Account.[82] McAfee & Taft itself kept the two separate. It referred to the "Zed AeroCapital escrow account," reported a "starting balance" of exactly $46,350,000 in that account, and separately distinguished "the funds in the escrow account" from an incoming CSDS wire.[83] Spirit's counsel conceded the point to this Court: the ZED funds "were to be held by the escrow agent pursuant to a separate . . . escrow agreement," "not the escrow agreement related to the sale that was approved by the Court," and ZED's transfers went "to the escrow agent's Bank of America account."[84]

## IV. SPIRIT OBTAINED THE AMENDED TRO BY BLURRING TWO ACCOUNTS, AND IT MUST BE DISSOLVED.

### A. Spirit Withheld Its Own Escrow Agreement and the February Notice Facts.

34. The original TRO application, which Spirit now says rested on a "massive fraud," did not mention the ZED escrow at all. Neither does the Amended TRO, which says not one word about the ZED Escrow Terms, the Bank of America account, or the fact that ZED's funds were never in Spirit's escrow.[85] Spirit did not disclose the FTI objection or the ZED wire file. And it never put into the record the one document that answers the question it asks the Court to assume:

---

[79] Objection ¶ 24; Am. Compl. ¶ 105.
[80] Escrow Agreement § 1 & Ex. A; Futernick Decl. ¶ 28.
[81] ZED Escrow Terms § 2; Futernick Decl. ¶ 27.
[82] Futernick Decl. ¶ 28.
[83] Futernick Decl. ¶¶ 46–48 & Ex. F.
[84] Oct. 21 Tr. at 11–12.
[85] See Adv. ECF No. 3; Amended TRO.

its own Escrow Agreement, which sends the Deposit to the Spirit Deposit Account and says nothing of the Bank of America account that held ZED's money.[86] Another dog that did not bark.

### B. Spirit Sought a Freeze of "Escrow Funds," Not the "Deposit Amount" It Had Defined.

35. Spirit knows exactly what to call the money CSDS owed it. Its pleadings define the $53,350,000 as the "Deposit Amount."[87] But Spirit did not ask the Court to freeze the Deposit Amount. It asked the Court to freeze assets connected with the "Escrow Funds," a term its motion never directly defines.[88] The substitution did real work. The Deposit Amount belonged in one place, the Spirit Deposit Account, and not one dollar of ZED's money was ever there. Had Spirit used its own defined term, its application would have shown on its face that ZED's money was never Spirit's deposit. The looser label let Spirit recast ZED's separately held bridge loan as a withdrawal from Spirit's "court-supervised fund,"[89] blur two accounts into one, and obtain without notice a freeze it could never have obtained on a straight presentation.

### C. *Grupo Mexicano* Independently Bars the Freeze.

36. Even apart from the record, the freeze cannot stand as a matter of law. Spirit's claims against the ZED Parties seek money damages from non-debtors, and Spirit asserts no lien on or equitable interest in any specific ZED asset. As undeniably established in *Grupo Mexicano*, a federal court has no equitable power to freeze a defendant's assets pending adjudication of such a claim.[90]

[86] Escrow Agreement.
[87] Compl. ¶ 19; Am. Compl. ¶ 26; Objection ¶ 21.
[88] Motion to Amend at 2–3 & n.5; Objection ¶ 24; Escrow Agreement § 1 (defining "Escrow Funds" as the deposit held in the JPMorgan "Escrow Account").
[89] Objection ¶ 24.
[90] *Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 333 (1999); *Leadenhall Cap. Partners LLP v. Advantage Cap. Holdings LLC,* 171 F.4th 155, 164 (2d Cir. 2026); Motion ¶¶ 48–55.

## V. THE EXTENSION MOTION SHOULD BE DENIED.

### A. Spirit Concedes It Cannot Proceed to a Preliminary Injunction, So Rule 65(b) Requires Dissolution, Not Extension.

37. A temporary restraining order issued without notice exists only to hold the status quo "just so long as is necessary to hold a hearing, and no longer."[91] For that reason, Rule 65(b)(3) requires that the motion for a preliminary injunction be heard "at the earliest possible time," and that "the party who obtained the order must proceed with the motion; if the party does not, the court must dissolve the order."[92] Spirit has not filed a preliminary-injunction motion. It admits that it cannot: "Without the necessary evidentiary record, Plaintiff cannot put forth the necessary information required for a motion seeking a preliminary injunction."[93] A plaintiff that cannot make a preliminary-injunction showing nearly three weeks after obtaining an *ex parte* freeze has, by definition, not shown "good cause" to keep the freeze in place.[94] "Good cause" does not mean more time to look for a case. The "[r]ule contemplates that notice and hearing shall result in an appropriate adjudication, *i.e.*, the issuance or denial of a preliminary injunction, not in extension of the temporary stay." [95]

