AMY NASHON (SBN 316353)
Email: anashon@troygould.com
JENNIFER C. WANG (SBN 280560)
Email: jwang@troygould.com
TROYGOULD PC
1801 Century Park East, 16th Floor
Los Angeles, CA 90067-2367
Telephone: (310) 553-4441
Facsimile: (310) 201-4746

Attorneys for Defendant, Wikert Investments Company LLC

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------

| | |
|---|---|
| In re:<br><br>SPIRIT AVIATION HOLDINGS, INC., *et al.*[1]<br><br>Debtors | Case No.: 25-11897 (SHL)<br><br>Chapter 11<br><br>(Jointly Administered) |
| SPIRIT AIRLINES, LLC<br>Plaintiff<br>v.<br><br>CSDS ASSET MANAGEMENT LLC, ZED AEROCAPITAL LLC, WIKERT INVESTMENTS COMPANY LLC, SRIYANTHA BENEDICT SIRIMANNE, CHRISTOPHER KELLER, GERALD GLASS, JIM, IACONO, ZANDER FUTERNICK,AND GARY LESNICK<br>Defendants | Adversary Proceeding No.:26-01102 (SHL) |

------------------------------------------------------------

**DEFENDANT WIKERT INVESTMENTS COMPANY LLC'S EMERGENCY MOTION TO DISSOLVE THE TEMPORARY RESTRAINING ORDER**

[1] The Debtors' names and last four digits of their respective employer identification numbers are as follows: Spirit Aviation Holdings, Inc. (1797); Spirit Airlines, LLC (7023); Spirit Finance Cayman 1 Ltd. (7020); Spirit Finance Cayman 2 Ltd. (7362); Spirit IP Cayman Ltd. (4732); and Spirit Loyalty Cayman Ltd. (4752). The Debtors' mailing address is 1731 Radiant Drive, Dania Beach, FL 33004.

# TABLE OF CONTENTS

**Page**


I. FACTUAL BACKGROUND .......... 2

A. Wikert Investments Company LLC .......... 2

B. WIC's Loans to CSDS .......... 2

C. The Fallout from CSDS's Default .......... 4

D. The TRO .......... 5

II. LEGAL ARGUMENT .......... 7

A. Standard for Issuance of a TRO .......... 7

B. The TRO Should be Dissolved Because Spirit Is Not Entitled to Freeze WIC's Assets. .......... 8

C. The TRO Should Be Dissolved Because It Is Procedurally Defective. .......... 11

D. The TRO Should be Dissolved Because Spirit Cannot Establish Irreparable Harm. .......... 12

E. The TRO Should be Dissolved Because Spirit Cannot Establish a Likelihood of Success .......... 13

F. The Balance of Equities and Public Interest Favor WIC. .......... 15

G. Alternatively, the Court Should Modify the TRO .......... 16

H. If Any Restraint Remains, Spirit Must Post Security .......... 16

III. HEARING REQUESTED .......... 17

IV. CONCLUSION .......... 18

## TABLE OF AUTHORITIES

**Page(s)**

### Federal Cases


*Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Loc. No. 70*,
415 U.S. 423 (1974)....................8

*Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*,
527 U.S. 308 (1999)....................8, 9, 10

*Haggiag v. Brown*,
728 F. Supp. 286 (S.D.N.Y. 1990)....................16

*JSG Trading Corp. v. Tray-Wrap, Inc.*,
917 F.2d 75 (2d Cir. 1990)....................12

*Krys v. Pigott*,
749 F.3d 117 (2d Cir. 2014)....................13

*Leadenhall Cap. Partners, LLP v. Advantage Cap. Holdings LLC*,
171 F.4th 155 (2d Cir. 2026)....................8, 9, 10

*NML Cap., Ltd. v. Republic of Argentina*,
2016 WL 836773 (S.D.N.Y. Mar. 2, 2016)....................7

*Nokia Corp. v. InterDigital, Inc.*,
645 F.3d 553 (2d Cir. 2011)....................16

*In re Primera Energy, LLC*,
No. 15-51396-CAG, 2015 WL 6556887 (Bankr. W.D. Tex. Oct. 28, 2015)....................9

*Waldman Publ'g Corp. v. Landoll, Inc.*,
43 F.3d 775 (2d Cir. 1994)....................16

*Wexner v. First Manhattan Co.*,
902 F.2d 169 (2d Cir. 1990)....................14

*Winter v. Natural Res. Def. Council, Inc.*,
555 U.S. 7 (2008)....................7, 12


### State Cases


*Colavito v. N.Y. Organ Donor Network, Inc.*,
8 N.Y.3d 43 (2006)....................15

*Corsello v. Verizon N.Y., Inc.*,
18 N.Y.3d 777 (2012)....................15

## TABLE OF AUTHORITIES (cont.)

**Page(s)**

*Foster v. Churchill*,
87 N.Y.2d 744(1996) ....................14

*Georgia Malone & Co. v. Rieder*,
19 N.Y.3d 511 (2012) ....................15

*Lama Holding Co. v. Smith Barney Inc.*,
88 N.Y.2d 413 (1996) ....................14