### B. As to the ZED Parties, the Requested Extension Exceeds Rule 65(b)'s 28-Day Outer Limit.

38. Rule 65(b)(2) permits a single extension "for a like period" of 14 days; anything longer requires the restrained party's consent.[96] Spirit obtained an Amended TRO declaring that the ZED Parties "are, **and since entry of the TRO have been**, Restrained Parties."[97] The TRO was entered on October 14. Spirit now asks to extend the restraint to November 18, which is more

---

[91] *Granny Goose*, 415 U.S. at 439.
[92] Fed. R. Civ. P. 65(b)(3), made applicable by Fed. R. Bankr. P. 7065.
[93] Extension Motion ¶ 9.
[94] Fed. R. Civ. P. 65(b)(2).
[95] *Granny Goose*, 415 U.S. at 443–44 (citation omitted).
[96] *U.S. D.I.D. Corp. v. Windstream Commc'ns, Inc.*, 775 F.3d 128, 132 n.2 (2d Cir. 2014) ("a TRO lasting longer than twenty-eight days requires that the adverse party consent").
[97] Amended TRO ¶ 4 (emphasis added).

than 28 days of restraint by Spirit's own account.[98] The ZED Parties do not consent. Spirit's footnoted reliance on *Crawford*, which applies where the parties "had notice" of the order and an opportunity to oppose it, only underscores the problem.[99] The ZED Parties had no notice of anything until after the Amended TRO was entered, and they were deemed bound retroactively to an order they had never seen.[100] A restraint that runs past 28 days without consent is, in substance, a preliminary injunction, and it cannot stand without the findings a preliminary injunction requires.[101]

**C. The Original Grounds Never Existed as to ZED, and Spirit's Harm Is Self-Inflicted.**

39. Spirit argues that good cause exists because "the original grounds for granting the TRO continue to exist."[102] But the Amended TRO issued on Spirit's one-sided *ex parte* presentation: that ZED "fronted" money into Spirit's escrow and then took it out of Spirit's escrow. That was false. The adversarial record shows that ZED's money was never in the Spirit Deposit Account, that ZED disclosed its terms in writing to Spirit's own estate-retained counsel, escrow agent, and FAA Counsel, and that Spirit's own team was told in February that the deposit came from ZED, through Seacoast, to a Bank of America account.[103]

40. Spirit says the freeze must continue because the ZED Parties are "slow to cooperate."[104] A TRO is not a discovery device, and a special appearance to contest jurisdiction and an unlawful freeze is not "obstruction." The ZED Parties' counsel contacted Spirit's counsel on October 19 and proposed a call to discuss "whether we can help facilitate getting you the

---

[98] Extension Motion at n. 3.
[99] *Id.* (*citing In re Criminal Contempt Proceedings Against Crawford*, 329 F.3d 131 (2d Cir. 2003)).
[100] Motion ¶¶ 1, 32–35.
[101] *See Pan Am. World Airways, Inc. v. Flight Eng'rs' Int'l Ass'n*, 306 F.2d 840, 842–44 (2d Cir. 1962); *Granny Goose*, 415 U.S. at 443–45.
[102] Extension Motion ¶ 11.
[103] See Parts I–II, supra.
[104] Extension Motion ¶¶ 6–8.

information you are seeking."[105] Spirit answered by obtaining an *ex parte* freeze of every asset the ZED Parties own, and binding their lawyers too, without a word of notice. The "risk of dissipation" Spirit invokes is the fact that ZED took back its own money, by traceable Fedwire, to the very Seacoast account it disclosed in writing at the outset, six months before Spirit filed anything.[106] That is not dissipation; it is the opposite of concealment. Since the Amended TRO was entered, no ZED Party has moved any asset in violation of it.[107]

41. Meanwhile, the harm to the ZED Parties is concrete and continuing. An operating aviation lender cannot fund transactions or meet operating obligations, and three individuals who received none of the funds personally cannot pay ordinary living expenses.[108] Spirit, by contrast, loses nothing from dissolution. Its claims, such as they are, remain. And the facts it now calls a "discovery" have sat in its professionals' inboxes, and in its own counsel's file, since February.