*Mandarin Trading Ltd. v. Wildenstein*,
16 N.Y.3d 173 (2011) ....................15

*Metro. Bank & Tr. Co. v. Lopez*,
189 A.D.3d 443 (1st Dep't 2020) ....................15

*Susquehanna Sec., LLC v. John Does 1-100*,
2026 WL 2718826, (S.D.N.Y. Sept. 14, 2026) ....................12

*Thyroff v. Nationwide Mut. Ins. Co.*,
8 N.Y.3d 283 (2007) ....................15

*Unitel Telecard Distrib. Corp. v. Nunez*,
90 A.D.3d 568 (Ist Dep't 2011) ....................10

W*hite Plains Coat & Apron Co. v. Cintas Corp.*,
8 N.Y.3d 422 (2007) ....................14

**Other Authorities**

Bankruptcy Rule 7009 ....................14

Fed. R. Civ. P. 9(b) ....................14

Fed. R. Civ. P.  65 .................... *passim*

Federal Rule of Bankruptcy Procedure 7065 ....................2, 7, 17, 18

Pursuant to Federal Rule of Civil Procedure ("Rule") 65(b)(4), as made applicable by Federal Rule of Bankruptcy Procedure 7065, Defendant Wikert Investments Company LLC ("WIC") respectfully moves this Court to dissolve the Order entered on October 21, 2026 (the "Amended TRO") [ECF No. 15] granting Plaintiff Spirit Airlines, LLC ("Plaintiff" or "Spirit")'s Motion for an Order Amending and Clarifying the Temporary Restraining Order on Sources of Escrow Funds (the "Motion to Amend") [ECF No. 16], as it applies to WIC and its officers, agents, servants, employees, and attorneys. In the alternative, WIC respectfully requests that the Court clarify and modify the Amended TRO to ensure that it is construed as narrowly as possible based on the facts of this case and, to the extent any restraint remains, require Spirit to post appropriate security.

## I. <u>FACTUAL BACKGROUND</u>

### A. <u>Wikert Investments Company LLC</u>

1. WIC is an investment vehicle owned and managed by businessman James Wikert and was formed in 2010 to hold Mr. Wikert's investment in El Media Holdings, a media and digital signage company (Wikert Decl. ¶ 3). Until 2025, WIC engaged in no business activities, and it did not have an operating account until September 2026, and then opened one only to properly track payments and expenses relating to loans WIC had extended to CSDS over the past year (as described in more detail below) (*Id,* ¶4). The account has [redacted] (*Id,* ¶ 4).

2. James Wikert is a long-time aviation professional who has owned, operated and sold aircraft for decades and regularly invests in the business aviation industry (*Id,* ¶5).

### B. <u>WIC's Loans to CSDS</u>

3. Mr. Wikert came to know and engaged in several aviation transactions brokered by Benedict Siramanne of CSDS in recent years (*Id*, ¶5). Siramanne regularly sought financing from Mr. Wikert for aircraft purchases and, until recently, he promptly repaid the funds he had borrowed, with interest (*Id*, ¶6). As a guaranty against such loans, CSDS granted WIC a continuing security interest in a Boeing 737-400 registered to CSDS and bearing serial number [redacted] (*Id*).

4. For example, in July 2025, CSDS borrowed [redacted] from Mr. Wikert's aviation company, Red River Aircraft Leasing, toward the purchase of two Boeing [redacted]s, and those funds were wired directly to (ironically enough) Erin Van Lannen at McAfee & Taft, to remain in escrow until the Buyer substituted the funds with its own deposit (*Id,* ¶ 7). Indeed, once the funds were in place, the [redacted] lion was repaid to Red River with an additional [redacted] in interest (*Id*).

5. On January 12, 2026, CSDS requested a bridge loan of [redacted], to be repaid by February 27, 2026 with [redacted] in interest (*Id,* ¶8). This time, Mr. Wikert requested and received the extension of a line of credit from WIC's bank to extend the loan to CSDS (*Id*).

6. On February 10, 20206, CSDS sought another bridge loan from WIC for [redacted] (*Id,* ¶ 9). As with the 2025 loan, CSDS requested that the funds be transferred directly to the escrow account administered by Erin Van Laanen at McAfee & Taft, and held and applied to the deposit on Spirit's twenty Airbus aircraft until March 15, 2026 (*Id*). WIC again requested a line of credit from its bank and [redacted] was extended and wired from the line of credit to the escrow account (*Id*). Approximately two months later, McAfee & Taft wired the funds back to the bank, and the line of credit was closed (*Id,* ¶10). <u>WIC did not request, instruct or initiate the transfer from McAfee & Taft and does not know who did</u> (*Id*, ¶11). Rather, WIC assumed, as had happened in the past, that its funds had been replaced with the permanent financing necessary to complete CSDS's transaction (*Id*). In fact, WIC did not learn otherwise until it was served with the TRO in this matter (*Id*).