42. The fault for this situation lies entirely with Spirit, its professionals who failed to act when noticed, and McAfee & Taft who was grossly negligent in the exercise of its duties as Spirit's counsel and as Escrow Agent. Spirit signed an escrow agreement requiring that the Deposit come from the Buyer's own account,[109] and then accepted a deposit that came entirely from third parties.[110] It specified the Spirit Deposit Account, and then accepted confirmations for money its team was told was going to Bank of America.[111] It received a wire file bearing ZED's name and a "bridge loan" reference, and asked nothing.[112] It retained McAfee & Taft as estate counsel, made the same firm its escrow agent and FAA Counsel, waived the conflict[113], and never asked its own

[105] Futernick Decl. ¶¶ 55–56 & Ex. G.
[106] *Id.* ¶¶ 26, 42, 47.
[107] *Id.* ¶ 57.
[108] *Id.* ¶¶ 58–59.
[109] Escrow Agreement § 1 & Ex. A; Futernick Decl. ¶ 28.
[110] ZED Escrow Terms § 2; Futernick Decl. ¶ 27.
[111] Oct. 21 Tr. at 11–12.
[112] Objection ¶ 18 (citing Tobak Decl. Ex. E).
[113] Escrow Agreement § 17.

lawyer the obvious question: whose money is this, and on what terms? It let the deal proceed through a stalking-horse designation and a Sale Order without verifying the Deposit. And it has sued everyone except the one party – McAfee & Taft, Spirit's own counsel – that held every dollar and made every confirmation.

43. Equity does not reward a party for its own failures. The public interest is not served by freezing the assets of a lender that documented its loan, disclosed its terms, and recovered only its own principal. It is served by holding a sophisticated debtor in possession, its estate professionals, and its advisors to the diligence the law demands of them.

## RESERVATION OF RIGHTS

44. The ZED Parties appear specially. They expressly reserve all rights, claims, objections, and defenses, including lack of personal jurisdiction, insufficient process, and insufficient service of process, and all claims for wrongful restraint, damages, fees, costs, and sanctions, as set forth in the Motion.[114] Nothing in this reply constitutes a general appearance or consent to the entry of final orders.

## CONCLUSION

WHEREFORE, the ZED Parties respectfully request that the Court enter an order (i) granting the Motion and dissolving the Amended TRO [Adv. ECF No. 15] in its entirety as to ZED AeroCapital LLC, Zander Futernick, Jim Iacono, and Gary Lesnik; (ii) denying the Extension Motion [Adv. ECF No. 44] as to the ZED Parties; (iii) in the alternative only, narrowing any continued restraint and requiring Spirit to post security under Federal Rule of Civil Procedure 65(c), made applicable by Federal Rule of Bankruptcy Procedure 7065; and (iv) granting such other and further relief as the Court deems just and proper.

---

[114] Motion ¶¶ 10, 81–82.

Dated: November 2, 2026

Respectfully submitted,

**COLE SCHOTZ P.C.**
Brickell City Tower
80 SW 8th Street, Suite 1900
Miami, Florida 33130
Telephone: (305) 374-4848
Email: LSalazar@coleschotz.com
Secondary: cs-eservice-Miami@coleschotz.com

By: /s/ Luis Salazar
Luis Salazar (admitted FL, NY, NJ)
New York Bar No. 2574762

-and –

1325 Avenue of the Americas, 19th Floor
New York, NY 10019
Telephone: (212) 752-8000
Jacob Frumkin, Esq.
New York Bar No. 4800215
Email: jfrumkin@coleschotz.com
Arielle H. Wasserman
New York Bar No. 5657119
Email: awasserman@coleschotz.com

*Counsel to ZED AeroCapital LLC, Zander Futernick, Jim Iacono, and Gary Lesnik*

## CERTIFICATE OF SERVICE

I hereby certify that on this 2nd day of November, 2026, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I further certify that the foregoing document is being served this day on all counsel of record and interested parties identified on the attached Service List via CM/ECF, to those registered to receive Notices of Electronic Filing generated by CM/ECF.

*/s/ Luis Salazar*
Luis Salazar

## SERVICE LIST

VIA CM/ECF ONLY:

- **Michael Jason Barrie** mbarrie@beneschlaw.com, debankruptcy@beneschlaw.com;kcapuzzi@beneschlaw.com;lmolinaro@beneschlaw.com
- **Benjamin S. Kaminetzky** kaminet@dpw.com, ecf.ct.papers@davispolk.com
- **Amy Lee Nashon** anashon@troygould.com
- **Luis Salazar** lsalazar@coleschotz.com, aleesin@coleschotz.com;jceide@coleschotz.com;jcervera@coleschotz.com;dfernandez@coleschotz.com;cs-eservice-miami@coleschotz.com;luis-salazar-4791@ecf.pacerpro.com
- **Daniel Joseph Saval** daniel.saval@kobrekim.com
- **Marc Joseph Tobak** mtobak@dpw.com, purdue.bloyd.service@davispolk.com;ecf.ct.papers@davispolk.com
- **Abbey Walsh** abbey.walsh@beneschlaw.com, docket2@beneschlaw.com;lmolinaro@beneschlaw.com