7. On or around July 23, 2026, CSDS again requested a bridge loan from WIC, this time for [redacted], in order to close on the purchase of the Spirit aircraft bearing registration number [redacted] (*Id*, ¶12). The funds were to be repaid to WIC by August 25, 2026 (although CSDS represented they would actually be repaid "within days") (*Id*). WIC agreed to extend the loan, subject to its bank's approval to issue another line of credit, and the bank agreed to do so with the aircraft pledged as collateral to WIC (and in the event of WIC's default, to the bank) (*Id*). The aircraft was so pledged, the [redacted] was paid to CSDS, and CSDS purchased the plane

from Spirit (*Id*, ¶13). However, CSDS did not repay the [redacted] to WIC prior to the closing of the aircraft purchase, so McAfee & Taft registered title to the aircraft in WIC's name (*Id*).

8. In describing the need for the above-referenced bridge financing, CSDS had informed WIC that [redacted] (*Id*, ¶14). Until this adversary proceeding was brought, at no time was WIC, Mr. Wikert or their lawyers aware of the Escrow Agreement, CSDS's Declaration to the Bankruptcy Court submitted on April 18, 2026, the Bankruptcy Court's Sale order of April 24, or any other term, order or obligation which required that the payment of funds to the escrow account and/or Spirit come only from CSDS, and not from any third-party or finance company (*Id*). To the contrary, based upon its previous experience and the information provided to it, WIC had no reason to believe that the financing of some or all of the transaction was prohibited by the Bankruptcy Court and CSDS's contractual obligations (*Id*).

**C. <u>The Fallout from CSDS's Default</u>**

9. After CSDS defaulted on the $[redacted], WIC continued to pursue Siramanne for the payments due, but despite his repeated promises, the funds were never repaid (*Id*, ¶16). Eventually, WIC engaged an aircraft broker to sell the Airbus (of which it was now the unhappy owner); however, [redacted] (*Id*). Then, on or about October 23, 2026, CSDS informed WIC that there was a TRO against the aircraft and it could not be sold without violating the court's order (*Id*, ¶17).

10. Mr. Wikert is now in the position of having to personally pay WIC's bank approximately [redacted]6 - but as of the date of the TRO, he is arguably prohibited from doing so (*Id*, ¶18). However, if he ceases making the payments, the bank will likely foreclose on the aircraft (*Id*).

11. WIC has also recently learned that CSDS is not making the payments to store, maintain and insure the aircraft, thereby diminishing the value of its (and the bank's) collateral -

but again, under the existing TRO, Mr. Wikert is arguably prevented from making those payments on WIC's behalf (and WIC does not have income or operating funds to pay those expenses itself) (*Id*, ¶19).

12. While Spirit has generously offered to allow WIC to pay the lienholder, and the storage, maintenance and insurance expenses of the aircraft (totaling several hundreds of thousands of dollars per month), it simultaneously refuses to recognize WIC's legal right and title to the aircraft and demands that the TRO remain in place so that the aircraft cannot be sold in order to mitigate WIC's damages.

13. Spirit can offer no legal, equitable or contractual basis for disputing WIC's ownership of the aircraft and WIC's right to sell it and pay off the bank loan. Spirit does not dispute that it was fully paid for the aircraft and that, in the Aircraft Purchase Agreement, it expressly disclaims any continuing interest, right, title or claim to the aircraft after receiving payment in full.

**D. <u>The TRO</u>**

14. Within twelve hours of finding out that there were no longer any funds in the McAfee & Taft escrow account, Spirit sought a TRO against WIC which is so sweeping in its overbreadth and the scope of its harm as to shock the conscience, and which in no way preserves the status quo that existed for the six months before it was issued, but instead wreaks havoc on the business and personal finances of dozens of people who have nothing to do with this dispute. By way of example, the undersigned – simply as an attorney for WIC – is prohibited by the express language of the TRO from transferring, withdrawing or moving any of *her* personal funds or assets. So are WIC's employees, agents and officers – none of whom have anything to do with CSDS, Spirit, or this dispute in any way. [Dkt. 15,¶ 4.] Spirit's counsel has acknowledged this overbreadth and has offered to redefine its terms, but even if it was more narrowly tailored as far as the individuals and entities that it restrains, it remains wholly inappropriate under the circumstances and should be dissolved in its entirety.

15. Spirit's TRO serves no legitimate purpose:

a. It does not maintain the status quo, which is that for seven months, the escrow account has had no funds available to pay Spirit for CSDS's default under the Aircraft Purchase Agreement. Of course, it is and remains CSDS's contractual responsibility to fund the escrow account, and no one else's – but that is not a fact Spirit is willing to acknowledge.

b. It does not preserve assets which Spirit may recover if it prevails; rather, it ensures that the aircraft which CSDS purchased from Spirit diminishes in value and is imminently foreclosed upon by the bank.

c. It does not secure the [redacted] that was transferred by McAfee & Taft out of escrow; that money is not in a deposit account, but was repaid to the bank in April and is not available to WIC, Spirit or anyone else.

16. Spirit's counsel performed no substantive investigation into the facts before seeking the TRO. Spirit did not even bother to reach out to WIC or its counsel to inquire about the facts or WIC's involvement before requesting the broadest, most damaging TRO it could come up with. And it remains completely unwilling to release the TRO now that it has been provided the facts and information showing that the TRO is wholly improper, preferring instead to continue weaponizing the TRO as an investigative tool and a means of bullying the parties into concessions to which Spirit is not entitled.

17. Most concerning in all of this is that the one party that Spirit did *not* sue and did *not* seek a TRO against is the one party that actually has the answers to most, if not all, of the questions Spirit continues to raise as "proof" of its continued need for a TRO. It was McAffee & Taft that had a duty to properly handle the escrow - and clearly did not do so. It is McAfee & Taft that can explain why it accepted funds from third-parties such as WIC in the first place, when the Escrow Agreement (which WIC only became aware of when it was filed by ZED's counsel on October 30, 2006) clearly states that "[a]ny funds wired to the Escrow Agent must come directly from [CSDS] and from an account held in the name of the Buyer (not a parent, subsidiary, related

company, officer or director)." It is McAfee & Taft that can explain who directed it to transfer $7 million back to WIC's line of credit in April 2026. It is McAfee & Taft that can explain what money replaced the [redacted], if any. It is McAfee & Taft that can explain why it so blatantly breached the Escrow Agreement and this Court's Sale Order (to which WIC is not a party). Yet, Spirit keeps protecting McAfee & Taft while going after fellow victims of CSDS – why?

18. At the end of the day, Spirit represented to this Court, in order to get its TRO, that it needed to know where the money from the escrow account went. It now has that information. The TRO is not necessary, and Spirit has no legal, equitable or contractual basis for demanding that it remain in place a day longer. Spirit must now, instead, try to prove the merits of its case against WIC (and those similarly situated) and it cannot do so.

## II. <u>LEGAL ARGUMENT</u>

### A. <u>Standard for Issuance of a TRO</u>

19. Federal Rule of Bankruptcy Procedure 7065 makes Rule 65 applicable in adversary proceedings. Under Rule 65(b)(4), a party subject to a temporary restraining order issued without notice may move to dissolve or modify the order on two days' notice, or on shorter notice set by the court. The court must then "hear and decide the motion as promptly as justice requires." Fed. R. Civ. P. 65(b)(4). A preliminary injunction "is an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). A federal court has "wide discretion" to vacate or modify injunctions. *NML Cap., Ltd. v. Republic of Argentina*, 2016 WL 836773, at *6 (S.D.N.Y. Mar. 2, 2016).

20. A plaintiff seeking a preliminary injunction "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20.

21. A court may issue a temporary restraining order without notice only if "specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition," and

the movant's attorney certifies in writing the reasons notice should not be required. Fed. R. Civ. P. 65(b)(1)(A)-(B). Such an order may last no more than 14 days unless the court extends it for good cause or the adverse party consents. Fed. R. Civ. P. 65(b)(2). *Ex parte* restraining orders "should be restricted to serving their underlying purpose of reserving the status quo and preventing irreparable harm," and should remain in effect only "just so long as is necessary to hold a hearing, and no longer." *Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Loc. No. 70*, 415 U.S. 423, 439 (1974).

22. Every restraining order must "state its terms specifically" and "describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." Fed. R. Civ. P. 65(d)(1)(B)-(C).

**B. <u>The TRO Should Be Dissolved Because Spirit Is Not Entitled to Freeze WIC's Assets.</u>**

23. WIC respectfully moves this Court for relief from the TRO that enjoins it from all economic activity because it places unwarranted, overbroad, and impermissible restraints on it and its assets (not to mention, those of its officers, agents, employees and attorneys), over which Spirit has no lien or other equitable claim.

24. In seeking this extraordinary relief, Spirit did not disclose controlling authority that constitutionally restricted the Court from entering the TRO. As the U.S. Supreme Court has long made clear, federal courts cannot issue a prejudgment freeze of assets where there is neither a lien against such assets or nor any equitable interest therein, and where such a freeze would serve only to secure a potential money judgment. *See, e.g., Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308 (1999); *Leadenhall Cap. Partners, LLP v. Advantage Cap. Holdings LLC*, 171 F.4th 155, 162 (2d Cir. 2026) (where creditor did not assert either a lien or equitable interest in assets, "the District Court abused its discretion in restraining Guarantors' assets").

25. *Grupo Mexicano* forecloses the restraint that Spirit invited the Court to implement in the TRO, and which it seeks to extend. Here, Spirit has not asserted that there is a lien relevant to WIC's property. Spirit seeks only monetary relief from WIC – without even proving that it is

entitled to that relief vis-a-vis CSDS and the Aircraft Purchase Agreement. Even if Spirit could prove every allegation against WIC, which it cannot, the Court's general equitable powers still would not permit it to freeze WIC's general assets merely to ensure payment of the resulting judgment.

26. In Gru*po Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc*., 527 U.S. 308, 333 (1999), the Supreme Court held that federal courts lack authority under Rule 65 to preliminarily enjoin a defendant from transferring assets in which the plaintiff claims no lien or equitable interest, merely to secure an eventual money judgment. In *Grupo Mexicano*, the district court had entered such an order after finding that the defendant was "at risk of insolvency if not already insolvent" and planned to use its only substantial asset to pay other creditors. *Id*. at 312. Even on those facts, the Supreme Court vacated the injunction, explaining that Rule 65 relief depends on traditional principles of equity jurisdiction and that courts of equity historically could not freeze assets in aid of a claim for legal damages. *Id*. at 318-19. In short, *Grupo Mexicano* "limited the availability of a preliminary injunction in federal court to freezing only those assets where a lien or equitable interest in the assets is claimed." *In re Primera Energy, LLC*, No. 15-51396-CAG, 2015 WL 6556887, at *3 (Bankr. W.D. Tex. Oct. 28, 2015).

27. *Grupo Mexicano* remains good law, and, in fact, the Second Circuit reaffirmed it this year in *Leadenhall Cap. Partners, LLP v. Advantage Cap. Holdings LLC*, 171 F.4th 155, 162 (2d Cir. 2026). There, the court vacated an asset freeze against defendant guarantors because the plaintiff lenders held only a contractual right against them and held neither a lien on nor an equitable interest in the guarantors' assets. *Id*. at 161-63. No equitable interest existed because the lenders (i) sought money damages reflecting only a general interest in compensation, and (ii) identified no property "belonging in good conscience to the plaintiff[s]" that could "clearly be traced to particular funds or property in the defendant[s"] possession." *Id.* at 163. The court also rejected the lenders" attempt to recast their claim as one for "specific performance," because the relief they sought amounted to "ensuring the legal debt can be paid" and thus created no cognizable equitable interest. *Id.* at 165.

28. As *Leadenhall* explained, "[t]he propriety of a preliminary injunction in relation to a court's equitable powers is determined by the nature of the final relief sought." *Id.* at 164 (emphasis omitted). Restitution, for example, is "not an exclusively equitable remedy"; it lies in equity only where "money or property identified as belonging in good conscience to the plaintiff could clearly be traced to particular funds or property in the defendant's possession." *Id.* at 165 (quoting *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 213, 215 (2002)). And "for restitution to lie in equity, the action generally must seek not to impose personal liability on the defendant, but to restore to the plaintiff particular funds or property in the defendant's possession." *Id.* (quoting *Knudson*, 534 U.S. at 214). A court may restrain fungible assets such as money without identifying particular property only "where the plaintiff is pursuing a claim for final equitable relief, and the preliminary injunction is ancillary to the final relief." *Id.* at 164.

29. Restraining WIC's assets serves only to secure a possible future money judgment—precisely what *Grupo Mexicano* forbids. And relabeling a damage claim as "unjust enrichment" or an "accounting" does not change that result. That rule is dispositive here. Spirit seeks only a money judgment from WIC, so it has no lien on, or equitable interest in, any asset it holds. (Am. Compl. ¶¶ 93, 99, 107, 113, 121-22, 128.)

30. The same analysis holds true regardless of whether the Court is analyzing Spirit's conversion, tortious interference, or aiding and abetting claims. Similarly, with respect to its request for an accounting, New York law grants an accounting only to a claimant who "has no adequate remedy at law," *Unitel Telecard Distrib. Corp. v. Nunez*, 90 A.D.3d 568 (Ist Dep't 2011), which Spirit has failed to show.

31. Every one of the events at issue took place between February and April, 2026, openly, by traceable wire, under written contracts to which Spirit was not a party, and with the full knowledge and participation of Spirit's agents at McAfee & Taft. All of it preceded Mr. Sirimanne's April 20 declaration that Spirit says deceived it, the April 24 HFS Sale Order, any alleged Buyer default (between July and October, 2026), and, of course, Spirit's October 14, 2026 TRO Application.

32. The wrongdoers, here, are CSDS, Mr. Sirimanne and McAfee & Taft. Fault does not lie with third-party WIC, which never contracted with Spirit, and which has been left holding an aircraft like an albatross around its neck.

**C. <u>The TRO Should Be Dissolved Because It Is Procedurally Defective.</u>**

33. Spirit failed to comply with the requirements of Federal Rule of Civil Procedure 65 for TROs sought without notice and Spirit failed to attest in an affidavit or verified complaint why notice should not be required.

34. Civil Rule 65(b)(1) permits a court to issue a temporary restraining order without notice "only if" two conditions are satisfied: (A) "specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition"; and (B) "the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required." Both are mandatory, which Spirit acknowledges in its moving papers. Yet, neither was satisfied here as to WIC.

35. The Amended Adversary Complaint is unverified and silent as to any "immediate and irreparable injury, loss, or damage" that would inure to Spirit before WIC could be heard. And, whatever Spirit claims, there is no Rule 65(b)(1)(B) certification. The Tobak Declarations authenticate documents produced by the Escrow Agent. They do not certify any effort to notify WIC of Spirit's attempt to move *ex parte* for a TRO, and they do not explain why notice "should not be required." The Ball Declaration addresses notice to CSDS, not Wikert. That omission is not ministerial; it alone requires dissolution.

36. The urgency underlying the requested TRO without notice was manufactured. The conduct Spirit complains of occurred six months earlier, and in the open: Fedwire transfers, with Fed reference numbers, to accounts disclosed in writing to Spirit's own escrow agent. A party that takes its money by traceable wire to an account it disclosed in advance is not a party that secrets assets on receipt of notice.

37. In addition, Federal Rule of Civil Procedure 65 provides that "[e]very temporary restraining order issued without notice must … describe the injury and state why it is irreparable; state why the order was issued without notice…." Fed. R. Civ. Proc. 65(b)(2). The TRO does neither as to WIC. It makes no finding indicating that WIC is dissipating assets or is insolvent, or that irreparable harm is "likely" in the absence of an injunction (*Winter*, 555 U.S. at 22), and instead recognizes the mere possibility that transfers "may" frustrate the Court's ability to enforce its prior orders. [Dkt. 15, p. 2.]

**D. <u>The TRO Should be Dissolved Because Spirit Cannot Establish Irreparable Harm.</u>**

38. Spirit cannot establish irreparable harm from a conventional claim for monetary relief. *See Susquehanna Sec., LLC v. John Does 1-100*, No. 26-cv- 5474 (AS), 2026 WL 2718826, at *4 (S.D.N.Y. Sept. 14, 2026) ("*Susquehanna*") (denying preliminary injunction and attachment because a chance that funds might be dissipated is not a clear showing of irreparable harm). As this Court has already recognized, TROs are disfavored when the harm is not ongoing, and the damage can be satisfied by a money judgment.

39. "Irreparable injury is one that cannot be redressed through a monetary award." *JSG Trading Corp. v. Tray-Wrap, Inc.*, 917 F.2d 75, 79 (2d Cir. 1990). Injunctive relief is unavailable "[w]here money damages are adequate compensation." *Id.* Spirit must "demonstrate that irreparable injury is likely in the absence of an injunction"; the mere possibility of harm falls short of the requisite standard. *Winter*, 555 U.S. at 22. Spirit's alleged injury is the financial loss —$ —cau[redacted]ged breaches of the APA and the loss of the Escrow Funds as a means of compensation for the alleged defaults. If Spirit prevails, a money judgment would fully redress that injury, making it reparable.

40. Moreover, Spirit does not allege that money damages would be inadequate compensation. It alleges that the harm it would suffer without the Amended TRO is that "Additional Parties may well attempt further actions to place assets outside of the Debtors' reach," and that it would "be irreparably harmed if not permitted to proceed on an emergency basis and ex

parte." (Am. TRO 91 7, 37.) Plaintiff offers no case law or other authority to support either of these claimed damages as "irreparable harm."

**E. The TRO Should be Dissolved Because Spirit Cannot Establish a Likelihood of Success.**

41. Far from establishing the requisite "likelihood of success," Spirit offers only the barest of allegations against WIC, based on speculation alone. Spirit does not allege that WIC reviewed, had access to, or knew the terms of the Escrow Agreement when it provided the $7 million bridge loan in February of 2026. Spirit does not allege that WIC personally withdrew or even requested the withdrawal of the [redacted] in April 2026. Spirit does not allege that WIC owed a duty to Spirit or how it may have breached that duty. Spirit does not allege that WIC made false representations to Spirit, or concealed material facts from Spirit, or that WIC ever communicated with Spirit *at all*. In other words, Spirit got a TRO first and asked questions later – and now, it is ignoring the answers because they do not support its trumpedup theory of liability.

42. Specifically, Spirit fails to establish a likelihood of success as to any of the causes of action it purports to plead against WIC as follows:

43. **Aiding and Abetting Fraud.** Aiding and abetting fraud under New York law requires an underlying fraud, the defendant's knowledge of it, and substantial assistance in its commission. *See Krys v. Pigott*, 749 F.3d 117, 127-28 (2d Cir. 2014). The knowledge must be actual. *See id.* at 127. Spirit pleads in the alternative that WIC "knew or had reason to know" that the Sale Motion rested on a declaration that did not disclose WIC's role (Am. Compl. ¶ 139). But "had reason to know" describes constructive knowledge, which does not suffice. *Krys*, 749 F.3d at 127. The only fact Spirit offers for "actual knowledge" as to WIC is that it "knew that the $[redacted] it transferred to the Escrow Agency … was made in connection with the transaction." (*Id.* ¶ 139). Even if true, this says nothing about whether WIC had any knowledge that it should not extend bridge financing to the escrow company, nor about whether WIC had any intent to defraud Spirit or the Court.

44. The underlying fraud, as Spirit tells it, is Mr. Sirimanne's April 20, 2026, Declaration. (ECF NO. 16, ¶¶ 21-25.) Spirit does not allege that WIC wrote or read or even knew of that declaration's existence, or that WIC knew of the Escrow Agreement and what it required, which begs the question how any conduct of WIC could have provided "substantial assistance." It alleges only that WIC "knew or had reason to know" that the Sale Motion rested on a declaration that did not disclose WIC's role and was not served upon him (Am. Compl. ¶ 139). A fraud-based claim pleaded on information and belief must "adduce specific facts supporting a strong inference of fraud." *Wexner v. First Manhattan Co*., 902 F.2d 169, 172 (2d Cir. 1990); *see also* Fed. R. Civ. P. 9(b), as applied by Bankruptcy Rule 7009.

45. Spirit also alleges that the participants concealed WIC's role from the Debtors. (Am. Compl. ¶ 140(d).) Yet WIC's role was obvious, blatant, and documented, and communicated clearly to the Escrow Agent, McAfee & Taft, which is Spirit's agent. If anything, this is the opposite of concealment.

46. **Tortious Interference with Contract**. Tortious interference requires a valid contract, the defendant's knowledge of it, intentional procurement of its breach without justification, actual breach, and damages. *Lama Holding Co. v. Smith Barney Inc*., 88 N.Y.2d 413, 424 (1996). Where the defendant acts to protect its own legal or financial interest, the economic-interest defense defeats the claim. W*hite Plains Coat & Apron Co. v. Cintas Corp.*, 8 N.Y.3d 422, 426 (2007); *Foster v. Churchill*, 87 N.Y.2d 744 (1996).

47. Spirit alleges that, by removing funds on which CSDS's performance depended, WIC deprived CSDS of the means to close on the aircraft and honor its obligations with respect to the escrow funds. (Am. Compl. ¶ 132.) This whole theory ignores the truth of the matter which is that the funds were never CSDS's to pay to Spirit—WIC's $[redacted]dge financing which was always intended to be returned directly to WIC. A lender collecting a matured loan that was in default, under the express terms of its own contract, is the paradigm of justification. No economic interest is more legitimate than recovering one's own principal.

48. **Conversion**. Conversion requires that the plaintiff have ownership or a superior possessory right in a specific, identifiable thing, and that the defendant exercise unauthorized dominion over it. *Thyroff v. Nationwide Mut. Ins. Co*., 8 N.Y.3d 283 (2007); *Colavito v. N.Y. Organ Donor Network, Inc*., 8 N.Y.3d 43, 50 (2006). Spirit never owned the [redacted]. WIC deposited it. It was bridge financing only, and was always intended to be returned to WIC. WICwas repaid its $[redacted], and not at its own direction. Exercising dominion over one's own property is the antithesis of conversion.

49. **Unjust Enrichment (Fourth Claim).** Unjust enrichment requires the defendant to have been enriched at the plaintiff's expense, such that equity and good conscience require restitution. *Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 182 (2011); *Georgia Malone & Co. v. Rieder*, 19 N.Y.3d 511, 516–17 (2012). The relationship between the parties cannot be "too attenuated." *Mandarin Trading Ltd.,* 16 N.Y.3d at 181. It is "not a catchall cause of action to be used when others fail." *Corsello v. Verizon N.Y., Inc*., 18 N.Y.3d 777, 790 (2012). WIC was not enriched—it merely received return of its own capital, without the promised interest. Moreover, WIC never had any sort of contractual relationship with Spirit or any other interaction, rendering the relationship between the parties attenuated.

50. **Accounting**. An equitable accounting requires a fiduciary or confidential relationship between the parties and a duty to account. *See Metro. Bank & Tr. Co. v. Lopez*, 189 A.D.3d 443, 446 (1st Dep't 2020). No such relationship exists between Spirit and Wikert. They are strangers to one another. Furthermore, there is no "absence of a legal remedy here"—Spirit is asking for money damages, a quintessential legal remedy. For these reasons alone, any accounting claim by Spirit against WIC fails.

**F. The Balance of Equities and Public Interest Favor WIC.**

51. The hardships fall entirely on WIC. The TRO freezes every asset of a private company and its officers, employees, agents and even attorneys, with no cap on the amount in dispute and no carve-out for operations, taxes, payroll, living expenses, or attorneys' fees. It also prevents WIC from moving, hypothecating, and even relocating the aircraft that it acquired as

collateral for its unpaid loan. WIC's bank is threatening to foreclose, and the aircraft itself will become worthless if WIC is unable to pay to store it properly and transport it so necessary maintenance can be performed. (Wikert Decl., ¶¶ 19.)

### G. Alternatively, the Court Should Modify the TRO

52. If the Court maintains any restraint, it should modify the TRO so that WIC can move, relocate, hypothecate, or sell the aircraft. It is undisputed that Spirit obtained the full purchase price for the aircraft. It is also undisputed that title is in WIC's name. There is no language in the APA providing that Spirit may assert a lien or any equitable interest over the aircraft. WIC needs Court authorization to sell the aircraft so that it can repay the line of credit to its bank and mitigate its damages.

53. Injunctive relief "should be narrowly tailored to fit specific legal violations" and "should not impose unnecessary burdens on lawful activity." *Waldman Publ'g Corp. v. Landoll, Inc.*, 43 F.3d 775, 785 (2d Cir. 1994) (abrogated on other grounds). An order that freezes a defendant's operating businesses is not tailored. *See Haggiag v. Brown*, 728 F. Supp. 286, 291 (S.D.N.Y. 1990) (freezing assets would "in effect, freeze the operations" of the business and prevent payment of bills and salaries).

54. Spirit suffers no cognizable harm from such a modification. If WIC is unable to sell the aircraft, it risks having the bank foreclose the aircraft, which will permanently remove it from Spirit's grasp. If the Court requires further protection for Spirit, it can require reporting of transactions outside the ordinary course above a threshold the Court sets.

### H. If Any Restraint Remains, Spirit Must Post Security

55. Rule 65(c) permits a restraining order "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). Security "assures the enjoined party that it may readily collect damages from the funds posted," *Nokia Corp. v. InterDigital, Inc.*, 645 F.3d 553, 557 (2d Cir. 2011), and the amount of the bond marks the limit of what the enjoined party can later recover. *See id.* at 557, 559.

56. Although Spirit asks the Court to excuse it from security because Rule 7065 allows relief on a debtor's application, the exemption is discretionary, and Spirit has given the Court no reason to exercise that discretion in its favor.

57. The decision Spirit cites, *In re Lyondell Chem. Co*., is not to the contrary: the court exercised its discretion to forego a bond there because it found only a remote possibility that the enjoined parties would suffer injury needing protection. 402 B.R. 571, 595 (Bankr. S.D.N.Y. 2009). Here the injury is not remote. WIC faces foreclosure of the aircraft by Amarillo Bank as well as the loss of its ability to operate. (Wikert Decl. ¶ 18.) Spirit is a Chapter 11 debtor, and without security WIC has no assurance of a source of recovery if the restraint proves wrongful. An order which restrains every asset of a business as well as a multi-million-dollar aircraft which is subject to foreclosure warrants a substantial security. If the Court is inclined to continue any aspect of the current TRO as it relates to WIC, it will be prepared to promptly supplement the record with specific facts to facilitate the Court's ability to set the bond at an appropriate amount to address the harm he may suffer.

## III. <u>HEARING REQUESTED</u>

58. Spirit obtained the TRO without notice to WIC. (Amended TRO at 2.) Rule 65(b)(4) provides that, "[o]n 2 days' notice to the party who obtained the order without notice—or on shorter notice set by the court—the adverse party may appear and move to dissolve or modify the order," and that "[t]he court must then hear and decide the motion as promptly as justice requires." Fed. R. Civ. P. 65(b)(4), made applicable by Fed. R. Bankr. P. 7065. The TRO says the same. (Amended TRO ¶ 8.)

59. WIC is serving this Motion on Spirit on Wednesday, November 4, 2026, through its counsel by email. Spirit's motion to extend is set for hearing on Thursday, Novembre 5, 2026. WIC asks the Court to hear and decide this Motion on that day, or at the Court's earliest availability, as promptly as justice requires. The request does not depend on the further hearing that the TRO sets for November 4, 2026; Rule 65(b)(4) entitles WIC to be heard on shortened

notice whatever other hearing is scheduled. The harm is occurring now: WIC cannot meet its obligations, and the bank is threatening to foreclose at any time. (Wikert Decl. ¶18)

## IV. CONCLUSION

WHEREFORE, WIC respectfully requests that the Court enter an order (i) granting the Motion and dissolving the TRO [Adv. ECF No. 15] in its entirety as to WIC (ii) denying the Extension Motion [Adv. ECF No. 44] as to WIC; (iii) in the alternative only, modifying any continued restraint and requiring Spirit to post security under Federal Rule of Civil Procedure 65(c), made applicable by Federal Rule of Bankruptcy Procedure 7065; and (iv) granting such other and further relief as the Court deems just and proper.

Dated: November 4, 2026
Charlotte, North Carolina

Bar No. 316353 (*pro hac vice* pending)
1801 Century Park, 16th Floor
Los Angeles, California 90067
E-mail address: anashon@troygould.com
Telephone number: 310-789-1245
Counsel for Defendant Wikert Investments Company LLC